## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Pro Slab, Inc., | No. 2:17-cv-03185-DCN |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| Argos North America Corp. f/k/a Argos USA Corp.; Argos Ready-mix, LLC; Elite Concrete LLC; Elite Concrete Holdings, LLC; Elite Concrete of SC, LLC; Thomas Concrete, Inc.; Thomas Concrete of Georgia, Inc.; Thomas Concrete of South Carolina; Inc.; Coastal Concrete Southeast II LLC; Evans Concrete Holdings Inc.; Evans Concrete, LLC; Cemex, Inc.; Cemex Materials, LLC; Cemex Southeast, LLC; and Holcim (US) Inc. | |
| Defendants. | |

## <u>NATURE OF THE CASE</u>

1.     This is a class action under Section 1 of the Sherman Act for Defendants' price fixing in the ready-mix concrete market.

2.     Plaintiff brings this lawsuit as a class action on behalf of all individuals and entities that purchased ready-mix concrete in coastal South Carolina and Georgia (also described as Savannah, Statesboro, Hilton Head/Bluffton, and Charleston) from Defendants from at least January 1, 2012, through the present (the "Class Period").

3.     Plaintiff alleges that during the Class Period, Defendants conspired to fix, raise, maintain, or stabilize prices for ready-mix concrete.

4.     Because of Defendants' conspiracy, Plaintiff and the other class members paid more for ready-mix concrete than they would have absent Defendants' conspiracy.

5.      Through their conspiracy, Defendants manipulated the ready-mix concrete market. Their conspiracy allocated customers, rigged bids, and engaged in group boycotts of nonparticipating competitors, all to fix, raise, and stabilize the price of ready-mix concrete.

6.      Since at least January 1, 2012, Defendants have conspired to fix ready-mix concrete prices by agreeing to periodic coordinated price increases that Defendants typically explained in price increase letters to customers as arising from increased material and distribution costs.

7.      Since at least January 1, 2012, the ready-mix concrete cartel has sought to corner the market for ready-mix used in residential, commercial, and infrastructure projects. Each time a new rival enters the market, the existing suppliers either convince the new entrant to join the ready-mix concrete cartel, or Defendants run the new rival out of business through predatory collusion and other exclusionary acts.

8.      Portland cement is an essential ingredient of ready-mix concrete and is key to the ready-mix concrete cartel's scheme.

9.      Argos abuses its dominant and cartel position in the Portland cement market (the central ingredient in ready-mix concrete) to assist Defendants' ready-mix concrete cartel by providing intelligence and offering rebates to firms that are part of the ready-mix concrete cartel in Defendants' coordinated effort to predatorily price the nonparticipating Portland cement firms out of the market.

10.     Through its actions in the ready-mix concrete cartel, Argos assures that downstream its members become loyal Portland cement customers upstream, where Argos can maximize its profits. By vanquishing Portland cement competition through predatory

conduct in the Portland cement market, the ready-mix concrete cartel can raise and fix ready-mix concrete prices above competitive levels.

11.    The ready-mix concrete business requires substantial capital and cash flow. New entrants face a steep uphill battle in dealing with the entrenched cartel. New entrants almost invariably go out of business because of the cartel's anticompetitive conduct.

12.    Afterward, the cartel resumes its supracompetitive price-fixing scheme. Ultimately ready-mix concrete consumers like Plaintiff suffer damages through overcharges.

## JURISDICTION AND VENUE

13.    Plaintiff brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover damages and costs of suit, including reasonable attorneys' fees, as the result of Defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.    This Court has original federal question jurisdiction over Plaintiffs' Sherman Act claim under 28 U.S.C. §§ 1331 and 1337 and under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

15.    Venue is proper in this district under Sections 4(a) and 12 of the Clayton Act, 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside, transact business, are found within, or have agents within this district. Plus, a substantial part of the events giving rise to Plaintiff's claims occurred in this district, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

16.    This Court has personal jurisdiction over Defendants because each Defendant (a) transacted business in this district; (b) sold or delivered ready-mix concrete in this district; (c) has substantial aggregate contacts with this district; and (d) engaged in a price-fixing, bid-rigging

and customer and market allocation conspiracy that was directed at and had the intended effect of causing injury to people and entities residing in, located in, or doing business in this district.

## PARTIES

17.    Plaintiff, Pro Slab, Inc., is a ready-mix concrete purchaser that provides concrete for residential and commercial projects in coastal South Carolina and Georgia. Plaintiff purchased ready-mix concrete directly from one or more of the Defendants during the Class Period.

### *Argos Defendants*

18.    Defendants Argos North American Corporation and Argo Ready-Mix LLC (collectively "Argos") are U.S. subsidiaries of the Columbian company Cementos Argos, headquartered in Alpharetta, Georgia. Argos Ready-mix is a mere alter ego of Argos North America Corp. Argos Ready-mix is not an independent center of decision-making.

19.    Argos manufactures Portland cement, cement products, concrete and landscape blocks, and rebar for use in commercial, residential, and public works projects. Argos's operations began in January 2005, after Cementos Argos' acquisition of American companies Southern Star and Concrete Express. Several other acquisitions followed.

20.    In 2006, Argos became the sixth largest concrete producer in the U.S.[1]

21.    In 2011, Argos purchased $760 million worth of machinery and equipment from Lafarge's (now LafargeHolcim) Alabama, South Carolina, and Georgia plants.[2]

---

[1] "History." Argos U.S. website (2017).
[2] Cementos Argos Corporate Presentation, November 2011, p. 7.; Argos Press Release (May 2011).

22.    One Bancolombia analyst commented that the purchase "complement[ed] perfectly [Argos'] ready mix business [and achieved] a vertical integration that [would] undoubtedly improve profit margins in the medium term."[3]

23.    In 2014, Argos purchased Vulcan Materials Company's Florida cement and concrete business for $720 million.[4]

24.    In 2015, Argos was the second-largest ready-mix concrete producer in the U.S, with approximately 390 plants and 2,800 mixers.[5]

25.    Argos operates in coastal South Carolina and Georgia, as well as in Alabama, Arkansas, Florida, Mississippi, North Carolina, Texas, and Virginia.

**Elite Defendants**

26.    Defendants Elite Concrete LLC, Elite Concrete Holdings LLC, and Elite Concrete of South Carolina LLC (collectively "Elite") are subsidiaries of Elite Concrete, headquartered in Bloomingdale, GA.

27.    Elite is a wholesale distributor of stone, cement, lime construction sand, gravel, and other concrete materials.

28.    Elite currently maintains four separate concrete plants located in Bloomingdale, GA, Hinesville, GA, Hardeeville, SC, and Richmond, GA.[6] The plants service the Savannah and Hilton Head markets.

---

[3] "Colombia: Cementos Argos bets on US Housing." September 23, 2013; *Financial Times* (2017).
[4] Chelsea Naso, "Vulcan Reaps $720M in Sale of Cement, Concrete Business," January 23, Law360 (2014).
[5] Cementos Argos Corporate Presentation (2015) pp. 3, 9.
[6] *See* "Coverage Area" page of Elite's website available at: http://eliteconcrete.biz/coverage-area/.

29.     The Elite companies work together and participate in the market as a single independent center of decision-making.

### Thomas Concrete Defendants

30.     Defendants Thomas Concrete Inc., Thomas Concrete of Georgia Inc., Thomas Concrete of South Carolina Inc., and Coastal Concrete Southeast II LLC (collectively "Thomas Concrete") are subsidiaries of the Swedish company Thomas Concrete Group.

31.     The Thomas companies work together and participate in the market as a single independent center of decision-making.

32.     Thomas Concrete's U.S. regional headquarters is in Atlanta, Georgia.

33.     Thomas Concrete distributes ready-mix concrete and aggregates throughout coastal South Carolina and Georgia, as well as North Carolina.

34.     In June 2013 Thomas Concrete took over the South Carolina plant Gree & Gaffney from Holcim (now LafargeHolcim).

35.     In May 2015, Thomas Concrete acquired Coastal Concrete Company, Inc., a Pooler, Georgia-based ready-mix concrete supplier that provides concrete for residential and commercial projects in coastal South Carolina and Georgia.

### Evans Concrete Defendants

36.     Defendants Evans Concrete Holdings Inc. and Evans Concrete LLC (collectively "Evans") are subsidiaries of Evans Concrete, which maintains headquarters in Claxon, Georgia.

37.     The Evans companies work together and participate in the market as a single independent center of decision-making.

38.     Founded in 1948, Evans runs twelve plants across Georgia, two of which operate in the Savannah and Statesboro regions.

39.     Evans Concrete's estimated annual revenue is $21.8 million.[7]

*Cemex Defendants*

40.     Defendants Cemex, Inc., Cemex Materials, LLC, and Cemex Southeast, LLC are U.S. subsidiaries of international cement supplier Cemex S.A.B. de C.V. doing business as Cemex or Cemex USA.

41.     The Cemex companies work together and participate in the market as a single independent center of decision-making.

*Defendant Holcim*

42.     Defendant Holcim (US), Inc. is the U.S. subsidiary of an international cement supplier.

43.     In 2015, Holcim parent company, Holcim Ltd., and another international cement supplier, Lafarge, merged to become LafargeHolcim, which claims to be the largest manufacturer of building materials in the world.

44.     Defendants and their employees and agents and unnamed co-conspirators participated personally in the unlawful conduct alleged here and, to the extent they did not personally participate, they authorized, acquiesced, or set in motion the acts alleged here, or they failed to take necessary steps to prevent the alleged facts from occurring.

---

[7] Evans Concrete LLC. Manta. 2017. Web

## THE READY-MIX CONCRETE MANUFACTURING PROCESS

45.    Ready-mix concrete is a heterogenous mixture of Portland cement[8] and a selection of aggregates.[9]

46.    Ready-mix concrete is used almost entirely in the construction industry in the building of highways, bridges, damns, buildings, airports, sewer systems, home foundations, driveways, and sidewalks.[10]

47.    The purpose of ready-mix concrete is to provide a precise, quality-controlled mixture that is ready to be placed, molded, and formed when it arrives on site.

48.    The production, delivery, use, and characteristics of ready-mix concrete are subject to well-established industry and governmental standards, including those published by ASTM International, American Concrete Institute, and other state and federal transportation agencies that ensure the consistency and uniformity of ready-mix.

49.    As noted in LafargeHolcim's 2016 annual report, "[b]uyers of ready-mix concrete are typically construction and public works contractors, ranging from major multinational corporations to small- scale customers."[11]

---

[8] Portland cement is a specific type of cement, comprised of 85 percent lime and silica, 15 percent alumina, iron oxide, gypsum, and/or limestone. All of Portland cement's components are readily found around the globe. See "Composition of Portland Cement," The Constructor, 2017. Available at: https://theconstructor.org/building/composition-of-Portland-cement/5725/.

[9] Concrete aggregates may include sand, gravel, or crushed stone. High quality aggregates are weather-resistant, hard, and non-absorptive. The size of the aggregate, ranging from fine to coarse, is determined by the purpose and desired thickness of the end product. Aggregates cannot be larger than three-quarters of the clear spacing between rebar, one-third the depth of the slab, and one-fifth the narrowest dimension of a member. *See* Seegebrecht, George. "The Role of Aggregate in Concrete." Concrete Network (2017).

[10] "Ready-Mixed Concrete." Vulcan Materials. (2017).

[11] LafargeHolcim Annual Report 2016, p. 15.

50.     Unlike other cement products, ready-mix concrete is not mixed on-site. It is blended at the plant or during transport in the revolving drum of a concrete mixing truck.

51.     Due to its higher average product quality, more accurate on-site product placement, and lower cost, ready-mix concrete is the preferred concrete choice in many projects.[12] Due to its lack of on-site spatial requirements and high level of product uniformity, it is often the necessary choice.

52.     All concrete is produced through hydration, a chemical process by which cement is molecularly bonded to water.

53.     Hydration begins when drinking water is added to a mixture of aggregates and cement. Nodes form on the surface of individual cement particles. The nodes expand until they combine with other nodes or adhere to other aggregates.

54.     Ready-mix concrete begins to harden immediately after the water is added to the mixture, and it sets just one hour after hydration commences.[13]

55.     In the hour before near solidification, ready-mix concrete is plastic and is spread and shaped. Ready-mix concrete must be correctly consolidated during this time to minimize the likelihood of flaws.

56.     Once ready-mix concrete has set enough to be resist marring, it may undergo a curing process.

57.     Ready-mix concrete becomes stronger the longer it remains wet. This "rehydration" process results in a more durable end-product.

---

[12] "Why Use Ready Mixed Concrete?" Concrete Construction (2017).
[13] Collard-Wexler, Allan. "Plant Turnover and Demand Fluctuations in the Ready-Mix Concrete Industry." p. 2. Nov. 2005. Center for Economic Studies. US Census Bureau (2017) (hereafter Collard-Wexler).

58.    Setting and strengthening continue microscopically for several years.[14]

59.    While the quality of the input materials plays a role in determining the quality of ready-mix concrete product, ready-mix concrete quality's principal factor is the ratio of the mixture's components as measured by volume.

60.    Ready-mix concrete's quality may be increased by reducing the water-to-cement ratio to as small as possible, without sacrificing the workability of the concrete.

61.    Mixtures are typically 10 to 15 percent cement, 60 to 75 percent aggregate, and 15 to 20 percent water. Entrained air may compromise 5 to 8 percent.

62.    To demonstrate this production process, Figure 1 displays a ready-mix concrete plant:

**Figure 1: The Ready-Mix Plant**
(Source: TheConstructor.org)



A  Aggregate delivery
B  Aggregate receiving hopper
C  Aggregate storage
D  Conveyor belt
E  Cementitious material storage
F  Weigh hopper
G  Cement delivery
H  Mixer

I  Admixtures
J  Ready mix truck with returned concrete
K  Recycled water
L  Reclaimed aggregates
M  Pump
N  Water storage
O  Concrete loaded in ready-mix truck
P  Control room

---

[14] "How Concrete is Made," Portland Cement Association (2017). (hereafter "How Concrete is Made"). Available at: http://www.cement.org/cement-concrete-applications/how-concrete-is-made.

63.      Aggregates are transported onto the site by truck or ship (A). Once the aggregates are put onto the receiving hopper (B), they are transported via conveyor belt into a materials storage bin. When a concrete order must be filled, aggregates fall into a weigh hopper (F) that accurately measures the volume of aggregate that must be transferred to the mixer (H). There, the aggregates combine with cementitious materials that come through a separate weigh hopper. Admixtures are incorporated, if desired. Water is pumped in, and the mixer combines the blend before being loaded into a ready-mix truck (O) and transported to the job site. Upon return, the truck empties leftover concrete into a water separator (K). An Archimedes screw filters the remaining aggregate into a pile for reuse.

64.      Recent technological advances, such as automated batching systems, have standardized the quality and service of supplier output.

65.      Batching is the process of weighing and mixing together concrete components before hydrolyzation. An automated batching system electronically measures the correct amount of each material, allowing for a more uniform product.

66.      Admixtures, which are additional chemical ingredients, affect concrete's workability, color, drying time, and porosity. Though admixtures allow specialization of the concrete output, all ready-mix concrete producers can easily offer add-ins.

67.      Logistical improvements have centralized concrete operations. Ready-mix concrete suppliers now typically own several plants in a region and coordinate deliveries among plants. This managerial method increases supplier productivity by consolidating overhead and increasing resource use efficiency.[15]

---

[15] Syverson, Chad. "Markets: Ready-Mixed Concrete." *Journal of Economic Perspectives*. p. 6 (Winter 2008) (hereafter "Syverson").

68.    Ready-mix concrete may be transit-mixed, shrink-mixed, or central-mixed.[16] Transit-mixed ready-mix concrete, also referred to as "truck-mixed" or "dry-batched," is created by placing dry concrete components into a truck drum and immediately adding most or all the water. The mixing drum is turned quickly, at a speed of 12–15 rpm, if the concrete is intended to finish mixing on-site. It is mixed slowly, at a speed of 8 rpm, if the concrete is intended to be fully mixed while in transit.

69.    Shrink-mixed ready-mix concrete is partially mixed at the plant before being poured into the truck drum.

70.    Central-mixed ready-mix concrete is fully mixed at the plant before being poured into the truck drum. Central-mixed ready-mix concrete is advantageous because of faster batching and reduced truck wear.[17] Twenty percent of U.S. ready-mix concrete plants operate with a central mixer.[18]

71.    To keep the concrete from becoming too stiff before reaching its destination, shrink-mixed or central-mixed ready-mix concrete is agitated in the truck during transport through a few slow revolutions of the drum.

72.    Plants specializing in ready-mix concrete tend not to produce other types of concrete or concrete-based products. Ninety-five percent of the output value of ready-mix concrete plants is from ready-mix concrete.[19]

---

[16] Ready-Mixed Concrete. Portland Cement Association (2017).
[17] Concrete Alberta website.
[18] "Central vs Dry Mix Concrete Plants—a Discussion" (2014). OCMER North America (2017).
[19] Collard-Wexler.

## READY-MIX CONCRETE DEMAND AND MARKET SIZE

73.     The estimated value of the U.S. ready-mix concrete industry in 2017 is $35 billion.[20] Ready-mix concrete accounts for 75 percent of the total cement shipped in the U.S.[21]

74.     According to the Bureau of Economic Analysis' Benchmark Input-Output Tables, the construction sector purchases 94 percent of the ready-mix output.[22] Thus, growth in the ready-mix concrete industry can be expected to closely follow construction market growth.

75.     Annual employment data from the Bureau of Labor Statistics reveal a simple correlation of 0.9 between employment growth rates in the ready-mix concrete market and those of the construction industry.[23]

76.     Demand for ready-mix concrete is divided relatively evenly among residential, commercial, infrastructural, and industrial use. Figure 2 displays global ready-mix concrete market volume by application:

---

[20] "Ready Mixed Concrete Production Statistics." National Ready Mixed Concrete Association. 2017 (hereafter "Ready Mixed Concrete Production Statistics").
[21] Ready Mixed Concrete production statistics.
[22] 2002 Use Tables—Input-Output Accounts Data. Bureau of Economic Analysis. 2017. Web.
[23] Syverson.



**Figure 2: Global Ready-Mix Concrete Market Volume by Application, 2013 – 2024 (in Metric Tons)**

Source: Grand View Research Market Report (2016)

77.    Demand has increased at a steady rate since 2013 and is expected to continue its trajectory.

78.    Residential construction accounts for 36 percent of concrete output, according to the 2016 Grand View market report. Residential use is slightly higher than infrastructural use, which in turn is higher than commercial and industrial use. Figure 2 demonstrates that these ratios are expected to persist into the future.

79.    According to the National Association of Home Builders, construction costs are 61.8 percent of a home's value.[24] Ready-mix concrete is 3 percent of total construction costs.[25]

80.    According to an IBISWorld report on ready-mix concrete manufacturing in the U.S., the ready-mix concrete industry is "in the mature phase of its life cycle, characterized by

---

[24] Taylor, Heather. "Cost of Constructing a Home." NAHB Economics and Housing Policy Group. National Association of Home Builders (Nov. 2, 2015).
[25] Syverson.

slow growth rates, industry consolidation and market acceptance. At this stage, growth is increasingly dependent upon the cyclical fluctuations of downstream construction industries."[26]

81.    This same report observes that within the U.S., "[t]he Southeast is the dominant region for industry activity, accounting for an estimated 28.7 percent of industry establishments in 2017, higher than the region's share of the US population."[27]

82.    This observation reflects the "relatively low labor costs in the region as well as the industrial clusters that provide easy access to raw material, trucks, and other inputs. The Southeast also provides a large market for ready-mix concrete due to the vast highway network that spans the region. The region also heavily manufactures concrete pipes, railway ties and blocks."[28]

83.    While demand for ready-mix concrete follows similar patterns nationally and regionally, its drivers are almost exclusively local supply and construction activity. This is due to ready-mix concrete's high perishability. As explained in an FTC report, "[t]he geographic scope of competition in ready-mix concrete is circumscribed by the perishable nature of the product. Once ready-mix concrete is blended at a plant and loaded into a truck, it will solidify if it is not poured in a timely manner (typically less than one hour), rendering it useless."[29]

84.    Due to high transportation costs and a limited time from batching to curing, markets for ready-mix concrete are necessarily limited in geographic scope:

---

[26] Ediz Ozelkan, "Ready-Mix Concrete Manufacturing in the US," IBISWorld Industry Report 32732, p. 11 (July 2017) (hereafter "IBISWorld Report").
[27] IBISWorld Report, p. 18.
[28] *Id.*
[29] *In the Matter of Cemex, S.A. de C.V.*, "Analysis of Agreement Containing Consent Orders to Aid Public Comment" (hereafter "FTC Cemex Analysis"). Available at: https://www.ftc.gov/sites/default/files/documents/cases/2005/02/050214ana0510007.pdf.

a.    Because transportation costs comprise a significant proportion of the cost of the final delivered product, the closer the distance between a site and the plant the better. Due to a low value-to-weight ratio, transportation also effectively limits the distance that ready-mix concrete can be shipped.

b.    Ready-mix concrete is perishable. Once it is blended at a plant and loaded into a truck, it will solidify if it is not poured in less than an hour. Accounting for time between batching and transport and pouring—as well as additional delays, setup at the job site, and the time it takes to pour and place the concrete—ready-mix suppliers typically limit their mixer drive time to a radius of about 20–30.

c.    As a result, the geographic markets for ready-mix concrete are fairly small. Savannah, Statesboro, Hilton Head/Bluffton, and Charleston are too far away from each another for a plant in one of these locations to profitably service another.

d.    Geographic markets for ready-mix concrete also have a lower limit because the customer base and volume of industrial, commercial, infrastructural/public works, and residential construction must be significant enough to justify one or more ready-mix concrete plants.

85.    Based on publicly available data, including metropolitan ready-mix concrete market values and growth in the local construction industries, the estimated value of the ready-mix concrete market in the coastal South Carolina and Georgia cities of interest to this litigation from 2012–2016 is reflected in Table 1.[30]

---

[30] The values above are based on the 2010 Barnes Report on the U.S Ready-Mix Concrete industry as well as the Census Bureau's regional annual construction payroll. The annual rate of growth in the regional construction industries was calculated to estimate the rate of change of the respective ready-mix concrete market. Using the Barnes Report's 2011 metropolitan market values as the base value, the markets in the years 2012–2015 can be valued by multiplying the previous year's value by the estimated rate of change. The value for 2016 was estimated by taking the average value of the past four years. The aggregated value for 2012–2016 is documented in Table 1. *See* "Barnes Reports: U.S. Ready-Mix Concrete Mfg. Industry (NAICS 32732)." C. Barnes and Co.; Metropolitan Statistical Areas: SUSB Annual Data Tables 2011-2015. U.S. Census Bureau (2016).

**Table 1: Ready Mix Concrete Market Size**

| Savannah | Statesboro | Hilton Head | Charleston | TOTAL |
|---|---|---|---|---|
| $99,315,509 | $64,459,573 | $413,766,227 | $384,237,146 | $961,778,455 |

A.    **Savannah, Georgia**

Demand for ready-mix concrete in Savannah has increased each year since 2012. The average monthly number of employees in the regional mining, logging, and construction market grew from 5,600 average employees in 2012 to 7,300 in the first nine months of 2017.[31] Annual construction payroll increased from $244,606,000 in 2012 to $294,924,000 in 2015.[32] In 2014, 47 percent of new permits issued were for residential projects, 47 percent were for commercial projects, and 6 percent were for full site permits.[33]

B.    **Statesboro, Georgia**

Demand for ready-mix concrete in Statesboro has risen slightly. Between 2012 and 2015, annual construction payroll increased from $39,852,000 to $44,863,000.[34] In that same period, the number of building permits in Statesboro's Bulloch County rose from 382 to 495.[35] The Federal Reserve Bank of St. Louis publishes the total number of new private housing structures authorized annually in Statesboro's Bulloch County. From 2012–2015, 835 new homes were authorized in Bulloch County.[36]

C.    **Hilton Head/Bluffton, South Carolina**

Demand for ready-mix concrete in Hilton Head has risen considerably. In 2015, Hilton Head saw an annual construction payroll of $160,831,000—a 43 percent increase from 2012's annual payroll.[37] There were 785 new private housing structures authorized in Beaufort County between 2012 and 2015.[38] Alternative

---

[31] State and Area Employment, Hours, and Earnings: Mining, Logging, and Construction Industry, Savannah, Georgia. Bureau of Labor Statistics (2017).
[32] Geography Business Patterns, 2012–2015. US Census Bureau.
[33] "Building and Construction." City of Savannah website (2017).
[34] Geography Business Patterns, 2012–2015. U.S. Census Bureau.
[35] "Building Statistics." Bulloch County Georgia website (2017).
[36] BPPRIV013031. FRED (2017).
[37] Geography Business Patterns, 2012–2015. US Census Bureau.
[38] "Building Statistics." Bulloch County Georgia website (2017).
[38] BPPRIV037013. FRED (2017).

housing construction also saw regional growth. In 2014, multiple developers announced plans to construct residence communities, apartment complexes, and affordable housing developments.[39]

D. **Charleston, South Carolina**

Demand for ready-mix concrete in Charleston has risen steadily since 2012. Total annual construction payroll in 2015 was $705,890—41 percent higher than in 2012.[40] The Charleston metro area's economy grew 15.2 percent between 2011 and 2016, bringing with it construction growth. In 2016, the construction industry comprised about 20 percent of regional economic growth.[41]

## READY MIX CONCRETE'S COMMODITY NATURE, COST, AND PRICE

86.    Ready-mix concrete is a commodity that is interchangeable and homogeneous across manufacturers.

87.    Due to ready-mix concrete's exceptional characteristics as a building material, ready-mix concrete customers would not switch to other materials in the event of a small but significant increase in price.

88.    Because ready-mix concrete is a commodity that is viewed as interchangeable by its consumer, its market is conducive to cartel activity.

89.    The ready-mix concrete market exhibits a high degree of transparency. Competitors are commonly aware of each other's production capacities, costs, sales volumes, prices, and customers.

90.    Defendants closely monitor each other's Portland cement pricing and sales, which facilitates ready-mix concrete coordination.

91.    With respect to the ready-mix concrete market, the FTC has concluded that

---

[39] Moody, Erin. "Hundreds of New Homes Proposed for Beaufort Market." *Island Packet*. Nov. 17, 2014.
[40] Geography Business Patterns, 2012–2015. US Census Bureau.
[41] Wren, David. "Charleston Region's Economy Humming at Fasted Pace in South Carolina." *Post and Courier*. Sept. 25, 2017.

"[c]oordination is particularly likely where the relevant product is homogenous, as is ready-mix concrete."[42]

92.    Since the ready-mix concrete market is highly concentrated, homogeneous, and has a high degree of transparency, collusion is more likely in this market because competitors are commonly aware of each other's production capacities, costs, sales volumes, prices, and customers, and it is easy to monitor and retaliate against potential deviation from a coordinated scheme.

93.    Defendants face a low level of annual expense volatility but high upfront charges due to high ready-mix concrete equipment prices. New plant machinery costs an estimated $3 to $4 million.[43] Typically, large plant entry costs are 30 percent higher than those of smaller plants.[44]

94.    The 2002 Census of Manufacturers reported an average value of plant capital stock, including structures and equipment, of $2.2 million.[45] Production costs include materials, equipment upkeep, and labor. Materials costs account for over 82 percent of annual production expenses.

95.    The average value of raw materials on-site is $81,000.[46] Equipment upkeep costs an average of $49,407 annually. At 10 percent of annual overhead expenses, equipment-upkeep costs are second only to labor.[47] Salaries account for one-third of overhead expenses.

96.    The U.S. Bureau of Labor Statistics tracks a producer price index for ready-mix

---

[42] *See In the Matter of Cemex, S.A. de C.V.*, No. 051 0007, Docket No. C-4131.
[43] Collard-Wexler.
[44] *Id.*
[45] Syverson.
[46] *Id.*
[47] Al-Araidah et al. "Costing of the Production and Delivery of Ready-Mix-Concrete." *Jordan Journal of Mechanical and Industrial Engineering.* pp. 163-173. Vol. 6, No. 2 (April 2012).

concrete in the Southern region of the U.S. This index is shown in Figure 3 below.

**Figure 3: South Region Ready-Mix Concrete PPI, 2013–2017**



Source: Bureau of Labor Statistics

97.　　As Figure 3 demonstrates, the quarterly PPI increased consistently from 2013–2017. It rose more sharply in 2014, likely due to the construction industry's recovery from the 2008 recession.

98.　　Figure 4 below illustrates the contractor ready-mix concrete cost for Savanah, Statesboro, Hilton Head/Bluffton, and Charleston compared to the national average.

99.　　The red line represents the national average cost ratio—100.0. Statesboro's Cost Index was consistently above the national average from 2010–2017. Hilton Head's Cost Index dropped only once below the national average. Stated differently, the cost of concrete in both Statesboro and Hilton Head were generally above national levels.



Source: RS Means

100.    All other conditions remaining stable, ready-mix concrete prices fluctuate with the market price of cement and the number of competitors in the market.

101.    As shown in Figure 5, the price of Portland cement does not fluctuate greatly. From 2000–2017, the price of Portland cement increased at an average annual compound rate of 2 percent. The widespread availability and ease of production explain its low cost.



Figure 5: Price of Portland Cement
(in USD/Metric Ton)

Source: IBISWorld, 2017

102.     Though inexpensive, Portland cement comprises 60 percent of concrete's total materials cost, the highest percentage of any component. Its price therefore weighs more heavily on the price of ready-mix concrete. The level of competition within the market also affects the price of ready-mix concrete.

103.     Allan Collard-Wexler (2006) found the median price of concrete varied with the number of competitors. If the market had only one competitor, the median price, in 1963 dollars, was $41.05 per cubic yard. If there were two competitors, the price dropped to $40.75. With eight competitors, the median price was about $40.25.[48]

104.     While the price of Portland cement and the number of competitors in the ready-mix concrete market alter the price of ready-mix concrete, they do not alter it greatly. Therefore, in a perfectly competitive market, the price of ready-mix concrete would not fluctuate widely.

105.     Pricing patterns in Savannah, Hilton Head/Bluffton, and Charleston do not follow

---

[48] Collard-Wexler.

the trends exhibited by the South regional PPI data.

## RELEVANT ANTITRUST PRODUCT AND GEOGRAPHIC MARKETS

106.    To constitute a relevant antitrust product market, a group of goods must be sufficiently broad so that there are no available external economic substitutes to which buyers could turn in the event of a small but significant and permanent price increase.

107.    In general, an economic analysis of the relevant antitrust product market requires identifying "products that are close demand or supply substitutes."[49]

108.    From the side of demand, the relevant product market includes all substitutes that purchasers could switch to if the price of ready-mix concrete were to increase.

109.    From the side of supply, the relevant market includes all producers who, using their existing facilities, could switch from producing ready-mix concrete to a substitute product.

110.    Here, the relevant antitrust product market is the market for ready-mix concrete. A lack of substitution on both sides of the market forms the basis of this allegation.

111.    Defendants specialize in ready-mix concrete, and ready-mix concrete accounts for 95 percent of their plant revenue.

112.    Defendants' customers cannot easily switch to a different type of building material in the event of a ready-mix concrete price decrease.

---

[49] Carlton, Dennis W. and Jeffrey M. Perloff, Modern Industrial Organization, Fourth Edition, Reading, MA: Addison Wesley (2005), p. 646 ("Product B is a demand substitute for A if an increase in the price of A causes consumers to use more B instead. Product B is a supply substitute for A if, in response to an increase in the price of A, firms that are producing B switch some of their production facilities to the production of A.") *See also*, Horizontal Merger Guidelines at § 4.

113.    Most projects require the use of ready-mix concrete and cannot substitute alternative building materials.

114.    Defendants' customers' substitution only occurs in the form of switching between ready-mix concrete suppliers.

115.    As noted in an FTC analysis, "[t]he geographic scope of competition in ready-mix concrete is circumscribed by the perishable nature of the product."[50]

116.    Due to ready-mix concrete's high-level of perishability, producers must choose a ready-mix concrete supplier within a small radius from the project site.

117.    The relevant antitrust geographic markets in which to analyze the effects of any anticompetitive conduct coastal South Carolina and Georgia—namely, (1) the Savannah, Georgia area; (2) the Statesboro, Georgia area; (3) the Hilton Head/Bluffton, South Carolina area; and (4) the Charleston, South Carolina area.

**MARKET FACTORS CONSISTENT WITH DEFENDANTS' ANTICOMPETITIVE CONDUCT AND MARKET POWER IN THE RELEVANT ANTITRUST MARKETS**

*Defendants' Respective Market Shares*

118.    A concentrated market facilitates the operation of a cartel because it makes it easier to coordinate behavior among possible co-conspirators and makes it more difficult for customers to avoid the effects of collusive behavior.

119.    The ready-mix concrete market is highly concentrated. Ready-mix concrete manufacturers do not compete on a national level.

---

[50] FTC Cemex Analysis.

120.    "[N]ational concentration measures understate concentration within individual geographic markets, which because of the high transportation costs of concrete, better reflects the competitive environment industry producers face."[51]

121.    The degree of concentration within each of relevant ready-mix concrete markets is as follows:

    a.    *Savannah:* Five of the Defendants have plants in the region: Argos, Elite Concrete, Evans Concrete, Thomas Concrete, and Cemex. Argos and Thomas Concrete both have more than one plant operating in the Savannah market.

        Argos has approximately 30 percent market share, Coastal/Thomas has approximately 30 percent, Elite has approximately 15 percent, Premier has approximately 12 percent, Southeast Ready-mix has approximately 12 percent, and others have approximately 1 percent.

    b.    *Statesboro:* In 2012, there were only three concrete establishments in Statesboro.[52] Two of Defendants have plants in the region: Argos and Evans Concrete.

        Argos has approximately 49 percent market share, Evans has approximately 49 percent and Southeast Ready-mix has approximately 2 percent.

    c.    *Hilton Head:* In 2012, there were eight concrete establishments in Hilton Head, including those owned and operated by Argos, Elite Concrete, and Thomas Concrete.[53] Thomas maintains two of the eight plants. Three other ready-mix concrete companies in the area include Essroc, Lowcountry Concrete Inc, and Palmetto Ready Mix Inc.

---

[51] Syverson.

[52] EC1231A1 – Manufacturing: Geographic Area Series: Industry Statistics for the States, Metropolitan and Micropolitan Statistical Areas, Counties, and Places (2012). U.S. Census Bureau (2017).

[53] EC1231A1 – Manufacturing: Geographic Area Series: Industry Statistics for the States, Metropolitan and Micropolitan Statistical Areas, Counties, and Places (2012). U.S. Census Bureau (2017).

Argos has approximately 15 percent market share, Coastal/Thomas has approximately 15 percent Elite has approximately 25 percent Palmetto has approximately 10 percent Premier has approximately 15 percent and Southeast Ready-mix has approximately 20 percent.

d.    *Charleston:* The only Defendant acting in the Charleston region is Thomas Concrete. There exist at least four other concrete suppliers in the area: Wando Concrete LLC, Van Smith Concrete Co, Stono Concrete Inc, and Port City Concrete. Van Smith operates four plants; Thomas Concrete operates two.

### Ready-Mix Concrete is a Commodity Product

122.    A market's susceptibility to coordinated anticompetitive behavior increases where the relevant product is a homogeneous commodity product. When products are characterized as commodities, it is easier to maintain a cartel as cheating can be more easily detected.

123.    As the FTC has observed, "[c]oordination is particularly likely where the relevant product is homogenous, as is ready-mix concrete."[54]

124.    Similarly, as described in a study on demand fluctuations in the ready-mix concrete industry, "[w]hile it is possible to produce several hundred types of concrete, these mixtures basically use the same ingredients and machinery. Thus, one can think of ready-mix concrete as a homogeneous product."[55]

125.    "Ready-mixed concrete is physically quite homogenous. While concrete can be differentiated along some dimensions[,] these differentiations are minor in scope relative to those seen within many manufacturing industries[.] Moreover, the differentiation in attributes of concrete output across plants is likely to be smaller still. Because of transport constraints, every

---

[54] FTC Cemex Analysis.
[55] Allan Collard-Wexler, "Demand Fluctuations in the Ready-Mix Concrete Industry," *Econometrica*, Vol. 81, No. 3, May 2013, p. 1005.

plant typically produces the entire spectrum of ready-mixed concrete varieties, rather than some plants specializing in certain types of concrete and others in different types."[56]

*Barriers to Entry*

126.    The intended effect of a conspiracy to raise prices is to generate higher profits for the participants.

127.    In a perfectly competitive market, higher profits draw other firms who wish to capture a share of those profits into the market.

128.    If barriers to entry exist that prevent these firms from coming into the marketplace, established firms may be able to raise price of the good above competitive levels and earn above-normal levels of profits without fear of interference.

129.    High barriers to entry exist in the ready-mix concrete market. These include high capital expenditures, long-standing customer relationships, low resale value, and environmental regulation.

*High Capital Expenditures*

130.    Ready-mix concrete production requires substantial initial capital and cash flow. Total new plant costs are estimated between $3 and 4 million.[57]

131.    A steady cash flow is necessary for equipment upkeep, for average plant maintenance costs $49,407 annually.[58]

132.    LafargeHolcim has explained that the market is "resource and energy-intensive."[59]

---

[56] Syverson.
[57] Collard-Wexler.
[58] Al-Araidah et al. "Costing of the Production and Delivery of Ready-Mix-Concrete." *Jordan Journal of Mechanical and Industrial Engineering.* pp. 163-173. Vol. 6, No. 2. April 2012.
[59] LafargeHolcim U.S. Website.

### Customer Relationships

133.    In addition to the high sunk costs required to initiate and maintain a ready-mix concrete operation, the "relationship capital" required to sustain the business may preclude entry.

134.    The ready-mix concrete industry fosters strong bonds between suppliers and purchasers.

135.    It is a difficult and awkward for a newcomer to take business away from established producers.

136.    As one cement company president testified to the FTC, "The ready-mixed business, as we analyze it, is a very personal type of business and the operators develop personal relationships with contractors over many, many years. To go in and go through developing those relationship on the part of a newcomer would assure you that you are going to lose money for 3, 4, 5 years."[60]

137.    These relationships also account for some sunk capital costs since ready-mix concrete companies often sell about half of their output with a given repayment period of six months.[61]

### Low Resale Value

138.    The likelihood of monetary loss for three to five years will preclude many from entering the market. This is especially true given the rate of turnover in the ready-mix concrete industry.

---

[60] Syverson.
[61] Collard-Wexler.

139.    In a 2005 NBER paper, Lucia Foster, John Haltiwanger, and Chad Syverson found that over 30 percent of plants in operation currently will not be operating five years later. Indeed, exit rates for the industry is high—21.8 percent. [62]

140.    Collard-Wexler (2005) found that small plants (fewer than 20 employees) were three times more likely to exit the market than plants with 60 employees or more. [63]

141.    If a firm decides to close, it has little on which to collect. Trucks may be resold at a competitive rate, but the plant machinery is a complete loss. Accounts with balances are unlikely to ever be paid in full, for firms are no longer able to threaten a future supply cut-off as pressure to receive payment. [64]

***Environmental Regulation***

142.    In addition to high capital costs and established customer relationships, environmental regulation also constitutes a barrier to entry in the ready-mix concrete market.

143.    South Carolina concrete plants cannot exceed particulate matter (PM) emissions of 250 tons per year, and PM of 10 micrometers of 100 tons per year.

144.    Plants operating as truck mixed cannot exceed 164 cubic yards produced per hour; central mixed plants cannot exceed 294 cubic yards produced per hour. [65]

145.    To remain in operation, plants must record their plant production, system pressure, and silo control devices daily.

---

[62] Foster, Lucia, John Haltiwanger, and Chad Syverson. "Reallocation, Firm Turnover, and Efficiency: Selection on Productivity or Profitability?" NBER (2005).
[63] Collard-Wexler.
[64] *Id.*
[65] "Concrete Plants." South Carolina Department of Health and Environmental Control (2017).

146.     Truck and mixer inspections occur weekly. Bag and cartridge filter replacements must be recorded as often as they occur. South Carolina also limits combustion emissions by limiting fuel sulfur content, engine displacement, or both.

147.     Georgia concrete plants are subject to broader regulations. Georgia requires managers to "take all reasonable precautions to prevent such dust from becoming airborne."[66] Such precautions include the watering down of roads and rock piles.

148.     Georgia also requires storage bins to be equipped with a bin vent fabric filter that must be maintained. Air quality permits are only necessary for plants producing greater than 125,000 tons annually.

149.     Record-keeping in Georgia is only limited to monthly production.[67]

### Local Markets

150.     The fact that the market in which collusion occurred is local rather than regional, national, or international is favorable to collusion in two respects. First, smaller markets generally include fewer sellers, which increases concentration. Second, the more local the market, the lower the cost of communicating without detection. The seller may be able to communicate on a continuing basis face to face, without need to resort to forms of communication that may create documentary evidence of collusion.

151.     The perishable nature of ready-mix concrete means that competition is limited to local markets.

### Sealed Bidding

152.     Sealed bidding also increases a market's susceptibility to anticompetitive conduct.

153.     It is easier for colluding sellers to detect cheating in markets in which business is

---

[66] Georgia Small Business Environmental Assistance Program.
[67] Rule 391-3-1-.02. Rules and Regulations of the State of Georgia. Oct. 13, 2017.

awarded based on sealed bids.

154.    If a seller other than the one whom the cartel has designated to submit the low bid wins the contract, it can only be because he submitted a lower bid than agreed upon.

155.    Ready-mix concrete contracts are often awarded by public agencies on a sealed-bid basis.

**High Fixed Costs**

156.    Industries characterized by high fixed costs are more susceptible to anticompetitive behavior as firms are more vulnerable to economic downturns because fixed costs cannot be adjusted according to changes in demand.

157.    High fixed costs exist in the ready-mix concrete industry and those fixed costs account for a large portion of total costs.

**Power to Exclude Rivals**

158.    Established ready-mix concrete operators often operate or acquire upstream input operations.

159.    Resource ownership allows some ready-mix concrete managers to receive discounts on input or increase their marginal revenue.

160.    Some competitors may also be frustrated in finding a steady supply of aggregate or cement.

161.    Argos, Elite, and Thomas Concrete all operate aggregate and Portland cement plants in at least one of the four regional areas.

162.    The proximity of the regions to each another and the nonperishability of concrete's compounds allows one compound plant to support plants in all four regions.

163.    Smaller companies are unlikely to own or operate input operations, giving

Defendants supply advantage and their ability to cut-off supply to rivals.

*Record of Antitrust Inquiry*

164.    A record of antitrust inquiry makes the existence of a collusive pricing arrangement more likely by demonstrating the historical tendencies for the market to operate in such a way as to facilitate collusive behavior.

165.    There have been several antitrust cases filed in the ready-mix concrete market.

166.    In 2005, five companies were found guilty of fixing prices in the Indianapolis Ready-mix concrete market and were forced to pay fines up to $29.2 million.[68]

167.    In 2011, three Iowa ready-mix concrete companies were found guilty of price-fixing. Their managers were sentenced to a combined five years in prison and were forced to pay over $900,000 in fines.[69]

168.    In 2012, direct and indirect ready-mix concrete purchasers settled their claims against four ready-mix concrete manufacturers in Florida. A October 2009 lawsuit accused the companies of scheming to hike prices by 30 percent in 2008, at the height of the housing market upheaval.[70]

---

[68] Syverson.
[69] "Iowa Ready-Mix Concrete Company Pleads Guilty to Participating in Price-Fixing Conspiracy." Jun. 20, 2011. Federal Bureau of Investigation (2017).
[70] Lana Birbrair, "Cement Cos. Settle Direct Purchasers' Price-Fixing Suit," Law360, March 13, 2012.

## EVIDENCE OF DEFENDANTS' CONSPIRACY

169.    Starting in approximately 2009, Defendants combined and conspired to jointly monopolize and fix prices in the market for ready-mix concrete in coastal South Carolina and Georgia. Together, their combined market share always exceeded 80 percent.

170.    Defendants formed a cartel to dominate the ready-mix concrete market and conspired to protect that domination from competitive threats. The motivations and success of this cartel were supported by Argos's ability to price supracompetitively in the Portland cement market.

171.    From time to time, a new ready-mix concrete competitor would enter the ready-mix cement market. If Defendants perceived this new entrant as a threat—that is, if the competitor was sufficiently large to handle substantial projects and to compete with the ready-mix concrete cartel—Defendants attempted to recruit the new entrant to avoid price competition.

172.    If the competitor was unwilling to cooperate in the price-fixing and market-allocation scheme, the ready-mix concrete cartel effectively employed the following punishment regime designed to either ensure compliance or drive the new entrant out of the market:

    a.    Defendants employees took turns following the competitor's trucks to job sites and reporting on customers and locations to the cartel. These employees then communicated this information to Defendants.

    b.    Argos asked its manager, Jim Pedrick, to determine whether the amount of cement that new entrants were purchasing for their ready-mix operations. If competitors were purchasing from Argos's cement competitors, Pedrick was able to obtain intelligence on its purchase volume. This was because Argos and its cement competitors had separately agreed to an anticompetitive course of conduct in the cement market that included trading competitively sensitive information. Based on new entrants' cement purchases and simple math, Defendants determined how much concrete the competitor was selling. This

determination permitted Defendants to assess the degree of competitive threat and competitors' ability to withstand Defendants' collusive efforts, including predatory price cutting.

c.    Armed with this information, Defendants took turns price cutting the new entrant's customers. This bid rigging allowed Defendants to withstand significantly more losses while working to take new entrants' customers. Defendants, individually and collectively, recouped any losses from their price cuts when new entrants left the market. Afterward, Defendants returned prices to the supracompetitive levels that existed before the new entrants sought to introduce competition.

d.    Argos provided rebates of up to 50 percent on cement purchases to Defendants when Defendants price predatorily. These rebates significantly and artificially decreased materials costs and allowed Defendants even more room to price predatorily. Predatory pricing more quickly put out of business companies that threatened the ready-mix concrete cartel. Argos could afford to offer these rebates because it was already pricing supracompetitively and was already agreeing with Defendants to fix prices and allocate customers and markets.

e.    Argos worked with Defendants to make it more difficult or impossible for low-price competitors to obtain essential materials for concrete, like rock and cement. For example, Argos sought and obtained an agreement from Holcim that neither company would supply cement to Baca Concrete or Bulloch Concrete because Baca and Bulloch competed on price with Defendants' concrete cartel.

f.    Argos supplied Defendants with information derived from its price-fixing conspiracy to set cement prices with Holcim, Giant Cement, and Cemex by disclosing the future price of cement before it became public. This gave Defendants an advantage in outbidding or weakening a competitor in the market.

g.    In some cases, Argos or other Defendants bought out a competitor after the competitor was sufficiently weakened and had little choice but to sell.

173.    Once a competitor was no longer a competitive threat, the ready-mix concrete cartel effectuated its ready-mix concrete price-fixing scheme through which its members overcharged their customers, including Plaintiff.

174.    In certain market areas, Defendants kept a "scorecard," taking turns winning or sharing jobs to ensure that they charged premium prices to customers, thereby avoiding competition with each other.

**Defendants' Conspiracy Targets Mayson Concrete, Then Southeast Ready-mix**

175.    Beginning in 2007, Jason Wells opened a ready-mix concrete plant and began operating as Mayson Concrete in the Savannah and Statesboro markets. Mayson immediately gained market share by pricing competitively.

176.    In 2012, Argos began meeting with Evans and Coastal to discuss strategies to cut out Mayson as the low-price leader. Mayson was a small relatively new company that was still getting established in the market.

177.    Defendants knew that Mayson was vulnerable in a business that depends heavily upon capital and cash flow.

178.    The ready-mix concrete cartel worked hard to put Mayson out of business. Its members followed Mayson's trucks around to job sites and took turns predatorily undercutting Mayson on price to those same customers, gradually eroding the customer base that Mayson had fought hard to earn.

179.    Defendants also agreed not to do business with Mayson, such as the standard practice of renting and loading each other's mixer trucks.

180.    By 2012, Mayson was going out of business because of the cartel's anticompetitive conduct.

181.    On March 6, 2012, Argos regional manager, Andy Stankwych, told his team that "a change in attitude" was in order due to the less competitive environment. He instructed his staff to coordinate with competitors to come up with a plan for a price increase.

182.    Jason Wells then partnered with Mark Turner in a new firm—Southeast Ready-mix—that purchased Mayson's plants and other assets.

183.    Defendants noticed this partnership, an Argos employee complaining, "there goes the price increase" because Southeast Ready-mix had disrupted the cartel's ready-mix concrete price-fixing plans.

184.    In mid-April 2012, the cartel attempted to "reason" with Mark Turner. Its members tried to convince him to put out a price increase letter as the members of the cartel had planned.

185.    Trey Cook of Elite asked Turner to meet him at Savannah Bank. There, Cook got into Turner's truck and told him that Coastal, Argos, and Elite had all agreed on new environmental fees and surcharges and that Southeast Ready-mix should too. Turner refused. He told Cook that he would not make illegal agreements and would not meet privately with a competitor again.

186.    Afterward, the cartel took the same approach with Southeast Ready-mix as it had with Mayson.

187.    Its members followed Southeast Ready-mix trucks to job sites, obtained Southeast Ready-mix's pricing and cement order information from Argos and Holcim, allocated customers and markets, and used cement rebates and credits to predatorily undercut Southeast Ready-mix on price by pricing below cost.

***Defendants' Green-Zone Policy***

188.    In 2016, a combination of continued competition by non-cartel ready-mix competitors and a sales downturn warranted another attack by the cartel. Defendants decided to

36

carve out geographic areas of the market in which the cartel would allocate all jobs to Defendants.

189.    At this same time, Argos established "green zones"—areas around Defendants' ready-mix plants with a radius of about five miles or fifteen minutes' drive. (These are approximations because some Defendants' plants are close to each another).

190.    For instance, any concrete job that Argos and Evans bid within a green zone was subject to an automatic cement credit or rebate. Argos may have also extended the credit and rebates to other Defendants. These credits and rebates ensured that Defendants bidding in their green zones would succeed against non-Defendants like Southeast Ready-mix.

191.    To ensure compliance with the green-zone policy, Defendants discussed green zone policy and selective predatory price-cutting strategies for eliminating nonparticipating competitors.

192.    Defendants subjected to various consequences ready-mix concrete Defendants who bid jobs within a green zone.

193.    Jim Pedrick of Argos assisted with enforcing the green zone scheme by intimidating any ready-mix company to not build a concrete plant within a green zone.

194.    Pedrick reiterated to Defendants that violating the green-zone policy would result in a loss of the cheating Defendant's cement advantages or price cutting near the cheater's plants.

195.    Argos instructed its sales teams to bid high on jobs near ready-mix concrete Defendants' plants to avoid competing in green zones.

*Anticompetitive Conduct in the Portland Cement Market*

196.    Argos's dominant position in the Portland cement market for coastal South Carolina and Georgia plays a significant role in the ready-mix concrete cartel's ability to punish and exclude rogue Portland cement competitors.

197.    Punishment and exclusion of Portland cement competitors allows the ready-mix concrete cartel to maintain supracompetitive ready-mix concrete prices.

198.    Argos produces Portland cement—a key component to ready-mix concrete—and participates in the ready-mix concrete cartel downstream.

199.    Defendants structured their ready-mix concrete conspiracy to ensure that its members were loyal Portland cement customers.

200.    Because Defendants have monopoly power in the Portland cement market for coastal South Carolina and Georgia, connecting the ready-mix concrete with the Portland cement markets maximizes Defendants' profits.

201.    Defendants can raise and fix ready-mix concrete prices above competitive levels because no competitive challenge exists in the ready-mix concrete market.

202.    Argos's dominant position in the Portland cement market permits this lack of competitive challenge in the ready-mix concrete market.

203.    In Savannah, Argos has more than 70 percent market share among Portland cement suppliers, Giant has 20 percent, and Holcim has 10 percent.

204.    In Statesboro, Argos has held 100 percent market share since purchasing Lafarge in 2011.

205.    Cemex has negligible market share coastal South Carolina and Georgia but has significant market share in Atlanta.

206.    Argos uses its monopoly power in the upstream Portland cement market in at least two ways. First, Argos participates in the ready-mix concrete cartel downstream, which ensures that its members become loyal cement customers upstream. This allows Argos to maintain and reinforce its existing dominant position in the Portland cement market. Second, by leveraging its monopoly power in the Portland cement market, Argos—with Evans, Elite, and Thomas—imposes anticompetitive conditions in the downstream market for ready-mix concrete that support its conspiracy to jointly monopolize and fix prices in the coastal South Carolina and Georgia market.

207.    Collusion among Defendants in the highly concentrated Portland cement market allows them to illegally raise ready-mix concrete prices.

208.    Since at least 2012, Argos, Cemex, Giant, and Holcim have conspired to fix prices in the Portland cement market and to exchange competitively sensitive information about Portland cement pricing and customers:

a.    On or about October 25, 2012, Jim Pedrick of Argos discussed with Dan Cleary, a representative from Giant, a coordinated price increase to occur in the Savannah market on January 1, 2013.

b.    On or about August 27, 2013, Jim Pedrick and representatives from Holcim, Giant, and Cemex agree to a January 1 price increase of $8 per ton. On August 30, 2013, Pedrick said that Argos's attorneys had instructed him to make his price increase for January 15 to reduce the chance of detection.

c.    In 2016, Bill Wagner, president of Argos North America, negotiated with Cemex and Holcim to implement a Portland cement price increase of $14 per ton.

d.    On or about March 26, 2016, Argos North America's accountant confirmed with Argos's ready-mix management team and Mike Taylor that the Portland cement suppliers had agreed to increase prices as of April 1.

e.    Holcim and Argos (and earlier, Lafarge) consistently exchanged market reports with sensitive pricing and output information.

## **FRAUDULENT CONCEALMENT**

209.    Until recently, neither Plaintiff nor class members had knowledge of any of the violations alleged. Further, until recently neither Plaintiff nor class members could have discovered by the exercise of reasonable diligence that Defendants and their co-conspirators had engaged in their ready-mix concrete conspiracy because Defendant and their co-conspirators actively and fraudulently concealed their illegal behavior to obscure it.

210.    Defendants successfully engaged in their illegal price-fixing conspiracy for ready-mix concrete that was by its nature inherently self-concealing.

211.    By the exercise of reasonable diligence, Plaintiff and class members could not have discovered by an earlier date Defendants' because of Defendants and their co-conspirators' deceptive practices and techniques secretly employed to avoid their conspiracy's detection and to fraudulently conceal their illegal contract, combination, or conspiracy.

212.    Defendants fraudulently concealed their illegal contract, combination and conspiracy by various means and methods, including secret and surreptitious communications.

213.    Defendants' concealed their conspiracy and carried it out in a manner that precluded its detection.

214.    For instance, Argos has repeatedly stated publicly that it has an antitrust compliance policy, including, as part of its "Path of Sustainability," a public report available on its website. Plaintiff and class members reasonably inferred that Argos was enforcing this antitrust compliance policy.

215.    Holcim's "Code of Business Conduct," also publicly available, states that "Holcim believes in free markets and fair competition" and that it does not violate antitrust laws because it is "never in Holcim's interest." Plaintiff and class members reasonably inferred that Holcim was enforcing this policy.

216.    To further conceal cartel activity, Defendants misrepresented market conditions to explain price changes and other anticompetitive conditions. For example, in Argos's price-increase letters to its ready-mix concrete customers, Argos falsely attributed price increases and fuel surcharges to changes in input costs.

217.    To further cloak its discussions with illegal competitors, Defendants used Argos's Jim Pedrick as a conduit to pass information back and forth among each another.

218.    As a cement salesman, Pedrick's discussions with Argos's ready-mix competitors would not have raised red flags.

219.    Pedrick even reassured customers that passing information through him would protect them because it was not suspicious for a supplier to meet with its customers.

220.    Pedrick and other Argos's management rebuffed concerns raised by employees Tommy Waters and Hugh Papy.

221.    Defendant and their co-conspirators' fraudulent concealment tolled the statute of limitations with respect Plaintiff and class members' claim against Defendants for Defendants' illegal contract, combination, or conspiracy.

## EFFECTS AND DAMAGES

222.    Defendants' illegal contract, combination, or conspiracy had the following effects, among others:

a.    Prices charged by Defendants and their subsidiaries to Plaintiff and class members were maintained at artificially high and non-competitive levels;

b.    Buyers of ready-mix concrete were deprived of free and open competition in the purchase of ready-mix concrete; and

c.    Competition in the sale of ready-mix concrete was unreasonably restrained.

223.    During the Class Period, Plaintiff and class members purchased ready-mix concrete from Defendants, their subsidiaries, and affiliates.

224.    As a direct and proximate result of Defendants' illegal contract, combination, or conspiracy, Plaintiff and class members were injured and financially damaged in their businesses and property because they paid more for ready-mix concrete than they would have absent Defendants and their co-conspirators' unlawful activities.

225.    Plaintiff does not presently know the total amount of damages.

## CLASS ACTION ALLEGATIONS

226.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the following class:

All people and entities that purchased from Defendants ready-mix concrete in coastal South Carolina and Georgia from January 1, 2012, through present.

Excluded from the class are Defendants, their parents, subsidiaries or affiliates, and any co-conspirators.

227.    Plaintiff does not know the exact size of the class because this information is in Defendants' exclusive control. But based on the nature of the trade and commerce involved, Plaintiff believes the class numbers in the thousands and that class members are geographically

dispersed throughout South Carolina and Georgia. Therefore, joinder of all class members would be impracticable.

228.    Common factual or legal questions exist among class members, including:

a.    whether Defendants conspired with others to fix, raise, maintain, or stabilize ready-mix concrete prices;

b.    whether Defendants conspired with others to allocate ready-mix concrete markets;

c.    whether Defendants' conduct caused injury to Plaintiff's and class members' business or property and, if so, the appropriate classwide measure of damages; and

d.    whether Defendants took steps actively to conceal their conspiracy.

These and other factual or legal questions predominate over any questions affecting only individual class members.

229.    Plaintiff's claims are typical of class members' claims because Plaintiff is a direct purchaser of ready-mix concrete whose purchases were, in all relevant respects, typical of class members' purchases and because the relief that Plaintiff seeks is common to the class.

230.    Plaintiff will fairly and adequately protect class members' interests because Plaintiff is a typical purchaser of ready-mix concrete, has no conflicts with any class members, and is represented by experienced and able antitrust class action counsel. Furthermore, Plaintiff's interests are coincident with and not antagonistic to class members' interests.

231.    Class action treatment is superior to any alternatives for the fair and efficient adjudication of this controversy because such treatment permits a many injured people or entities to prosecute their common claims in a single forum efficiently simultaneously and without unnecessary duplication of evidence and effort. Class treatment also permits adjudication by

smaller class members who could not afford to individually litigate an antitrust claim against corporate defendants.

## TRADE AND COMMERCE

232.     Defendants manufacture and sell ready-mix concrete in coastal South Carolina and Georgia. The ready-mix concrete manufactured or sold by Defendants is comparable to and interchangeable with the ready-mix concrete products that each Defendant manufactures and sells.

233.     During the Class Period, Defendants sold ready-mix concrete in a continuous and uninterrupted flow of interstate commerce to customers in states other than the states in which Defendants produced their ready-mix concrete. Defendants' business activities were thus within the flow of and substantially affected interstate trade and commerce.

## VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1

234.     Plaintiff repeats the preceding paragraphs' allegations and incorporates these paragraphs and their allegations by reference.

235.     Defendants and their co-conspirators engaged in a continuing illegal contract, combination, or conspiracy to artificially fix, raise, maintain, and stabilize ready-mixed concrete prices in coastal South Carolina and Georgia in violation of Section 1 of the Sherman Act.

236.     Defendants and their co-conspirators agreed to and did restrain trade or commerce by fixing, raising, maintaining, and stabilizing at artificial and supracompetitive levels the prices of ready-mix concrete in coastal South Carolina and Georgia.

237.     In formulating and effectuating their illegal contract, combination, or conspiracy, Defendants and their co-conspirators engaged in anticompetitive activities, the purpose and

effect of which were to (a) artificially fix, raise, maintain, and stabilize the price of ready-mix concrete in coastal South Carolina and Georgia; (b) rig bids for ready-mix concrete in coastal South Carolina and Georgia; and (c) allocate customers and territories with respect to marketing ready-mix concrete in coastal South Carolina and Georgia.

238.    Defendants' illegal contract, combination, or conspiracy had the following effects, among others:

a.    The prices that Defendants charged to Plaintiff and class members—and that Plaintiff and class members paid to Defendants—for ready-mix concrete in coastal South Carolina and Georgia were fixed, raised, maintained and stabilized at artificially high and supracompetitive levels;

b.    Defendants deprived Plaintiff and class members of free and open competition in the purchase of ready-mix concrete in coastal South Carolina and Georgia;

c.    Defendants required Plaintiff and class have been required to pay more for ready-mix concrete in coastal South Carolina and Georgia than they would have paid in a competitive marketplace unaffected by Defendants' illegal contract, combination, or conspiracy;

d.    Defendants restrained, suppressed, and eliminated competition in the sale of ready-mix concrete in coastal South Carolina and Georgia.

239.    As a direct and proximate result of Defendants' illegal contract, combination, or conspiracy, Defendants damaged Plaintiff and class members in their business and property in an amount to be determined according to the proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays as follows:

a.    That this Court determine this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

b.    That the Defendants' illegal contract, combination, or conspiracy—and Defendants' acts done in furtherance of their illegal contract, combination, or conspiracy—violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and that Defendants injured Plaintiff and class members in their businesses and property because of their violations;

c.    That judgment be entered for Plaintiff and class members against Defendants for threefold the amount of damages sustained by Plaintiff and the class as allowed by law, that Defendant be enjoined from further involvement in the misconduct alleged, and that Plaintiff be awarded the costs of this action, including reasonable attorneys' fees; and

d.    That Plaintiff and class members receive other and further relief as the Court may deem just and proper under the circumstances.

## **DEMAND FOR JURY TRIAL**

Under Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of all the issues triable of right by jury.

Dated: November 22, 2017                    Respectfully submitted,

_s/Chad McGowan_____
Chad McGowan (_____)
**McGOWAN HOOD & FELDER, LLC**
1539 Health Care Drive
Rock Hill, SC 29732
Phone: (803) 327-7800
E-mail: cmcgowan@mcgowanhood.com

Karl D. Twenge (Fed Bar No.: 10033)
**TWENGE + TWOMLEY LAW FIRM**
311 Carteret Street
Beaufort, SC 29902
Phone: (843) 476-4573
E-mail: twenge@twlawfirm.com

Daniel R. Karon
Beau D. Hollowell
**KARON LLC**
700 W. St. Clair Avenue, Suite 200
Cleveland, OH 44113
Phone: (216) 622-1851
E-mail: dkaron@karonllc.com
bhollowell@karonllc.com

Vincent J. Esades
Renae D. Steiner
**HEINS MILLS & OLSON, PLC**
310 Clifton Avenue
Minneapolis, MN 55403
Phone: (612) 338-4605
E-mail: vesades@heinsmills.com
rsteiner@heinsmills.com

*Attorneys for Plaintiff and the Class*