**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| PRO SLAB, INC. and BREMER CONSTRUCTION MANAGEMENT, INC., on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>ARGOS USA CORP.,<br>ARGOS NORTH AMERICA CORP.,<br>ARGOS USA LLC,<br>ARGOS READY MIX LLC,<br>ARGOS READY MIX (CAROLINAS) CORP.,<br>LAFARGE NORTH AMERICA INC.,<br>LAFARGE BUILDING MATERIALS INC.,<br>COASTAL CONCRETE COMPANY, INC.,<br>COASTAL CONCRETE SOUTHEAST II, LLC,<br>THOMAS CONCRETE, INC.,<br>THOMAS CONCRETE OF GEORGIA, INC.,<br>THOMAS CONCRETE OF SOUTH<br>    CAROLINA, INC.,<br>EVANS CONCRETE HOLDINGS, INC.,<br>EVANS CONCRETE, L.L.C.,<br>ELITE CONCRETE HOLDINGS, LLC,<br>ELITE CONCRETE, LLC,<br>ELITE CONCRETE OF RICHMOND<br>    HILL, LLC, and<br>ELITE CONCRETE OF SC, LLC,<br><br>Defendants. | Case No. 2:17-cv-03185-DCN<br><br>**JURY TRIAL DEMANDED** |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Pro Slab, Inc. ("Pro Slab") and Bremer Construction Management, Inc.

("Bremer") (collectively "Plaintiffs"), on behalf of themselves and all others similarly

situated as more specifically set forth below, by counsel, bring this action for treble

damages, injunctive relief and statutory attorneys' fees under the antitrust laws of the United States, demanding a trial by jury, and make the following allegations:

## SUMMARY OF CLAIMS

1.      This lawsuit arises from an ongoing conspiracy among Defendants, who are the largest Ready-Mix Concrete producers in the Savannah, Georgia to Charleston, South Carolina region (hereafter referred to as the "Savannah/Charleston Region"), to suppress and eliminate competition in the markets for Ready-Mix Concrete. By fixing prices, rigging bids and/or allocating territories and customers from at least January 1, 2010 through the present (the "Class Period"), Defendants have artificially sustained or raised the price of Ready-Mix Concrete and related fees paid by their customers. This conduct constitutes a combination and conspiracy that was and is a *per se* violation of Section One of the Sherman Act (1890) as an unreasonable restraint of trade.

2.      Defendants' conspiracy occurred in highly concentrated markets, concerned a highly standardized and interchangeable product, and occurred against a background of supply and demand factors that were common to all of their customers. As a result, the conspiracy successfully caused or allowed identical prices and/or parallel price movements among the conspirators, on price lists, in price increases, in transactional pricing and in bid prices. Defendants' customers therefore paid substantially more for Ready-Mix Concrete than they would have in the absence of the conspiracy and have suffered antitrust injury to their business or property.

3.      This case is brought as a class action in order to recover the millions of dollars in unlawful overcharges paid by Defendants' customers as a result of Defendants'

antitrust conspiracy. Plaintiffs request the certification of a plaintiff class and three subclasses, comprised of all individuals and entities who directly purchased Ready-Mix Concrete from Defendants' plants in the Savannah/Charleston Region during the Class Period, as more specifically defined below (herein the "Class" and "Subclasses").

4.      Plaintiffs make the following allegations on information and belief, except as to those paragraphs that pertain to Plaintiffs, which are based upon personal knowledge. Plaintiffs' information and belief are based upon, *inter alia*, the investigation made by their attorneys.

## JURISDICTION AND VENUE

5.      Plaintiffs bring this action for treble damages, costs of suit, attorneys' fees, and injunctive relief under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for the injuries sustained by Plaintiffs and members of the Class and Subclasses arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, as alleged herein.

6.      Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

7.      Venue in this District is proper pursuant to Sections 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, and 28 U.S.C. § 1391.  The combinations and conspiracies alleged in this Complaint were carried out in substantial part within this District.  Defendants are found, or transact business within, this District, and the trade and commerce described in this Complaint were carried out in substantial part within this District.

8.      This Court has personal jurisdiction over Defendants because each Defendant (a) transacted business in this district; (b) sold or delivered ready-mix concrete in this district; (c) has substantial aggregate contacts with this district; and (d) engaged in a price fixing, bid-rigging and customer and market allocation conspiracy that was directed at and had the intended effect of causing injury to people and entities residing in, located in, or doing business in this district.

## THE PARTIES AND CO-CONSPIRATORS

### PLAINTIFFS

9.      Bremer Construction Management, Inc. is a Georgia corporation with its principal place of business in Savannah, Georgia.  During the Class Period, Bremer directly purchased Ready-Mix Concrete from one or more Defendants.

10.     Pro Slab, Inc. is a South Carolina Corporation with its principal place of business in Beaufort, South Carolina. During the Class Period, Pro Slab directly purchased Ready-Mix Concrete from one or more Defendants.

### DEFENDANTS

### The LaFarge Defendants

11.     Defendant LaFarge North America Inc. is a Maryland corporation with its principal place of business in Herndon, Virginia, that is registered to conduct business in the state of Georgia and the state of South Carolina.

12.     Defendant LaFarge Building Materials Inc. is an Alabama corporation with its principal place of business in Herndon, Virginia, that is registered to conduct business in the state of Georgia and the state of South Carolina.

4

13.    Defendants LaFarge North America Inc. and LaFarge Building Materials Inc. are actual agents, apparent agents and/or alter egos of one another and operate and identify themselves as one company (herein collectively "LaFarge"). LaFarge sold Ready-Mix Concrete during the Class Period to Class and Subclass members from plants located in the Savannah/Charleston Region.

**The Argos Defendants**

14.    Defendant Argos USA Corp. is a Delaware corporation with its principal place of business in Alpharetta, Georgia, that is registered to conduct business in the state of Georgia.

15.    Defendant Argos North America Corp. is a Delaware corporation with its principal place of business in Houston, Texas, that is registered to conduct business in the state of Georgia.

16.    Defendant Argos USA LLC is a Delaware limited liability company with its principal place of business in Alpharetta, Georgia, that is registered to conduct business in the state of Georgia and the state of South Carolina.

17.    Defendant Argos Ready Mix LLC is a Delaware limited liability company with its principal place of business in Alpharetta, Georgia, that is registered to conduct business in the state of Georgia and the state of South Carolina.

18.    Defendant Argos Ready Mix (Carolinas) Corp. is a North Carolina corporation with its principal place of business in Alpharetta, Georgia, that is registered to conduct business in the state of Georgia and the state of South Carolina.

5

19.    Defendants Argos USA Corp., Argos North America Corp., Argos USA LLC, Argos Ready Mix LLC, and Argos Ready Mix (Carolinas) Corp. are actual agents, apparent agents and/or alter egos of one another and operate and identify themselves as one company (herein collectively "Argos"), and are U.S. subsidiaries of the Colombian company Cementos Argos, headquartered in Alpharetta, Georgia. Argos sold Ready-Mix Concrete during the Class Period to Class and Subclass members from plants located in the Savannah/Charleston Region.

20.    Argos is a successor in interest to LaFarge, having purchased Lafarge's Alabama, South Carolina, and Georgia operations for $760 million in 2011. By 2015, Argos was the second-largest ready-mix concrete producer in the U.S, with approximately 390 plants and 2,800 mixers.

**The Coastal Defendants**

21.    Defendant Coastal Concrete Company, Inc. is a Georgia corporation with its principal place of business in Brunswick, Georgia.

22.    Defendant Coastal Concrete Southeast II, LLC is a Delaware limited liability company with its principal place of business in Pooler, Georgia, that is registered to conduct business in the state of Georgia.

23.    Defendants Coastal Concrete Company, Inc. and Coastal Concrete Southeast II, LLC are actual agents or apparent agents of one another and operate and identify themselves as one company (herein collectively "Coastal"). Coastal sold Ready-Mix Concrete during the Class Period to Class and Subclass members from plants located in the Savannah/Charleston Region.

6

**The Thomas Defendants**

24.     Defendant Thomas Concrete, Inc. is both: (i) a Delaware corporation with its principal place of business in Atlanta, Georgia, that registered to conduct business in the state of Georgia; and (ii) a South Carolina Corporation with its principal place of business in Atlanta, Georgia, that is registered to conduct business in the state of South Carolina.

25.     Defendant Thomas Concrete of Georgia, Inc. is a Georgia corporation with its principal place of business in Atlanta, Georgia.

26.     Defendant Thomas Concrete of South Carolina, Inc. is both: (i) a South Carolina corporation with its principal place of business in Atlanta, Georgia, that is registered to conduct business in the state of Georgia; and (ii) a Delaware corporation with its principal place of business in Atlanta, Georgia, that is registered to conduct business in the state of South Carolina.

27.     Defendants Thomas Concrete, Inc., Thomas Concrete of Georgia, Inc. and Thomas Concrete of South Carolina, Inc. are actual agents or apparent agents of one another and operate and identify themselves as one company (herein collectively "Thomas"). Thomas sold Ready-Mix Concrete during the Class Period to Class and Subclass members from plants located in the Savannah/Charleston Region.

28.     Thomas purchased Coastal's Ready-Mix Concrete assets, including the Coastal plants in the Savannah/Charleston Region, in 2015.

**The Evans Defendants**

29.    Defendant Evans Concrete Holdings, Inc. is a Georgia corporation with its principal place of business in Claxton, Georgia.

30.    Defendant Evans Concrete, L.L.C. is a Georgia limited liability company with its principal place of business in Claxton, Georgia.

31.    Defendants Evans Concrete Holdings, Inc. and Evans Concrete, L.L.C. are actual agents or apparent agents of one another and operate and identify themselves as one company (herein collectively "Evans"). Evans sold Ready-Mix Concrete during the Class Period to Class and Subclass members from plants located in the Savannah/Charleston Region.

**The Elite Defendants**

32.    Defendant Elite Concrete Holdings, LLC is a Georgia limited liability company with its principal place of business in Hardeeville**,** South Carolina.

33.    Defendant Elite Concrete, LLC is a Georgia limited liability company with its principal place of business in Hardeeville**,** South Carolina.

34.    Defendant Elite Concrete of SC, LLC is a South Carolina limited liability company with its principal place of business in Hardeeville**,** South Carolina.

35.    Defendant Elite Concrete of Richmond Hill, LLC is a Georgia limited liability company with its principal place of business in Richmond Hill, Georgia.

36.    Defendants Elite Concrete Holdings, LLC, Elite Concrete, LLC, Elite Concrete of SC, LLC and Elite Concrete of Richmond Hill, LLC are actual agents or apparent agents of one another and operate and identify themselves as one company

(herein collectively "Elite"). Elite sold Ready-Mix Concrete during the Class Period to Class and Subclass members from plants located in the Savannah/Charleston Region.

37.    The acts alleged to have been done by Defendants and their co-conspirators were authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

38.    Other persons and entities not named as defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. Defendants are jointly and severally liable for the acts of their co-conspirators whether or not the conspirators are named as defendants in this Complaint.

39.    Each Defendant acted as a principal or an agent of or for the other Defendants and their co-conspirators with respect to the acts, violations and common course of conduct alleged in this Complaint.

## **TRADE AND COMMERCE**

40.    During all or part of the Class Period, Defendants produced and/or sold Ready-Mix Concrete in a continuous and uninterrupted flow of interstate commerce to purchasers in the United States, including without limitation purchasers in Georgia and South Carolina. Defendants purchased equipment, supplies and raw materials from multiple states. These business activities had a substantial effect on interstate trade and commerce.

## READY-MIX CONCRETE CHARACTERISTICS

41.    Ready-Mix Concrete is a compound of Portland cement,[1] water, aggregates[2] and sometimes additives such as fibers, mesh, and chemical admixtures. Cement, and sometimes fly ash, slag or silica, is mixed with water to make a binding medium into which sand, gravel, rocks or other aggregates are embedded. Ready-Mix Concrete remains in a fluid state for several hours, during which time it can be transported to customers, placed, molded and formed. Ready-Mix Concrete hardens over time into a strong and durable material.

42.    Different types of cement, cementitious materials and aggregates affect the performance and cost of Ready-Mix Concrete, and make up the largest raw material cost for the production of Ready-Mix Concrete. Admixtures in the form of fibers, mesh, chemicals and powders are added to Ready-Mix Concrete to modify the fluid characteristics, slump, setting properties, cure time, finished properties, finished strength, density and appearance of the final product.

43.    Ready-Mix Concrete is manufactured in batch plants. Ready-Mix Concrete ingredients are sometimes mixed in the batch plant and sometimes mixed in mixing or

---

[1] Portland cement is a specific type of cement, comprised of 85 percent lime and silica, 15 percent alumina, iron oxide, gypsum, and/or limestone. All of Portland cement's components are readily found around the globe. *See* "Composition of Portland Cement," The Constructor, 2017. Available at: https://theconstructor.org/building/composition-of-Portland-cement/5725/ (visited Jan. 10, 2018).

[2] Concrete aggregates may include sand, gravel, or crushed stone. High quality aggregates are weather-resistant, hard, and non-absorptive. The size of the aggregate, ranging from fine to coarse, is determined by the purpose and desired thickness of the end product. Aggregates cannot be larger than three-quarters of the clear spacing between rebar, one-third the depth of the slab, and one-fifth the narrowest dimension of a member. *See* Seegebrecht, George. "The Role of Aggregate in Concrete," Concrete Network (2017). Available at: https://www.concretenetwork.com/aggregate/ (visited Jan. 10, 2018).

agitator trucks. Ready-Mix Concrete can be batched by the plant according to several mix designs and customer specifications. Ready-Mix Concrete is typically delivered to customers in mixing trucks or agitator trucks.

44.    The foregoing product characteristics of Ready-Mix Concrete are true of all of the Ready-Mix Concrete manufactured and sold by each of Defendants during the Class Period.

45.    The production, delivery, use, and fluid and finished characteristics of Ready-Mix Concrete are subject to well-established industry and governmental standards intended to ensure the consistency, predictability, reliability and uniformity of Ready-Mix Concrete. Standards for Ready-Mix Concrete are propounded and published by ASTM International, the American Concrete Institute, and state agencies such as the Georgia Department of Transportation and South Carolina Department of Transportation.

46.    The common standards applicable to Ready-Mix Concrete are known and consistently relied upon and applied by Defendants, engineers, architects, designers, builders, quality control specialists and others. All the Ready-Mix Concrete manufactured and sold by each of the Defendants during the Class Period conformed to, or was intended to conform to, these common industry and governmental standards.

47.    Ready-Mix Concrete, including the Ready-Mix Concrete manufactured and sold by each of the Defendants during the Class Period, is and was used principally in commercial, agricultural, governmental and residential construction projects, including without limitation sidewalks, driveways, foundations, walls, bridges, roads, slabs, tunnels, highways and livestock confinement structures. The common standards

applicable to Ready-Mix Concrete applied to all the uses of the Ready-Mix Concrete sold by the Defendants.

48.     Because of common industry and governmental standards, Ready-Mix Concrete, including the Ready-Mix Concrete manufactured and sold by each Defendant during the Class Period, is and was highly interchangeable and homogeneous. Ready-Mix Concrete is a commodity, which is interchangeable across manufacturers. Although construction projects can be bid under various concrete specifications, all Defendants have the equipment and expertise to meet these specifications. Each Defendant is and was capable of manufacturing, delivering and selling each of the Ready-Mix Concrete mixes designed manufactured, delivered and sold by each of the other Defendants.

49.     The interchangeability of the Ready-Mix Concrete sold by Defendants is also demonstrated by the fact that Defendants sometimes purchase Ready-Mix Concrete from one another or fill deliveries for one another. It is also common practice in the industry for competitors to purchase Ready-Mix Concrete from one another in the event of emergencies due to equipment failure or plant shutdowns.

50.     When products offered by different suppliers are viewed as interchangeable by the purchaser, it creates an environment more conducive for the suppliers to unlawfully agree on the price for the product, and in turn to effectively monitor and enforce agreed-upon prices.

51.     Because of its unique characteristics, there are few if any economic substitutes for Ready-Mix Concrete, making demand for Ready-Mix Concrete highly inelastic. "Elasticity" is a term used to describe the sensitivity of supply and demand to

changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small (if any) decline in the quantity sold of that product. In other words, customers have nowhere to turn for alternative, cheaper products of similar grade or quality, and so continue to purchase despite a price increase.

52.    Because Ready-Mix Concrete is a major and necessary component of commercial, governmental, agricultural and residential construction, a small but significant, non-transitory increase in the price of Ready-Mix Concrete will not cause purchasers to switch to a different construction material, even if such a material is available and compatible with the needs of a given construction job.  Moreover, Ready-Mix Concrete of a particular strength or mix is often already specified as the material of choice by the architect, engineer or customer before the Defendants are asked to compete for a given project.

53.    The U.S. Department of Justice (DOJ) has concluded that demand for Ready-Mix Concrete is highly inelastic: "a small but significant post-acquisition increase in the price of ready mix concrete that meets the bid specifications would not cause the purchasers of ready mix concrete for large projects to substitute another building material in sufficient quantities, or to utilize a supplier of ready mix concrete [who would otherwise not be considered a competitor for the business] with sufficient frequency so as to make such a price increase unprofitable." Am. Compl. ¶ 21, Dkt. No. 7, *U.S. v. Cemex, S.A.B. de C.V.*, Case. No. 07-cv-00640 (D.D.C.  May 2, 2007).

54.    The product characteristics of Ready-Mix Concrete, including the common ingredients and manufacturing process of the product, the applicability of common

industry and governmental standards to the product, the interchangeability and homogeneity of the product, the lack of substitutes for the product, and the inelasticity of demand for the product, substantially furthered the ability of the Defendants to effectively conspire, by fixing prices, rigging bids and/or allocating territories and customers, in the sale of Ready Mix-Concrete to the members of the Class and Subclasses.

## PRODUCT MARKET AND PRICING

55.    The standardized, interchangeable and homogeneous character of Ready-Mix Concrete has resulted in a well-defined and common product market among the Defendants and their customers. For example, Defendants' price lists include mixes and mix categories, alternative aggregates, chemical admixtures, fibers, short-load fees, environmental fees, fuel surcharges and off-hour delivery charges that are substantially identical. Defendants use substantially identical language when discussing prices and terms within their price lists, bids, annual price increase notices and other price proposals made to customers, and within their other internal references to prices.

56.    Each of the Defendants, internally and in their price lists, bids and price quotes, identifies the Ready-Mix Concrete mixes or categories of mixes that they sell using common terminology, including "3000," "3500," "4000." Numbers such as "4000" refer to the finished compressive strength of the Ready-Mix Concrete in terms of pounds per square inch or "psi."  The largest share of Ready-Mix Concrete sold by Defendants falls into just a few mixes or mix categories.

57.    The price of the most commonly sold Ready-Mix Concrete mix, 3000 psi, was understood and used by Defendants and their employees as a reference from which the prices of most or all other mixes could be determined. For example, if one Defendant knew that another Defendant was offering 3000 psi at a particular price, it could determine the prices offered by the other Defendant for most or all other mixes.

58.    Among Defendants, increases in the price of all mixes of Ready-Mix Concrete could be and were expressed in a single dollar amount. Thus, if one Defendant communicated to another Defendant or a customer that the original Defendant was increasing prices by $8.00 for a given year, it was understood by the second Defendant or customer that this meant an $8.00 increase for the base price of all mixes.

59.    Among Defendants, the prices for mixes or mix categories that were stated in Defendants' price lists were used as a starting point when Defendants and their employees determined, negotiated or discounted prices they offered in bids, quotes, annual contracts and other pricing. At various times during the Class Period some or all Defendants offered standard discounts from the prices for mixes or mix categories that were stated in their price lists to certain categories of purchasers or for certain uses.

60.    The common price lists used by Defendants to announce prices for common mixes, mix categories, additives and additional charges were created or modified by all Defendants on an annual basis, usually during the first quarter. Revised price lists were sometimes created during the year to account for price changes. Most or all Defendants provided their price sheets to their known customers, by mailing or emailing to customer lists and/or by hand delivery to larger customers. Price sheets were

provided to potential customers by all Defendants upon request. Price lists were used by dispatchers and other employees of all Defendants to determine list prices or standardized discount prices, and were posted or available at all plants.

61.    The product market and pricing practices were common and highly structured among all Defendants. The common price lists, the common product mixes, the small number of mixes accounting for the great majority of Defendants' sales volume, the common reference point for mix prices, the common method of expressing price increases, and the common practice of determining negotiated and discounted prices by reference to list prices all substantially furthered the ability of Defendants to effectively conspire by fixing prices and rigging bids in the sale of Ready-Mix Concrete to the members of the Class and Subclasses, and to monitor and enforce their collusive agreements.

## GEOGRAPHIC MARKETS AND CONCENTRATION

62.    Defendants are and were the dominant suppliers of Ready-Mix Concrete in the Savannah/Charleston Region. Because of the limited delivery range of Ready-Mix Concrete plants, this region is comprised of four well-defined geographic markets.

63.    Ready-Mix Concrete plants have a limited delivery range for both technical and economic reasons. Because of its setting properties, Ready-Mix Concrete is a perishable product that must be delivered to its destination in specially designed trucks within a limited amount of time. According to ASTM International standards, Ready-Mix Concrete must be discharged no later than 1.5 hours after either the water is mixed with the cement and aggregates or the cement is mixed with the aggregates, or before the drum

on a rotating drum truck completes 300 revolutions, unless the purchaser waives these requirements. In hot weather or other conditions that could cause the Ready-Mix Concrete to set more quickly, ASTM International standards permit the purchaser to require discharge before 1.5 hours elapse.

64.    Delivery range may also be affected by economic factors related to transportation costs and downtime of equipment. Thus, a supplier may assess the profitability of a particular delivery distance by reference to fuel costs and the cost of lost use of plant and trucks resulting from longer delivery and return times.

65.    These technical and economic limits on delivery range have resulted in four distinct geographic markets for Ready-Mix Concrete in the Savannah/Charleston Region.

66.    **The Savannah Market.** The Savannah Market includes areas served by: Argos plants in Hinesville, Pooler, Richmond Hill and Savannah; Coastal/Thomas plants in Hinesville, Savannah and East Savannah; and Elite plants in Bloomingdale, Hinesville and Richmond Hill, as illustrated below:



**Figure 1: Savannah RMC Market**

67. Within the Savannah Market, the sale of Ready-Mix Concrete is highly concentrated in Argos, Coastal/Thomas and Elite. The market shares of Argos (30%), Coastal/Thomas (30%), and Elite (15%) provide these Defendants with market power in the Savannah Market.

68. For any delivery location within the Savannah Market, Argos, Coastal/Thomas and Elite were and are able to deliver Ready-Mix Concrete meeting the standard delivery specifications. There is no location within the Savannah Market that can only be served by one Defendant's plant, or for which only one Defendant has an economic incentive to sell Ready-Mix Concrete.

69. **The Statesboro Market.** The Statesboro Market includes areas served by: the Argos plant in Statesboro and the Evans plants in Statesboro and Claxton, as illustrated below:



70. Within the Statesboro Market, the sale of Ready-Mix Concrete is highly concentrated in Argos and Evans. The market shares of Argos (49%) and Evans (49%) provide these Defendants with market power in the Statesboro Market.

71.    For any delivery location within the Statesboro Market, Argos and Evans were and are able to deliver Ready-Mix Concrete meeting the standard delivery specifications. There is no location within the Statesboro Market that can only be served by one Defendant's plant, or for which only one Defendant has an economic incentive to sell Ready-Mix Concrete.

72.    **The Hilton Head/Bluffton Market.** The Hilton Head/Bluffton Market includes areas served by: Argos plants in Hilton Head and Rincon; Coastal/Thomas plants in Beaufort and Bluffton; and the Elite plant in Hardeeville, as illustrated below:



**Figure 3: Hilton Head/Bluffton Market**

73.    Within the Hilton Head/Bluffton Market, the sale of Ready-Mix Concrete is highly concentrated in Argos, Coastal/Thomas and Elite. The market shares of Argos (15%), Coastal/Thomas (15%) and Elite (25%) provide these Defendants with market power in the Hilton Head/Bluffton Market.

74.     For any delivery location within the Hilton Head/Bluffton Market, Argos, Coastal/Thomas and Elite were and are able to deliver Ready-Mix Concrete meeting the standard delivery specifications. There is no location within the Hilton Head/Bluffton Market that can only be served by one Defendant's plant, or for which only one Defendant has an economic incentive to sell Ready-Mix Concrete.

75.     **The Charleston Market.** The Charleston Market includes areas served by: Argos plants in North Charleston and Summerville, and Coastal/Thomas plants in North Charleston and Summerville, as illustrated below:



**Figure 4: Charleston Market**

76.     Within the Charleston Market, the sale of Ready-Mix Concrete is highly concentrated in Argos and Coastal/Thomas and Elite. The market shares of Argos and Coastal/Thomas provide these Defendants with market power in the Charleston Market.

77.     For any delivery location within the Charleston Market, Argos and Coastal/Thomas were and are able to deliver Ready-Mix Concrete meeting the standard

delivery specifications. There is no location within the Charleston Market that can only be served by one Defendant's plant, or for which only one Defendant has an economic incentive to sell Ready-Mix Concrete.

78.    For each of these geographic markets, there is little or no cross-elasticity of demand between suppliers of Ready-Mix Concrete outside the market and those within the market.

79.    Suppliers from outside each of these geographic markets are only capable of meeting the delivery requirements of Ready-Mix Concrete within a limited area of the market, and even then at a diminished level of profitability, and therefore do not have an incentive to compete on price to capture a larger share of the market. Conversely, Defendants in each geographic market do not and did not have an incentive to lower their prices in order to compete with potential competitors from outside the market.

80.    Competition from plants outside each of the geographic markets therefore did not, and does not, substantially affect the ability of Defendants to exert control over the price of Ready-Mix Concrete in that geographic market. Moreover, many of the potential competitor plants outside each of the geographic markets were owned by Defendants or companies affiliated with Defendants and therefore had no incentive to compete with Defendants within the market.

81.    There are high barriers to entry in each of the geographic markets by a new Ready-Mix Concrete supplier. Entry would require a company to incur significant start-up capital expenditures, in the millions of dollars, for the purchase or lease of real property on which to locate a plant, the cost of a ready-mix batch plant itself, the cost of

specialized delivery trucks, the cost of labor, fuel and raw materials, and the cost of

permits and certifications. Because the perishability and economics of delivering Ready

Mixed Concrete limit the service area of a particular plant, a successful entrant would

also need to operate multiple plants and develop assured relationships with significant

customers in order to justify its substantial investments of capital. The high barriers to

entry enhanced the concentration of suppliers in each of the geographic markets, and

therefore enhanced the market power of the Defendants operating plants therein.

82.    The well-defined geographic markets serviced by the plants of Defendants,

when coupled with the very high supplier concentration held by Defendants in each

market and the limited ability and incentive of outside companies to compete in the

region, provided Defendants in each geographic market with the ability to effectively

sustain or raise the price of Ready-Mix Concrete in their service areas through collusion

on prices, bids, customers and territory.

## READY-MIX CONCRETE DEMAND AND MARKET SIZE

83.    The estimated value of the U.S. Ready-Mix Concrete industry in 2017 is

$35 billion.[3] Ready-Mix Concrete accounts for 75 percent of the total cement shipped in

the U.S.[4]

84.    According to the Bureau of Economic Analysis' Benchmark Input-Output

Tables, the construction sector purchases 94 percent of the Ready-Mix Concrete output.[5]

---

[3] "Ready Mixed Concrete Production Statistics," National Ready Mixed Concrete Association. 2017 (hereafter "Ready Mixed Concrete Production Statistics"). Available at: https://www.nrmca.org/concrete/data.asp (visited Jan. 10, 2018).
[4] Ready Mixed Concrete Production Statistics.

Thus, growth in the Ready-Mix Concrete industry can be expected to closely follow construction market growth.

85.    Annual employment data from the Bureau of Labor Statistics reveal a simple correlation of 0.9 between employment growth rates in the Ready-Mix Concrete market and those of the construction industry.[6]

86.    Demand for Ready-Mix Concrete is divided relatively evenly among residential, commercial, infrastructural, and industrial use. Figure 5 displays global ready-mix concrete market volume by application:[7]



87.    Demand has increased at a steady rate since 2013 and is expected to continue its trajectory.

---

[5] 2002 Use Tables—Input-Output Accounts Data, Bureau of Economic Analysis . Available at: https://www.bea.gov/industry/io_benchmark.htm (visited Jan. 10, 2017).
[6] Syverson, Chad, "Markets: Ready-Mixed Concrete," JOURNAL OF ECONOMIC PERSPECTIVES (Winter 2008) at 6 (hereafter "Syverson").
[7] Source: Grand View Research Market Report (2016).

88.    Residential construction accounts for 36 percent of Ready-Mix Concrete output, according to the 2016 Grand View market report. Residential use is slightly higher than infrastructural use, which in turn is higher than commercial and industrial use. Figure 5 demonstrates that these ratios are expected to persist into the future.

89.    According to the National Association of Home Builders, construction costs are 61.8 percent of a home's value.[8] Ready-Mix Concrete is 3 percent of total construction costs.[9]

90.    According to an IBISWorld report on Ready-Mix Concrete manufacturing in the U.S., the Ready-Mix Concrete industry is "in the mature phase of its life cycle, characterized by slow growth rates, industry consolidation and market acceptance. At this stage, growth is increasingly dependent upon the cyclical fluctuations of downstream construction industries."[10]

91.    This same report observes that within the U.S., "[t]he Southeast is the dominant region for industry activity, accounting for an estimated 28.7 percent of industry establishments in 2017, higher than the region's share of the US population."[11]

92.    This observation reflects the "relatively low labor costs in the region as well as the industrial clusters that provide easy access to raw material, trucks, and other inputs. The Southeast also provides a large market for Ready-Mix Concrete due to the

---

[8] Taylor, Heather, "Cost of Constructing a Home," NAHB Economics and Housing Policy Group, National Association of Home Builders (Nov. 2, 2015).
[9] Syverson.
[10] Ediz Ozelkan, "Ready-Mix Concrete Manufacturing in the US," IBISWorld Industry Report 32732, p. 11 (July 2017) (hereafter "IBISWorld Report").
[11] IBISWorld Report, p. 18.

vast highway network that spans the region. The region also heavily manufactures concrete pipes, railway ties and blocks."[12]

93.    While demand for Ready-Mix Concrete follows similar patterns nationally and regionally, its drivers are almost exclusively local supply and construction activity. This is due to Ready-Mix Concrete's high perishability. High transportation costs and a limited time from batching to curing means markets for Ready-Mix Concrete are necessarily limited in geographic scope.

94.    Based on publicly available data, including metropolitan Ready-Mix Concrete market values and growth in the local construction industries, the estimated value of the Ready-Mix Concrete market in the Savannah/Charleston Region cities of interest to this litigation from 2010–2016 is reflected in Table 1.[13]

| Table 1: Ready Mix Concrete Market Size, 2010-2016 | | | | |
|---|---|---|---|---|
| Savannah | Statesboro | Hilton Head | Charleston | TOTAL |
| $134,215,509 | $88,459,574 | $553,466,227 | $485,808,716 | $1,261,950,026 |

95.    Demand for Ready-Mix Concrete has seen significant increase in each of the geographic markets:

---

[12] *Id.*

[13] The values in Table 1 are based on the 2010 Barnes Report on the U.S Ready-Mix Concrete industry as well as the Census Bureau's regional annual construction payroll. The annual rate of growth in the regional construction industries was calculated to estimate the rate of change of the respective ready-mix concrete market. Using the Barnes Report's 2011 metropolitan market values as the base value, the markets in the years 2010 and 2012–2015 can be valued by multiplying the previous year's value by the estimated rate of change. The value for 2016 was estimated by taking the average value of the past four years. The aggregated value for 2010–2016 is documented in Table 1. *See* "Barnes Reports: U.S. Ready-Mix Concrete Mfg. Industry (NAICS 32732)," C. Barnes and Co.; Metropolitan Statistical Areas: SUSB Annual Data Tables 2011-2015, U.S. Census Bureau (2016). Available at: https://www.census.gov/programs-surveys/susb/data/tables.All.html (visited Jan. 10, 2018).

A. **Savannah, Georgia.** Demand for Ready-Mix Concrete in Savannah has increased each year since 2012. The average monthly number of employees in the regional mining, logging, and construction market grew from 5,600 average employees in 2012 to 7,300 in the first nine months of 2017.[14] Annual construction payroll increased from $244,606,000 in 2012 to $294,924,000 in 2015.[15] In 2014, 47 percent of new permits issued were for residential projects, 47 percent were for commercial projects, and 6 percent were for full site permits.[16]

B. **Statesboro, Georgia.** Demand for Ready-Mix Concrete in Statesboro has risen slightly. Between 2012 and 2015, annual construction payroll increased from $39,852,000 to $44,863,000.[17] In that same period, the number of building permits in Statesboro's Bulloch County rose from 382 to 495.[18] The Federal Reserve Bank of St. Louis publishes the total number of new private housing structures authorized annually in Statesboro's Bulloch County. From 2012–2015, 835 new homes were authorized in Bulloch County.[19]

C. **Hilton Head/Bluffton, South Carolina.** Demand for Ready-Mix Concrete in Hilton Head has risen considerably. In 2015, Hilton Head saw an annual construction payroll of $160,831,000—a 43 percent increase from 2012's annual payroll.[20] There were 785 new private housing structures authorized in Beaufort County between 2012 and 2015.[21] Alternative housing construction also saw regional growth. In 2014, multiple developers announced plans to construct residence communities, apartment complexes, and affordable housing developments.[22]

---

[14] State and Area Employment, Hours, and Earnings: Mining, Logging, and Construction Industry, Savannah, Georgia, Bureau of Labor Statistics (2017).

[15] Geography Business Patterns, 2012–2015. U.S. Census Bureau.

[16] "Building and Construction," City of Savannah website (2017).

[17] Geography Business Patterns, 2012–2015, U.S. Census Bureau.

[18] "Building Statistics," Bulloch County Georgia website (2017).

[19] BPPRIV013031, Federal Reserve Economic Database ("FRED") (2017).

[20] Geography Business Patterns, 2012–2015. U.S. Census Bureau.

[21] "Building Statistics," Bulloch County Georgia website (2017).

[21] BPPRIV037013, FRED (2017).

[22] Moody, Erin. "Hundreds of New Homes Proposed for Beaufort Market," *Island Packet* (Nov. 17, 2014).

D.    **Charleston, South Carolina.** Demand for Ready-Mix Concrete in Charleston has risen steadily since 2012. Total annual construction payroll in 2015 was $705,890,000—41 percent higher than in 2012.[23] The Charleston metro area's economy grew 15.2 percent between 2011 and 2016, bringing with it construction growth. In 2016, the construction industry comprised about 20 percent of regional economic growth.[24]

## MARKET FACTORS FAVORING ANTICOMPETITIVE CONDUCT

96.    Several factors exist in the product and geographic markets identified above that strongly favor the effectiveness of anticompetitive conduct by the Defendants. These factors exist in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market.

A.    **Market Concentration.**

97.    A concentrated market facilitates the operation of a cartel because it makes it easier to coordinate behavior among possible co-conspirators and makes it more difficult for customers to avoid the effects of collusive behavior. Each of the Ready-Mix Concrete geographic markets identified above is highly concentrated.

98.    In highly concentrated markets Ready-Mix Concrete manufacturers are able to effectively exert market power – the power to control pricing – because direct purchasers like the Plaintiffs do not have a sufficient number of other suppliers to turn to for lower prices.

99.    Since the Ready-Mix Concrete market geographic markets identified above are highly concentrated, homogeneous, and have a high degree of transparency, collusion

---

[23] Geography Business Patterns, 2012–2015. US Census Bureau.
[24] Wren, David. "Charleston Region's Economy Humming at Fasted Pace in South Carolina," *Post and Courier* (Sept. 25, 2017).

is more likely because competitors are commonly aware of each other's production

capacities, costs, sales volumes, prices, and customers, and it is easy to monitor and

retaliate against potential deviation from a coordinated scheme.

### B.    Commodity Characteristics of Ready-Mix Concrete.

100.    A market's susceptibility to coordinated anticompetitive behavior increases

where the relevant product is a homogeneous commodity product. When products are

characterized as commodities, it is easier to maintain a cartel as cheating can be more

easily detected.

101.    With respect to the ready-mix concrete market, the Federal Trade

Commission has concluded that "[c]oordination is particularly likely where the relevant

product is homogenous, as is ready-mix concrete."[25]

102.    Similarly, as described in a study on demand fluctuations in the Ready-Mix

Concrete industry, "[w]hile it is possible to produce several hundred types of concrete,

these mixtures basically use the same ingredients and machinery. Thus, one can think of

ready-mix concrete as a homogeneous product."[26]

103.    "Ready-mixed concrete is physically quite homogenous. While concrete

can be differentiated along some dimensions[,] these differentiations are minor in scope

relative to those seen within many manufacturing industries[.] Moreover, the

differentiation in attributes of concrete output across plants is likely to be smaller still.

Because of transport constraints, every plant typically produces the entire spectrum of

---

[25] *See In the Matter of Cemex, S.A. de C.V.*, No. 051 0007, Docket No. C-4131.
[26] Allan Collard-Wexler, "Demand Fluctuations in the Ready-Mix Concrete Industry,"
*Econometrica*, Vol. 81, No. 3, May 2013, p. 1005.

ready-mixed concrete varieties, rather than some plants specializing in certain types of concrete and others in different types."[27]

### C.    High Barriers to Entry.

104.    The intended effect of a conspiracy to raise prices is to generate higher profits for the participants. In a perfectly competitive market, higher profits draw other firms who wish to capture a share of those profits into the market.

105.    If barriers to entry exist that prevent these firms from coming into the marketplace, established firms may be able to raise price of the good above competitive levels and earn above-normal levels of profits without fear of interference.

106.    High barriers to entry exist in the Ready-Mix Concrete geographic markets identified above. These include, without limitation, high capital expenditures, long-standing customer relationships, low resale value, and environmental regulation.

107.    <u>High Capital Expenditures</u>. Ready-Mix Concrete production requires substantial initial capital and cash flow. Total new plant costs are estimated between $3 and 4 million.[28] A steady cash flow is necessary for equipment upkeep, for average plant maintenance costs $49,407 annually.[29] Plants must be located on property that is zoned for industry but also convenient for deliveries, resulting in additional search and purchase costs. These high initial costs associated with entering a Ready-Mix Concrete market are significant barriers to entry.

---

[27] Syverson.
[28] Collard-Wexler.
[29] Al-Araidah et al. "Costing of the Production and Delivery of Ready-Mix-Concrete." *Jordan Journal of Mechanical and Industrial Engineering.* pp. 163-173. Vol. 6, No. 2. April 2012.

108.　Established Customer Relationships. The "relationship capital" required to sustain the business may also preclude entry into a Ready-Mix Concrete market. As one cement company president testified to the FTC, "The ready-mixed business, as we analyze it, is a very personal type of business and the operators develop personal relationships with contractors over many, many years. To go in and go through developing those relationships on the part of a newcomer would assure you that you are going to lose money for 3, 4, 5 years."[30] The front cost of lost revenue while establishing goodwill and a sufficiently large customer base is therefore also a significant barrier to entry.

109.　High Turnover Rates. The likelihood of monetary loss for three to five years while establishing a market presence is exacerbated in Ready-Mix Concrete markets by a high rate of turnover. In a 2005 NBER paper, Lucia Foster, John Haltiwanger, and Chad Syverson found that over 30 percent of plants in operation currently will not be operating five years later. Indeed, exit rates for the industry are high—21.8 percent.[31] Collard-Wexler (2005) also found that small plants (fewer than 20 employees) were three times more likely to exit the market than plants with 60 employees or more.[32] These high turnover rates, and the accompanying risk of significant capital loss, are also a significant barrier to entry.

---

[30] Syverson.
[31] Foster, Lucia, John Haltiwanger, and Chad Syverson. "Reallocation, Firm Turnover, and Efficiency: Selection on Productivity or Profitability?" NBER (2005).
[32] Collard-Wexler.

110. <u>Environmental Regulations</u>. In addition to strict quality control standards, Ready-Mix Concrete manufacturers must also comply with environmental regulations. For example, South Carolina concrete plants cannot exceed particulate matter (PM) emissions of 250 tons per year, and PM of 10 micrometers of 100 tons per year; plants operating as "truck mixed" cannot exceed 164 cubic yards produced per hour; "central mixed" plants cannot exceed 294 cubic yards produced per hour.[33] Compliance and related record-keeping related to environmental regulations are thus an additional cost of operation that act as barriers to entry.

## THE DEFENDANTS' CONSPIRACY

111. From at least January 1, 2010 through the present Defendants have engaged in discussions leading to: (i) agreements concerning the list prices, and specific prices stated in bids, quotes or otherwise, for Ready-Mix Concrete and related fees to be charged to customers in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market; (ii) agreements concerning the annual across-the-board price increases for Ready-Mix Concrete to impose on customers in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market; and (iii) agreements concerning the allocation, among Defendants, of territories and customers in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market. These agreements were successful, causing customers in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market to pay substantially more for Ready-

---

[33] "Concrete Plants," South Carolina Department of Health and Environmental Control (2017).

Mix Concrete than they would have in the absence of the conspiracy, and causing

antitrust injury to their business or property.

### *Individual Participants*

112.    Defendants have engaged in these discussions and entered these agreements

through high-ranking management and sales representatives with full authority over

pricing. In some instances, management or sales representatives from related entities

participated in forming, policing and enforcing the agreements among Defendants.

113.    From at least January 1, 2010 through the present, Greg Melton was the

Division Manager in charge of sales and pricing for LaFarge and later Argos in the

Savannah region. Greg Melton had and has full and final authority over all pricing

decisions for Ready-Mix Concrete, additives and related items or services sold by

LaFarge and Argos in the Savannah region, including annual price increases and the

prices stated in price lists, bids and other offers to customers.

114.    From at least January 1, 2010 through mid-2016, Jim Pedrick was a cement

sales manager for LaFarge Cement and later Argos Cement in the Savannah region and

other locations. Pedrick sold or attempted to sell cement to all the Defendants in the

Savannah region.

115.    From at least January 1, 2010 through the present, Andy Stankwytch was

the Division Regional Manager of the Carolinas and Savannah region for LaFarge and

later Argos. Stankwytch was and is the supervisor to Greg Melton.

116.    From at least January 1, 2010 through mid-2015, David Melton – who is

the brother of Greg Melton – was the General Manager and Director of Operations for

Elite in the Savannah region. David Melton had full and final authority over all pricing decisions for Ready-Mix Concrete, additives and related items or services sold by Elite in the Savannah region, including annual price increases and the prices stated in price lists, bids and other offers to customers. Prior to becoming General Manager and Director of Operations for Elite, Greg Melton was employed by LaFarge Concrete, which later became Argos.

117.    From at least January 1, 2010 through the present, Troy Baird and Trey Cook have been the co-owners of Elite, have been aware of the pricing and sales conduct of David Melton alleged in this Complaint, and have participated in or facilitated the conspiracy alleged in this Complaint.

118.    From at least January 1, 2010 until its sale to Thomas in 2015, Tim Coughlin was President of, and Tim Mahoney was a salesperson for, Coastal. Coughlin and Mahoney were in charge of sales and pricing for Coastal in the Savannah region, and shared full and final authority over all pricing decisions for Ready-Mix Concrete, additives and related items or services sold by Coastal in the Savannah region, including annual price increases and the prices stated in price lists, bids and other offers to customers.

119.    From at least January 1, 2010 through the present, Tommy Strickland and his nephew Bo Strickland have been co-owners of, and in charge of sales and pricing for, Evans in the Savannah region. Tommy and Bo Strickland shared full and final authority over all pricing decisions for Ready-Mix Concrete, additives and related items or services

sold by Evans in the Savannah region, including annual price increases and the prices stated in price lists, bids and other offers to customers.

### *List Prices and Annual Price Increases*

120.    From at least 2010 through the present, Defendants have periodically updated their list prices to increase their prices for Ready-Mix Concrete, and have sent their customers price increase announcements informing them of the price increases. For each price increase during this period, before increasing their list prices, representatives of Defendants communicated through an intermediary, or communicated in person and/or by phone, regarding the amount of such increases and agreed concerning either the increased price per yard for a benchmark mix (3000 psi) or the amount of an across-the-board increase.

121.    For some or all of these years, Jim Pedrick, cement sales manager for LaFarge Cement and later Argos Cement, told representatives of the other Defendants, including David Melton (Elite), Bo Strickland (Evans), and Tim Coughlin or Tim Mahoney (Coastal), the amount of the annual price increase proposed by Argos, and secured from each of these representatives an agreement that their respective companies would increase their prices in the same amount. Subsequently, each of these Defendants changed their list prices in amounts consistent with the agreement and advised their customers of the amount of the annual price increase.

122.    In early 2012, Greg Melton and Andy Stankwytch (Argos) met with Trey Cook and David Melton (Elite) at a Cracker Barrel restaurant in Pooler or Savannah, Georgia, and agreed that they would increase their prices effective April 1, 2012 by

$6.00, resulting in a base price of $86.00 per yard for 3000 psi Ready-Mix Concrete. Jim

Pedrick then shared the amount of the price increase with Tim Coughlin of Coastal

Concrete and Bo Strickland at Evans Concrete, both of whom agreed to the baseline price

of $86.00 per yard for 3000 psi Ready-Mix Concrete.

123.    In April 2012, members of the conspiracy attempted to convince Mark

Turner, co-owner of non-Defendant Mayson Concrete, to join their agreement for a price

increase and to adopt the baseline price of $86.00 per yard for 3000 psi Ready-Mix

Concrete. Turner refused to agree to the price increase.

124.    On or about October 25, 2012, representatives of Argos and Coastal

discussed an agreed across-the-board price increase of $7.00 per yard, to take effect

January 1, 2013.

125.    In late 2013, Pedrick coordinated an $8.00 annual price increase among

Defendants effective January 1, 2014. On or about October 9, 2013, Pedrick coordinated

an agreement between Argos and David Melton (Elite) to implement an $8.00 per yard

Ready-Mix Concrete price increase for 2014. On October 11, 2013, Pedrick told the

Ready-Mix Concrete management team at Argos that he had already coordinated an

$8.00 per yard price increase for 2014 with Elite, that he expected Evans to agree to the

price increase, and that he had lunch scheduled with a representative of Coastal the

following Thursday to ask them to agree to the price increase.

126.    Pedrick met with Tim Coughlin and/or Tim Mahoney (Coastal) on or about

October 17, 2013 to discuss and agree on an $8.00 Ready-Mix Concrete price increase by

Argos and Coastal. On the same day Bo Strickland, in a phone conversation with Pedrick, agreed that Evans would implement the same $8.00 Ready-Mix Concrete price increase.

127.    Pedrick and/or Greg Melton collected price increase letters from Coastal, Evans, and Elite in October 2013, confirming their $8.00 per yard increase in Ready-Mix Concrete prices effective January 1, 2014.

128.    From at least 2010 through the present, Defendants prepared price sheets and/or internal price lists that reflected the price increases to which they had agreed. The price sheets and internal price lists reflecting their agreement were provided to customers and employees of their respective companies to be used for determining the price of the Ready-Mix Concrete they sold or offered for sale in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market.

129.    The price sheets and internal price lists reflecting their agreements were used by Defendants to set actual and offered prices for Ready-Mix Concrete for customers in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market, who paid the base, list or price sheet price. The price sheets and internal price lists reflecting their agreement were also used by Defendants as a starting point to set actual and offered prices in the form of annual contract or quote prices, specific price quotes, bid prices, structured discount prices and other negotiated or discounted prices in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market.

130.    Defendants communicated with one another from at least 2010 through the present to determine whether their agreements on price increases were being successfully

implemented in the prices offered to and/or paid by customers.  Defendants were and are

also able to monitor the prices being offered by the other companies for Ready-Mix

Concrete from information provided to them by customers, prospective customers and

other participants in the industry.

### *Market Allocation and Bid Rigging*

131.    Prior to 2011, LaFarge and Evans had an agreement that LaFarge would not

sell Ready-Mix Concrete in Statesboro, Georgia, if the job required a LaFarge truck to

pass an Evans concrete plant. LaFarge told its salespeople to not sell Ready-Mix

Concrete for jobs located in the Statesboro area.

132.    After Argos purchased the LaFarge plants in the Savannah/Charleston

Region in 2011, Argos entered into a new agreement with Evans for the Statesboro

Market. Greg Melton and Bo Strickland agreed that neither would go to a price below

$88.00 per yard (using the 3000 psi benchmark) on commercial jobs, and that the two

companies would alternate winning bids for major projects, with the intended losing

bidder submitting a purposefully higher bid.

133.    Thereafter, Greg Melton and Strickland communicated regularly

concerning specific jobs in the Statesboro Market, and for those jobs reached agreements

concerning which company would submit the winning bid, what the winning bid amount

would be, and what the losing bid amount would be. Greg Melton maintained a

"scorecard" identifying the jobs given to Evans under the agreement and the jobs given to

Argos under the agreement. For example, on June 15, 2012, Greg Melton instructed an

Argos salesperson to bid $89.00 per yard on the Georgia Southern University ("GSU")

Juneau Dining Hall job, and told the salesperson that Evans will quote $91.00 per yard on the same job. Argos "won" the job by agreement with Evans.

134.    On June 19, 2012, Greg Melton informed the Argos management team that he was allocating some customers to Evans.  He also shared with management lists of customers of non-Defendants Southeast Ready Mix and Premiere Concrete, which were obtained through Pedrick or by following mixer trucks, and stated that Argos would undercut the pricing of Southeast and Premier with their largest customers.

135.    In 2012 and 2013, Argos and Evans divided up several substantial jobs in the Statesboro Market through this method of bid rigging. As a result of their collusion, Argos received the job for a Hampton Inn (600 yds.), a job identified as "Rucker III" (3000 yds.), site work for The Islands apartments (300 yds.), a CVS Pharmacy (600 yds.), the GSU Juneau Dining Hall (3000 yds.), and Aspen Heights apartments (9000 yds.). As a result of their collusion, Evans received the job for the GSU Biology building (11000 yds.), a Nissan dealership (250 yds.), a Steak & Shake (200 yds.), building work for The Islands apartments (3000 yds.), a Briggs & Stratton facility (200 yds.), the GSU Recreational facility (300 yds.), site work for Aspen Heights apartments (1500 yds.) and the GSU Douglas Monarchs apartments (2000 yds.). As a result of their collusion, Evans and Argos split the job of supplying Ready-Mix Concrete for the GSU sports stadium.

136.    From at least 2010 through the present LaFarge/Argos and Elite have engaged in an ongoing process of market allocation and bid-rigging in the Savannah Market and Hilton Head/Bluffton Market. From before 2010, LaFarge/Argos and Elite agreed that as between them LaFarge/Argos would take predominantly the commercial

jobs while Elite would take predominantly the residential jobs. Greg Melton (LaFarge/Argos) instructed salespeople to allow David Melton (Elite) to "win" 75% of the residential work. This agreement was so well-established that Greg and David Melton had a specific understanding that Elite would provide 75% of the Ready-Mix Concrete required by residential builder Terry Varnadore, even if LaFarge/Argos had "won" the job. In many instances, Ready-Mix Concrete that was supposed to have been provided by LaFarge/Argos – to Varnadore and others – was actually provided by Elite.

137.    During at least 2012 and 2013, Greg Melton, David Melton and sometimes a representative from Coastal met regularly at the Sunshine Restaurant in Pooler, Georgia to discuss pricing and specific jobs in the Savannah Market and Hilton Head/Bluffton Market, including the allocation of jobs by agreement.

138.    Greg Melton and David Melton communicated regularly by phone, as often as several times per week, about pricing and specific jobs in the Savannah Market and Hilton Head/Bluffton Market, and to agree on the allocation of specific jobs between LaFarge/Argos and Elite. Greg Melton and David Melton also shared mix designs necessary for submitting bids on certain jobs to facilitate their bid-rigging and market allocation scheme.

139.    By rigging bids, Defendants could enforce their existing agreements regarding pricing and market allocations in the Savannah Market and Hilton Head/Bluffton Market, collectively meet their shared goal of maintaining or raising prices, and split up and share larger projects. Bid rigging also allows parties to a price-

fixing or market allocation agreement to deter cheating on the agreement on particularly lucrative projects that might otherwise reward cheating.

### *Add-Ons and Service Fees*

140.    From at least 2010 through the present, LaFarge/Argos, Elite, Evans and Coastal have agreed to include certain additional fees for the delivery of Ready-Mix Concrete in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market, and have agreed on the amount of those fees.

141.    On April 3, 2012, Greg Melton (Argos) spoke to David Melton (Elite) by phone. During the conversation, the two agreed that the group of conspiring companies would add a fuel surcharge to all Ready-Mixed Concrete deliveries.

142.    In April 2012, Troy Cook (Elite) met with Mark Turner, co-owner of non-Defendant Mayson Concrete, and told him that Elite, Coastal and Argos had agreed to charge new environmental fees and other surcharges. Cook asked Turner to join the agreement to impose these additional charges but Turner did not agree to do so.

143.    LaFarge/Argos, Elite, Evans and Coastal agreed to impose on purchasers a fuel surcharge for each truckload of Ready-Mix Concrete delivered, in an amount tied to the market price of diesel fuel. Pursuant to their agreement, LaFarge/Argos, Elite, Evans and Coastal did collect a per-truckload fuel surcharge from their customers.

144.    LaFarge/Argos, Elite, Evans and Coastal agreed to impose on purchasers an environmental fee for each truckload of Ready-Mix Concrete delivered, in an amount ranging from $3.00 to $6.00 per truckload. Pursuant to their agreement, LaFarge/Argos,

Elite, Evans and Coastal did collect a per-truckload environmental fee from their customers.

145.    LaFarge/Argos, Elite, Evans and Coastal agreed to impose on purchasers a "short load" or "small load" fee for each truckload of Ready-Mix Concrete of 5 cubic yards or less, in an amount ranging from $120.00 to $125.00 per truckload. Pursuant to their agreement, LaFarge/Argos, Elite, Evans and Coastal did collect a per-truckload "short load" or "small load" fee from their customers.

146.    By agreeing to include certain additional fees for the delivery of Ready-Mix Concrete in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market, and agreeing on the amount of those fees, Defendants have eliminated the ability of direct purchasers to benefit from competition between Ready-Mix Concrete suppliers in those Markets on whether and in what amount to charge for such fees. The Defendants' agreement on additional fees also reinforced and enhanced the effectiveness of their existing agreements regarding pricing and market allocations in these Markets, and deterred cheating by conspiracy participants who might otherwise manipulate their true price by altering the additional fees.

*Monitoring and Enforcement*

147.    It is only economically rational and in the self-interest of members of a cartel to participate in a conspiracy if all members of the cartel are complying with the rules of the conspiracy.  The success and duration of a conspiracy to fix prices or allocate markets, such as Defendants' conspiracy in this case, are therefore both substantially

enhanced by the ability of participants to monitor the pricing conduct and market shares of other participants to ensure that no participants are cheating.

148.    A consistency of market shares among the participants of a cartel indicates compliance with the agreed rules. An increase of market share by a participant indicates cheating or the ineffectiveness of the rules or mechanisms of the conspiracy. Greg Melton (LaFarge/Argos) and likely others monitored the respective market shares of Defendants in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market. Greg Melton regularly received tonnage reports of the amount of cement sold to the purchasers in the Savannah region from Jim Pedrick (LaFarge/Argos Cement) and Jimmy Carson, a sales representative for Holcim Cement. Greg Melton shared the market reports with David Melton (Elite) and with Pedrick, who would have had the opportunity to share the reports with other Defendants.

149.    From at least 2010 through the present, Greg Melton (LaFarge/Argos), Jim Pedrick (Argos), David Melton (Elite), Troy Baird (Elite), Bo Strickland (Evans), Tim Coughlin (Coastal/Thomas), Tim Mahoney (Coastal/Thomas) and additional individuals representing the Defendants have engaged in ongoing communications, both directly and through intermediaries, regarding the sale and pricing of Ready-Mix Concrete in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market, and specific jobs and specific customers in these Markets, for the purpose of furthering and enforcing the conspiracy, including without limitation:

- Confirmation of pricing on particular jobs, on list prices and on price increases;

- Making or responding to complaints about undercutting agreed pricing;

- Making or responding to complaints about selling in prohibited locations; and

- Threatening harm or retaliation for failing to comply with agreed pricing or market allocation.

150.    For example, on or about February 28, 2012, Tim Coughlin, Greg Melton and Troy Baird (Elite) exchanged price-increase letters through Pedrick to confirm they had complied with the agreement to increase prices in the Savannah Market, Statesboro Market and Hilton Head/Bluffton Market.

151.    As an additional example, on or about March 12, 2012, Greg Melton told Argos sales employees that they were prohibited from undercutting the prices of Elite and Coastal, but could match those prices. Melton also instructed Argos sales employees to discount aggressively when necessary to take work from non-conspirators Mayson Concrete and Premier Concrete.

152.    Further, on March 30, 2012, Greg Melton (Argos) told one or more other Argos employees that Troy Baird (Elite) had threatened Mark Turner, co-owner of non-Defendant Mayson Concrete, that Mayson needed to go along with the price-increase agreed to by other suppliers, and that it would suffer if it took any customers from Elite.

153.    And on or about May 30, 2012, Greg Melton (Argos), Andy Stankwytch (Argos) and Troy Cook (Elite) met for breakfast at a Cracker Barrel restaurant to discuss market prices and compliance with the conspirators' price-fixing agreement.

## HARM TO COMPETITION AND ANTITRUST INJURY

154.    Defendants' conspiracy to fix or raise prices, allocate markets, rig bids and impose additional fees in the Savannah Market, Statesboro Market, Hilton Head/Bluffton

Market and Charleston Market from 2010 through the present has had anticompetitive effects in, and has caused competitive harm to, each of these Markets for Ready-Mix Concrete as a whole.

155.    Defendants' conspiracy to fix or raise prices, allocate markets, rig bids and impose additional fees from 2010 through the present has harmed competition in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market for Ready-Mix Concrete by: (i) limiting or displacing customer choice; (ii) limiting or displacing competition on the basis of price; and (iii) limiting or displacing competition on the basis of the inclusion and amount of additional fees.

156.    Direct purchasers of Ready-Mix Concrete from Defendants' plants in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market were substantially impacted by the conspiracy among Defendants to fix or raise prices and allocate markets, and their enforcement of those agreements through bid-rigging. These purchasers paid substantially more for Ready-Mix Concrete than they would have paid in the absence of the conspiracy, and therefore suffered antitrust injury to their business or property.

157.    The impact of Defendants' conspiracy on the price of Ready-Mix Concrete can be seen in the inverse relationship of demand and price in the greater Savannah region. Among the four basic laws of supply and demand in economics are: (i) if demand increases and supply remains unchanged, price and production will rise, and (ii) if demand decreases and supply remains unchanged, price and production will fall.

158.    In Figure 6 below, for the greater Savannah region, demand for normal weight Ready-Mix Concrete is plotted against the indexed average of pricing for multiple strengths of normal weight Ready-Mix Concrete. As demand increased from 2003 through 2006, the price of Ready-Mix Concrete rose, as expected. However, when demand fell drastically from 2007 through 2010, the price of Ready-Mix Concrete continued to rise, falling only modestly at about the time demand began to improve. This data and the inverse relationship between demand and price are consistent with the presence of effective collusion on price, and strongly suggest the conspiracy was well underway by 2010.



Figure 6: Normal Weight RMC Price v. Cost Index, Demand: Savannah

159.    The cost of Ready-Mix Concrete for contractors in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market also frequently

exceeded national averages, and did not move with the cost of Portland cement, the most significant cost driver of the price of Ready Mix Concrete.

160.   The U.S. Bureau of Labor Statistics tracks a producer price index for ready-mix concrete in the Southern region of the U.S. This index is shown in Figure 7 below.[34]



161.   As Figure 7 demonstrates, the quarterly PPI increased consistently from 2013–2017. It rose more sharply in 2014, likely due to the construction industry's recovery from the 2008 recession.

162.   Figure 8 below illustrates the contractor Ready-Mix Concrete cost for Savannah, Statesboro, Hilton Head/Bluffton, and Charleston compared to the national average cost ratio—100.0. Statesboro's Cost Index was consistently above the national average from 2010–2017. Hilton Head's Cost Index dropped only once below the

---

[34] Source: Bureau of Labor Statistics

national average. Stated differently, the cost of concrete in both Statesboro and Hilton Head were generally above national levels. The strongly similar cost movement in the Hilton Head/Bluffton market and the Charleston market also is evidence that these two South Carolina markets are highly integrated – i.e. that the price of Ready-Mix Concrete in these markets was driven by the same variables, including the Defendants' conspiracy.



Figure 8: City Cost Indexes for Ready-Mix Concrete, 2010-2017

163.    All other conditions remaining stable, ready-mix concrete prices fluctuate with the market price of cement and the number of competitors in the market.

164.    As shown in Figure 9, the price of Portland cement does not fluctuate greatly. From 2000–2017, the price of Portland cement increased at an average annual

compound rate of 2 percent. The widespread availability and ease of production explain its low cost.



**Figure 9: Price of Portland Cement (USD/Metric Ton)**

165.    Though inexpensive, Portland cement comprises 60 percent of concrete's total materials cost, the highest percentage of any component. Its price therefore weighs more heavily on the price of ready-mix concrete.

166.    The level of competition within the market also affects the price of ready-mix concrete. Allan Collard-Wexler (2006) found the median price of concrete varied with the number of competitors. If the market had only one competitor, the median price, in 1963 dollars, was $41.05 per cubic yard. If there were two competitors, the price dropped to $40.75. With eight competitors, the median price was about $40.25.

167.    While the price of Portland cement and the number of competitors in the ready-mix concrete market alter the price of ready-mix concrete, they do not alter it

greatly. Therefore, in a perfectly competitive market, the price of ready-mix concrete would not fluctuate widely.

168.    As shown above, pricing patterns in Statesboro, Savannah, Hilton Head/Bluffton, and Charleston do not follow the trends exhibited by the South regional PPI data, and exhibit fluctuations that are inconsistent with the cost history of Portland cement. This data is further evidence consistent with the presence of effective collusion on the price of Ready-Mix Concrete.

169.    Direct purchasers of Ready-Mix Concrete from Defendants' plants in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market were also substantially impacted by the conspiracy among Defendants to impose and fix the amount of additional fees for fuel surcharges, short load charges and environmental charges. These purchasers paid additional fees that might have been subject to negotiation in the absence of the conspiracy, paid more for such fees than they would have paid in the absence of the conspiracy, and paid substantially more for Ready-Mix Concrete than they would have in the absence of the conspiracy, and therefore suffered antitrust injury to their business or property.

## FRAUDULENT CONCEALMENT

170.    Plaintiffs incorporate the allegations of paragraphs 111-153 above as though set forth verbatim herein.

171.    Throughout the Class Period, Defendants and their co-conspirators intended to and did affirmatively and fraudulently act to conceal their wrongful conduct and the existence of their unlawful combination and conspiracy from Plaintiffs and other

members of the proposed Class and Subclasses, and intended that their communications with each other and their resulting actions be kept secret from Plaintiffs and other Class and Subclass members.

172.    Defendants' illegal price-fixing, bid-rigging and market allocation conspiracies are, by their nature, inherently self-concealing, and the affirmative actions of Defendants and their co-conspirators were wrongfully concealed and carried out in a manner that precluded detection.

173.    For instance, Argos has repeatedly stated publicly that it has an antitrust compliance policy, including, as part of its "Path of Sustainability," a public report available on its website. Plaintiffs and other Class and Subclass members reasonably inferred that Argos was enforcing this antitrust compliance policy.

174.    Defendants also misrepresented market conditions to explain price changes and other anticompetitive conditions. For example, in their price-increase letters to Ready-Mix Concrete customers, Defendants falsely attributed price increases and fuel surcharges to changes in input costs.

175.    Defendants discussed and formed their anticompetitive agreements during secret meetings and conversations. No one other than the co-conspirators was invited to or present at these meetings or conversations. Defendants conducted these meetings and conversations in secrecy to prevent the discovery of their conspiracy by members of the Class and Subclasses.

176.    Some employees of Defendants reported to their superiors, including regional-level managers, that the antitrust violations alleged herein were occurring in the

Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston

Market. In response, those employees were firmly told not to ever communicate about

such conduct, were told that no one would believe them or that there was no evidence of

such conduct, and were punished with negative job reviews or other retaliatory treatment.

177.    To further cloak their illegal communications with competitors, Defendants

used Argos's Jim Pedrick as a conduit to pass information among each another. As a

cement salesman, Pedrick's discussions with Argos's ready-mix competitors would not

have raised red flags.

178.    Pedrick even reassured customers that passing information through him

would protect them because it was not suspicious for a supplier to meet with its

customers. And Pedrick and other Argos management rebuffed concerns about the

Defendants' illegal antitrust activities raised by employees Tommy Waters and Hugh

Papy.

179.    Defendants and their officers and employees were and are aware that the

price-fixing, bid-rigging and market allocations that are the subject of the conspiracy

were and are occurring, and are illegal and violated federal law. Defendants' officers and

employees underwent training regarding the antitrust laws and the types of agreements

and other conduct that violate those laws.

180.    Defendants represented their list prices, bid quotes and other prices, as well

as delivery locations, to be the products of a free, open and competitive market.

Defendants swore under oath that bids submitted on public projects were free of

collusion. Defendant knew that their conspiratorial activities would not be successful if

they were disclosed to their customers or others, and therefore actively concealed their existence.

181.    On July 24, 2017, the complaint initiating the case of *Southeast Ready Mix, LLC and Mayson Concrete, Inc. v. Argos North America Corp. et al.*, Case 1:17-cv-02792-ELR (N.D. Ga.) was filed against the Defendants herein and additional entities, and contained substantial allegations of price-fixing of Ready-Mix Concrete among Defendants. The *Southeast Ready Mix* case received some media coverage.

182.    Until July 24, 2017 at the earliest, Plaintiffs and members of the Class and Subclasses were not aware of the combination and conspiracy alleged herein. Until July 24, 2017 at the earliest, Plaintiffs and members of the Class and Subclasses were not aware of facts that should have excited further inquiry on their part.

183.    Plaintiffs and members of the Class and Subclasses could not have discovered the combination and conspiracy alleged herein at any earlier date by the exercise of due, ordinary and reasonable diligence, because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of and affirmatively conceal their actions.

184.    Based on the foregoing, customers of Defendants and their co-conspirators, including Plaintiffs and members of the Class and Subclasses, were unaware that prices for Ready-Mix Concrete had been artificially raised and maintained as a result of the wrongful conduct as alleged in this Amended Complaint until at least July 24, 2017.

185.    By virtue of the fraudulent concealment by Defendants and their co-conspirators, the running of any statute of limitations has been tolled and suspended with

respect to any claims that Plaintiffs and other Class and Subclass members have as a result of the unlawful contracts, combinations and conspiracies alleged in this Complaint. The Class and Subclasses may therefore assert and recover damages for their claims for activities of the Defendants throughout the Class Period alleged herein and earlier if supported by the evidence.

## CLASS ACTION ALLEGATIONS

186.    Plaintiffs bring this action on behalf of themselves and, under Federal Rule of Civil Procedure 23(b)(2) and (b)(3), as representatives of the following Class (herein the "Class"):

> All persons or entities who purchased Ready-Mix Concrete at any time during the Class Period directly from the following: (i) LaFarge or Argos plants in Hinesville, Pooler, Richmond Hill, Savannah, Statesboro, Hilton Head, Rincon, North Charleston or Summerville; (ii) Coastal or Thomas plants in Hinesville, Savannah, East Savannah, Beaufort, Bluffton, North Charleston or Summerville; (iii) Evans plants in Statesboro or Claxton; or (iv) Elite plants in Bloomingdale, Hinesville, Richmond Hill or Hardeeville, but excluding Defendants, their co-conspirators, their respective parents, subsidiaries, and affiliates, and government entities.

187.    Pursuant to Federal Rule of Civil Procedure 23(c)(5), Plaintiffs propose the following subclasses (herein collectively the "Subclasses"):

> a.    The Savannah Subclass, composed of all persons or entities who purchased Ready-Mix Concrete at any time during the Class Period directly from: (i) LaFarge or Argos plants in Hinesville, Pooler, Richmond Hill and Savannah; (ii) Coastal/Thomas plants in Hinesville, Savannah and East Savannah; or (iii) Elite plants in Bloomingdale, Hinesville and Richmond Hill, but excluding Defendants, their co-conspirators, their respective parents, subsidiaries, and affiliates, and government entities.

> b.    The Statesboro Subclass, composed of all persons or entities who purchased Ready-Mix Concrete at any time during the Class Period directly from: (i) the LaFarge or Argos plant in Statesboro; or (ii) Evans plants in

Statesboro and Claxton, but excluding Defendants, their co-conspirators, their respective parents, subsidiaries, and affiliates, and government entities.

c.    The Hilton Head/Bluffton Subclass, composed of all persons or entities who purchased Ready-Mix Concrete at any time during the Class Period directly from: (i) LaFarge or Argos plants in Hilton Head and Rincon; (ii) Coastal/Thomas plants in Beaufort and Bluffton; or (iii) the Elite plant in Hardeeville but excluding Defendants, their co-conspirators, their respective parents, subsidiaries, and affiliates, and government entities.

d.    The Charleston Subclass, composed of all persons or entities who purchased Ready-Mix Concrete at any time during the Class Period directly from: (i) LaFarge or Argos plants in North Charleston and Summerville; or (ii) Coastal/Thomas plants in North Charleston and Summerville, but excluding Defendants, their co-conspirators, their respective parents, subsidiaries, and affiliates, and government entities

188.    Plaintiffs propose that they be appointed representatives of the Class and Subclasses, and that Plaintiffs' counsel be appointed counsel for the Class and Subclasses.

189.    The number of unique direct purchasers falling into the definition of the Class and each of the Subclasses is in the thousands. Therefore, the joinder of all Class members, or all Subclass members, is impracticable.

190.    There are questions of law and fact common to the Class and to each of the Subclasses, including the scope, duration, nature and impact of the conspiracy among Defendants.

191.    Plaintiffs are members of the Class and the Subclasses, and their claims are typical of the claims of Class and Subclass members generally. The claims of Plaintiffs arise from the same conduct giving rise to the claims of the Class and the Subclasses, and the relief Plaintiffs seek is common to the Class and Subclasses.

192.    Plaintiffs will fairly and adequately protect the interests of the Class and each of the Subclasses. The interests of Plaintiffs coincide with, and are not antagonistic to, those of the Class or the Subclasses.

193.    Plaintiffs are represented by competent counsel experienced in the prosecution of class action antitrust litigation, including antitrust claims against Ready-Mix Concrete manufacturers, and will fairly and adequately represent the interests of the Class and Subclasses.

194.    Questions of law and fact common to all members of the Class and each Subclass predominate over any questions affecting only individual class members. Predominating common questions include, without limitation:

    a.  whether Defendants and their co-conspirators conspired to fix, raise, stabilize or maintain the price of Ready-Mix Concrete in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market;

    b.  the mechanics, scope and extent of the conspiracy;

    c.  whether the conspiracy affected the prices of Ready-Mix Concrete paid by direct purchasers in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market during the Class Period;

    d.  the time period during which the conspiracy existed;

    e.  whether the conspiracy violated Section 1 of the Sherman Act;

    f.  whether the conspiracy caused injury to the business and property of members of the Class and Subclasses;

    g.   whether members of the Class and Subclasses are entitled to declaratory or

        injunctive relief;

    h.   the appropriate measure of damages sustained by members of the Class and

        Subclasses;

    i.   when the conspiracy could have been discovered in the exercise of ordinary

        or reasonable diligence; and

    j.   whether Defendants and their co-conspirators affirmatively and

        fraudulently concealed the conspiracy

195.   A class action is superior to any other available method for the fair and efficient adjudication of the claims of the Class and Subclasses. Indeed, it is the only realistic method for litigating the large number of claims at issue herein. Class treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously and efficiently. There are no difficulties likely to be encountered in the management of this lawsuit that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of the controversy.

196.   Defendants and their co-conspirators have acted on grounds generally applicable to the Class and Subclasses, thereby making final injunctive relief appropriate with respect to the Class and each Subclass as a whole.

## <u>VIOLATION OF FEDERAL ANTITRUST LAWS</u>

197.    Plaintiffs incorporate all foregoing allegations as though set forth verbatim

herein.

198.    Throughout the Class Period, Defendants and their co-conspirators engaged

in a continuing combination and conspiracy in unreasonable restraint of trade and

commerce in Ready-Mix Concrete in violation of Section 1 of the Sherman Act, 15

U.S.C. § 1.

199.    This combination and conspiracy consisted of agreements, understandings

and concerted action among Defendants and their co-conspirators, the substantial

objective of which was to raise and maintain at artificially high levels the prices of

Ready-Mix Concrete and additional related fees in the Savannah Market, the Statesboro

Market, the Hilton Head/Bluffton Market and the Charleston Market.

200.    For the purpose of forming and effectuating their combination and

conspiracy, Defendants and their co-conspirators did those things which they combined

and conspired to do, including, among other things, discussing, forming and

implementing agreements to raise and maintain at artificially high levels the prices for

Ready-Mix Concrete and related fees in the Savannah Market, the Statesboro Market, the

Hilton Head/Bluffton Market and the Charleston Market.

201.    Throughout the Class Period, Defendants and their co-conspirators

conspired to and did (i) agree concerning the list prices, and specific prices stated in bids,

quotes or otherwise, for Ready-Mix Concrete and related fees to be charged to customers

in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the

Charleston Market; (ii) agree concerning the annual across-the-board price increases for Ready-Mix Concrete to impose on customers in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market; and (iii) agree concerning the allocation, among Defendants, of territories and customers in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market.

202.    Throughout the Class Period, Defendants and their co-conspirators had a unity of purpose or common design and understanding, and a meeting of the minds in an unlawful arrangement.

203.    As a result of the combination and conspiracy among Defendants and their co-conspirators, the prices of Ready-Mix Concrete and related fees paid by Plaintiffs, Class members and Subclass members were artificially sustained or increased.

204.    The conduct of Defendants and their co-conspirators was undertaken for the purpose and with the specific intent of raising and maintaining prices of Ready-Mix Concrete and related fees and eliminating competition, in *per se* violation of Section 1 of the Sherman Act.

205.    The combination and conspiracy between Defendants and their co-conspirators caused harm to competition in the Savannah Market, the Statesboro Market and the Hilton Head/Bluffton Market for Ready-Mix Concrete and injury to the business and property of the Plaintiffs, the Class and the Subclasses.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs request:

1.    That the Court determine that this action may be maintained as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class and each Subclass, that the Court determine that Plaintiffs are adequate and appropriate representatives of the Class and Subclasses, that the Court designate the undersigned Plaintiffs' counsel as counsel for the Class and Subclasses;

2.    That the Court adjudge and decree that Defendants and their co-conspirators have engaged in an unlawful combination and conspiracy in violation of Section 1 of the Sherman Act;

3.    That Defendants and their respective affiliates, successors, transferees, assignees and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be restrained from, in any manner:

a)  continuing, maintaining or renewing any contract, combination or conspiracy alleged herein, or engaging in any other contract, combination or conspiracy having a similar purpose or effect, and adopting or following any practice, plan, program or device having a similar purpose or effect; or

b)  communicating or causing to be communicated to any other person engaged in the production, distribution or sale of any product

that Defendants also produce, distribute or sell, including Ready-Mix Concrete, information concerning prices or other terms or conditions of any such product, except to the extent necessary in connection with a *bona fide* sales transaction between parties to such communications;

4.   That the Court adjudge and decree that Defendants are jointly and severally liable to Plaintiffs, the Class and the Subclasses for three-fold the damages resulting from their conduct;

5.   That the Court enter judgment for Plaintiffs, the Class and each Subclass against Defendants and each of them, jointly and severally, for three times the amount of damages sustained by Plaintiffs, the Class and each Subclass, together with the costs and expenses of this action, including reasonable attorneys' fees, all as allowed by law;

6.   That Plaintiffs, the Class and each Subclass be awarded pre-judgment and post-judgment interest at the highest rate allowed by law; and

7.   That the Court grant such additional and further relief as may be deemed just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

Dated: <u>January 15, 2018</u>

Respectfully submitted,

<u>/s/Chad McGowan</u>
Chad McGowan
S.C. Fed. I.D. # 6620
Russell Burke
S.C. Fed. I.D. # 1604
McGOWAN HOOD & FELDER, LLC
1539 Health Care Drive
Rock Hill, SC 29732
(803) 327-7800
cmcgowan@mcgowanhood.com
rburke@mcgowanhood.com

***Proposed Plaintiffs' Liaison Counsel***

Irwin B. Levin
Richard E. Shevitz
Scott D. Gilchrist
Vess A. Miller
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
(317) 636-6481
ilevin@cohenandmalad.com
rshevitz@cohenandmalad.com
sgilchrist@cohenandmalad.com
vmiller@cohenandmalad.com

Gregory P. Hansel
Randall B. Weill
Michael S. Smith
Eric G. Penley
PRETI FLAHERTY,
 BELIVEAU & PACHIOS LLP
One City Center, P.O. Box 9546
Portland, ME 04101
(207) 791-3000
ghansel@preti.com
rweill@preti.com
msmith@preti.com
epenley@preti.com


Vincent J. Esades
Renae D. Steiner
Jessica N. Servais
HEINS MILLS & OLSON, PLC
310 Clifton Avenue
Minneapolis, MN 55403
(612) 338-4605
vesades@heinsmills.com
rsteiner@heinsmills.com
jservais@heinsmills.com

***Proposed Plaintiffs' Co-Lead Counsel***


Daniel R. Karon
Beau D. Hollowell
KARON LLC
700 W. St. Clair Avenue, Suite 200
Cleveland, OH 44113
(216) 622-1851
dkaron@karonllc.com
bhollowell@karonllc.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.

One South Broad Street, Suite 2100
Philadelphia, PA  19107
(215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Karl D. Twenge
S.C. Fed. I.D. # 10033
TWENGE + TWOMLEY LAW FIRM
311 Carteret Street
Beaufort, SC 29902
(843) 476-4573
twenge@twlawfirm.com

Frederick S. Bergen
BERGEN & BERGEN, P.C.
123 East Charlton Street
Savannah, GA 31401-4603
(912) 233-6600
fsbbergenlaws@aol.com

***Additional Counsel for the Plaintiffs***

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2018 a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system.

*s/Chad McGowan*
Chad McGowan
S.C. Fed. I.D. # 6620
**McGOWAN HOOD & FELDER, LLC**
1539 Health Care Drive
Rock Hill, SC 29732
Phone: (803) 327-7800
cmcgowan@mcgowanhood.com