UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Pro Slab, Inc., Bremer Construction Management, Inc., and Forrest Concrete, LLC, on behalf of themselves and all others similarly situated, | ) ) ) ) | Civil Action No.: 2:17-cv-3185-BHH |
| | ) | |
| Plaintiffs, | ) | **OPINION AND ORDER** |
| vs. | ) ) | |
| | ) | |
| Argos USA LLC, | ) | |
| Argos Ready Mix LLC, | ) | |
| Lafarge North America Inc., | ) | |
| Coastal Concrete Southeast II, LLC, | ) | |
| Thomas Concrete, Inc., | ) | |
| Thomas Concrete of South Carolina, Inc., | ) ) | |
| Evans Concrete, LLC, and | ) | |
| Elite Concrete, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the sufficiency of Plaintiffs Pro Slab, Inc., Bremer Construction Management, Inc., and Forrest Concrete, LLC's ("Plaintiffs") Second Amended Complaint. Pending before the Court are six motions to dismiss, including a joint motion to dismiss filed on behalf of all but one Defendant. For the reasons discussed below, the Court denies each of the motions to dismiss.

## BACKGROUND

Plaintiffs Pro Slab, Inc. and Bremer Construction Management, Inc. initially filed this proposed class action on November 22, 2017, alleging a claim under § 1 of the Sherman Antitrust Act, 15 U.S.C. §§ 1-7, arising from Defendants' alleged price fixing in the ready-mix concrete

market in coastal South Carolina and Georgia from at least January 1, 2012, through the present. On January 15, 2018, Plaintiffs filed an amended complaint alleging that Defendants violated § 1 of the Sherman Antitrust Act by conspiring to fix the prices of ready-mix concrete, to rig bids for certain projects, and/or to allocate certain territories and customers amongst themselves. Plaintiffs are purchasers of ready-mix concrete and allege that they have suffered injury as a result of Defendants' conspiracy to set artificially high prices for ready-mix concrete. In response, several Defendants filed a joint motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, asserting that the amended complaint (1) does not identify the role that each Defendant allegedly played in the conspiracy; (2) offers no factual allegations to support the alleged duration of the purported conspiracy; and (3) offers no factual allegations to support the inclusion of the Charleston market area. In addition to the joint motion to dismiss, various Defendants filed separate motions pursuant to Federal Rule of Civil Procedure 12(b).

On June 28, 2018, the Court issued an order granting the joint motion to dismiss and one of the separate motions to dismiss on the single issue that the amended complaint failed to allege facts to support Defendants' individual involvement (the "Order"). (ECF No. 129). In relevant part, the Court found that Plaintiffs impermissibly grouped Defendants according to their alleged corporate affiliation and failed to identify each Defendant's involvement in the alleged conspiracy. (*Id.* at 12-13) (". . . the amended complaint does not allege any facts showing that the entities failed to observe proper corporate form or that they identified themselves in documents or in meetings as one company, and the amended complaint does not even allege which entity or entities employed the individuals who allegedly attended specific meetings on behalf of the lumped-together entities"). The Court dismissed the action without prejudice, explaining that "to the extent that Plaintiffs can file an action containing sufficient factual allegations as to *each Defendant*, the

Court does not believe this dismissal should preclude them from doing so, particularly when this case is still in the early stages." (*Id.* at 14). Plaintiffs thereafter filed an opposed motion to amend the complaint, which the Court granted. (ECF No. 136). Plaintiffs filed the Second Amended Complaint ("SAC") on December 4, 2018. (ECF No. 139).

The SAC omits ten Defendants, leaving: Argos USA LLC and Argos Ready Mix LLC (referred to herein as Argos USA/Argos Ready Mix); Lafarge North America Inc.; Coastal Concrete Southeast II, LLC; Thomas Concrete, Inc.; Thomas Concrete of South Carolina, Inc.; Evans Concrete, LLC; and Elite Concrete, LLC (collectively and hereinafter, "Defendants"). The SAC adds approximately 30 new paragraphs, including a subsection titled, "Defendants Operated in the Savannah/Charleston Region," (ECF No. 139 at ¶¶ 66-72), and another subsection titled, "Individual Conspiracy Participants," (*id.* at ¶¶ 124-126, 128-130, 133, 136-137, 140, 142-145, 147, 149, 151-152). The SAC also revises various allegations under the subsection "Market Allocation and Bid Rigging," to specify certain time periods with greater precision. *See, e.g.,* (*id.* at ¶¶ 164, 169, 171, 173). In all other respects, the SAC is virtually identical to the first amended complaint.

Defendants responded as before by filing various motions to dismiss under Rule 12(b). With the exception of Lafarge North America Inc. ("Lafarge"), Defendants filed a joint motion to dismiss pursuant to Rule 12(b)(6) ("Joint Motion"), asserting that Plaintiffs have alleged no facts that (1) plausibly support the existence of a conspiracy before September 2011 or after December 2014; and (2) plausibly support the existence of a conspiracy in the Charleston market.[1] (ECF No. 148). For its part, Lafarge filed a motion to dismiss under Rules 12(b)(1) and 12(b)(6), arguing

---

[1] Defendant Elite Concrete, LLC does not join in the argument asserted as to the Charleston market. (ECF No. 146 at 1).

that the conspiracy claim as to Lafarge fails to meet the pleading requirements set forth in Federal Rule of Civil Procedure 8, is time-barred by the applicable four-year statute of limitations, and fails to meet the standing requirements for both Article III standing and antitrust standing. (ECF No. 147). Defendant Coastal Concrete Southeast II, LLC ("Coastal") filed a motion to dismiss under Rule 12(b)(6), arguing that the Court should dismiss Plaintiff's "Post-April 2015 Claims" and "Pre-April 2015 Claims," and asserting that the claims are time-barred. (ECF No. 150). Defendants Thomas Concrete, Inc. and Thomas Concrete of South Carolina, Inc. (the "Thomas Entities") filed a motion to dismiss under Rule 12(b)(6), arguing that the SAC fails to adequately allege their involvement in the conspiracy. (ECF No. 151). Defendant Evans Concrete, LLC ("Evans Concrete") filed a motion to dismiss under Rules 12(b)(2) and 12(b)(3) for lack of personal jurisdiction and improper venue. (ECF No. 149). Finally, Defendant Elite Concrete, LLC ("Elite Concrete") filed a motion to dismiss under Rule 12(b)(6), asserting that Plaintiffs' claims are time-barred. (ECF No. 146).

## **STANDARD OF REVIEW**

### A.     **Federal Rule of Civil Procedure 12(b)(1)**

Under Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss a cause of action based on lack of subject-matter jurisdiction. "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Brickwood Contractors, Inc. v. Datanet Engineering, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (quoting *Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 541 (1986)). Challenges to jurisdiction under Rule 12(b)(1) can be raised in two different ways: facial attacks and factual attacks. *Thigpen v. United States,* 800 F.2d 393, 401 n.15 (4th Cir. 1986) (citing *Adams v. Bain,* 697 F.2d 1213, 1219 (4th Cir.1982)), *disagreed with*

*on other grounds, Sheridan v. United States,* 487 U.S. 392 (1988). A facial attack questions the sufficiency of the complaint. *Id.* When presented with this argument, the court must accept the allegations in the complaint "as true, and materials outside the pleadings are not considered." *Id.* If the court lacks subject matter jurisdiction, it has no authority to evaluate whether a plaintiff's complaint fails to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 94 (1997) (instructing that courts should not assume jurisdiction for the purpose of deciding the merits).

**B.      Federal Rule of Civil Procedure 12(b)(2)**

Under Rule 12(b)(2), the Court may dismiss a case for lack of personal jurisdiction. "[A] defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). "The plaintiff's burden in establishing jurisdiction varies according to the posture of a case and the evidence that has been presented to the court." *Id.* at 268. Here, where the Court addresses the personal jurisdiction question by reviewing only the Parties' motions and briefs, affidavits attached to the motion, and the allegations in the SAC, Plaintiffs "need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge." *Id.* (citing *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir. 1989)). While the Court must construe all factual allegations in the light most favorable to the nonmoving party, the showing of personal jurisdiction "must be based on specific facts set forth in the record in order to defeat [a] motion to dismiss." *Magic Toyota, Inc. v. Southeast Toyota Distributors, Inc.*, 784 F. Supp. 306, 310 (D.S.C. 1992). The Court may consider evidence outside of the pleadings, such as affidavits and other evidentiary materials, "without converting the motion to dismiss into a motion for summary judgment." *Id. See Grayson*, 816 F.3d at 268 (citing *Mylan Labs., Inc. v. Akzo, N.V.*,

2 F.3d 56, 62 (4th Cir. 1993) (explaining that courts may consider affidavits from any party when applying the *prima facie* standard)). Ultimately, "a plaintiff must establish facts supporting jurisdiction over the defendant by a preponderance of the evidence." *Grayson*, 816 F.3d at 268 (citing *Combs,* 886 F.2d at 676) (noting that "the burden [is] on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence").

## C.      Federal Rule of Civil Procedure 12(b)(3)

Under Rule 12(b)(3), a defendant may move to dismiss an action as brought in an improper venue. A plaintiff need "make only a prima facie showing of proper venue in order to survive a motion to dismiss." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365-66 (4th Cir. 2012) (citation omitted). The court must view the facts in the light most favorable to the plaintiff when determining whether plaintiff has made a prima facie showing of proper venue. *Id.*

## D.      Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) examines the legal sufficiency of the facts alleged on the face of a plaintiff's complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible when the factual content allows the court to reasonably infer that the defendant is liable for the misconduct alleged. *Id.* When considering a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Additionally, under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a

"short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As the Supreme Court held in *Twombly*, the pleading standard set forth in Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement." *Id.* (quoting *Twombly*, 550 U.S. at 557).

## DISCUSSION

Section 1 of the Sherman Antitrust Act prohibits any contract or conspiracy in restraint of trade. 15 U.S.C. § 1. "To establish a § 1 antitrust violation, a plaintiff must prove (1) a contract, combination, or conspiracy; (2) that imposed an unreasonable restraint of trade." *N.C. State Bd. of Dental Exam'rs v. FTC,* 717 F.3d 359, 371 (4th Cir. 2013). The plaintiff must also demonstrate that she suffered "the type of injury that 'the anti-trust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Turner v. Va. Dep't of Medical Assistance Services*, 301 F. Supp. 3d 637, 646 (E.D. Va. 2018) (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Plaintiffs allege that Defendants are "the largest Ready-Mix Concrete producers in the Savannah, Georgia to Charleston, South Carolina region," and that they are engaged in an ongoing conspiracy "to suppress and eliminate competition in the markets for Ready-Mix Concrete" by "fixing prices, rigging bids, and/or allocating territories and customers." (ECF No. 139 at ¶ 1). Plaintiffs seek certification of one plaintiff class and three subclasses, "comprised of all individuals and entities who directly purchased Ready-Mix Concrete from Defendants' plants in the Savannah/Charleston Region during the Class Period." (*Id.* at ¶ 3). Plaintiffs define the Class

Period as "from at least January 1, 2010 through the present." (*Id.* at ¶ 1). Plaintiffs assert that each one of them, "[d]uring the Class Period, [] directly purchased Ready-Mix Concrete from one or more Defendants." (*Id.* at ¶¶ 9-11).

As discussed below, the Court finds that Plaintiffs have alleged a conspiracy to restrict trade as to all Defendants, and the Court declines to narrow that claim prior to the Parties engaging in discovery. In large part, these two rulings guide the Court's findings on the remainder of the issues presented in the motions to dismiss.

## A. Pleading Standard for § 1 Conspiracy Claim

As an initial matter, and as a backdrop to the six motions pending before it, the Court finds it helpful to review the factual allegations against the pleading standard set forth in *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412 (4th Cir. 2015). The *SD3* court explained that "section one's prohibition against restraint of trade applies only to concerted action, which requires evidence of a relationship between at least two legally distinct persons or entities." *Id.* (quoting *Robertson v. Sea Pines Real Estate Cos.,* 679 F.3d 278, 284 (4th Cir. 2012)). Accordingly, for a claim to be actionable, the defendants must have specifically made a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.,* 465 U.S. 752, 764 (1984)). However, "conscious parallelism" is not enough. *Brooke Grp., Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227 (1993); *Va. Vermiculite, Ltd. v. Historic Green Springs, Inc.,* 307 F.3d 277, 280 (4th Cir. 2002). The pleading must allege an agreement to restrain trade *and* "enough factual matter (taken as true) to suggest that [the requisite] agreement was made." *Twombly*, 550 U.S. at 556. Put another way, the complaint must contain "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*

Ready-mix concrete is a compound of Portland cement, water, and aggregates, and may also contain additives such as fibers, mesh, and chemical admixtures. (ECF No. 139 at ¶ 45). Ready-mix concrete is manufactured in batch plants and the ingredients may be mixed in agitator trucks while on the road. (*Id.* at ¶ 47). The production, delivery, and use of ready-mix concrete are subject to well-established industry and governmental standards. (*Id.* at ¶ 49). Because of these common industry and governmental standards, ready-mix concrete is highly interchangeable and homogeneous. It is also inelastic, meaning an increase in price of the product does not necessarily result in change in demand. (*Id.* at ¶¶ 52, 55-57). Ready-mix concrete remains in a fluid state for several hours, during which time it can be transported to customers. (*Id.* at ¶ 45). Ready-mix concrete has a limited delivery range for technical and economic reasons, which the SAC explains has resulted "in four distinct geographic markets for Ready-Mix Concrete in the Savannah/Charleston Region." (*Id.* at ¶¶ 74-76).

The Court finds that in narrowing the field of Defendants and clarifying which entity, and which individual representative of the entity, is responsible for the various actions alleged, Plaintiffs have pleaded the parallel conduct and "something 'more,'" which the Fourth Circuit has specified is necessary to stating a § 1 claim. To begin, the subsections in the SAC titled "List Prices and Annual Price Increases," "Market Allocation and Bid Rigging," and "Add-Ons and Service Fees," (ECF No. 139 at ¶¶ 153-179), describe in large part who took part in the alleged restraint of trade, by what means those individuals arrived at the decision to restrain trade, and how the plan was implemented. For instance, Plaintiffs allege:

> From at least 2010 through the present, Defendants have periodically updated their list prices to increase their prices for Ready-Mix Concrete, and have sent their customers price increase announcements informing them of the price increases. For each price increase during this period, before increasing their list prices, representatives of Defendants communicated through an intermediary, or communicated in person and/or by phone, regarding the amount of such increases

and agreed concerning either the increased price per yard for a benchmark mix (3000 psi) or the amount of an across-the board increase.

(*Id.* at ¶ 153).

For some or all of these years, Jim Pedrick, cement Territory Sales Manager for Lafarge and later Argos USA, told representatives of the other Defendants, including David Melton (Elite), Bo Strickland (Evans), and Tim Coughlin or Tim Mahoney (Coastal), the amount of the annual price increase proposed by Lafarge and later Argos, and secured from each of these representatives an agreement that their respective companies would increase their prices in the same amount. Subsequently, each of these Defendants changed their list prices in amounts consistent with the agreement and advised their customers of the amount of the annual price increase.

(*Id.* at ¶ 154).

In early 2012, Greg Melton and Andy Stankwytch (Argos USA/Argos Ready Mix) met with Trey Cook and David Melton (Elite) at a Cracker Barrel restaurant in Pooler or Savannah, Georgia, and agreed that they would increase their prices effective April 1, 2012 by $6.00, resulting in a base price of $86.00 per yard for 3000 psi Ready-Mix Concrete. Jim Pedrick then shared the amount of the price increase with Tim Coughlin (Coastal) and Bo Strickland (Evans), both of whom agreed to the baseline price of $86.00 per yard for 3000 psi Ready-Mix Concrete.

(*Id.* at ¶ 155).

In late 2013, Pedrick (Argos USA) coordinated an $8.00 annual price increase among Defendants effective January 1, 2014. On or about October 9, 2013, Pedrick coordinated an agreement between Argos USA/Argos Ready Mix and David Melton (Elite) to implement an $8.00 per yard Ready-Mix Concrete price increase for 2014. On October 11, 2013, Pedrick told the Ready-Mix Concrete management team at Argos USA/Argos Ready Mix that he had already coordinated an $8.00 per yard price increase for 2014 with Elite, that he expected Evans to agree to the price increase, and that he had lunch scheduled with a representative of Coastal the following Thursday to ask them to agree to the price increase.

(*Id.* at ¶ 158).

In 2011, Defendants Argos USA, LLC/Argos Ready Mix purchased Lafarge. (ECF No. 139 at ¶ 19). Plaintiffs allege that prior to that transition, "[f]rom before 2010," Lafarge agreed with Elite Concrete that Lafarge "would take predominantly the commercial jobs while Elite would

take predominantly the residential jobs":

> Greg Melton (on behalf of Lafarge and then Argos USA/Argos Ready Mix) instructed salespeople to allow David Melton (Elite) to "win" 75% of the residential work. This agreement was so well-established that Greg and David Melton had a specific understanding that Elite would provide 75% of the Ready-Mix Concrete required by residential builder Terry Varnadore, even if Lafarge or Argos USA/Argos Ready Mix had "won" the job. In many instances, Ready-Mix Concrete that was supposed to have been provided by Lafarge or Argos USA/Argos Ready Mix—to Varnadore and others—was actually provided by Elite.

(*Id.* at ¶ 169).

> During at least 2012 and 2013, Greg Melton (Argos USA/Argos Ready Mix), David Melton (Elite) and sometimes a representative from Coastal met regularly at the Sunshine Restaurant in Pooler, Georgia to discuss pricing and specific jobs in the Savannah Market and Hilton Head/Bluffton Market, including the allocation of jobs by agreement.

(*Id.* at ¶ 170).

> From at least 2010 until June 2016, Greg Melton (on behalf of Lafarge and then Argos USA/Argos Ready Mix) and David Melton (Elite) communicated regularly by phone, as often as several times per week, about pricing and specific jobs in the Savannah Market and Hilton Head/Bluffton Market, and to agree on the allocation of specific jobs between Lafarge or Argos USA/Argos Ready Mix and Elite. Greg Melton and David Melton also shared mix designs necessary for submitting bids on certain jobs to facilitate their bid-rigging and market allocation scheme.

(*Id.* at ¶ 171).

> By rigging bids, Defendants could enforce their existing agreements regarding pricing and market allocations in the Savannah Market and Hilton Head/Bluffton Market, collectively meet their shared goal of maintaining or raising prices, and split up and share larger projects. Bid rigging also allows parties to a price fixing or market allocation agreement to deter cheating on the agreement on particularly lucrative projects that might otherwise reward cheating.

(*Id.* at ¶ 172).

In addition to the general agreements between Defendants regarding price increases and

market allocation, Plaintiffs allege that in April 2012, Greg Melton, then of Argos USA/Argos

Ready Mix, spoke with his brother David Melton of Elite Concrete, and the two agreed that "the

11

group of conspiring companies would add a fuel surcharge to all Ready-Mixed Concrete deliveries." (*Id.* at ¶ 174). The SAC further alleges that Defendants, Argos USA/Argos Ready Mix, Elite Concrete, Evans Concrete, and Coastal agreed to impose on purchasers an environmental fee and a "short load" fee per delivery or truckload of ready-mix concrete. (*Id.* at ¶¶ 175-179). The SAC chronicles with specific examples the efforts of Greg Melton (with Lafarge and then Argos USA/Argos Ready Mix), Jim Pedrick (with Lafarge and then Argos USA), David Melton (with Elite Concrete), Troy Baird (with Elite Concrete), Bo Strickland (with Evans Concrete), Tim Coughlin (with Coastal and then with the Thomas Entities), and Tim Mahoney (with Coastal and then with the Thomas Entities) to monitor the sales and pricing of ready-mix cement within the subject markets for the purpose of enforcing the alleged agreement between Defendants and punishing the competitors who declined to participate. (*Id.* at ¶¶ 182-186).

The SAC further alleges the injury incurred by the alleged conspiracy:

Defendants' conspiracy to fix or raise prices, allocate markets, rig bids and impose additional fees from 2010 through the present has harmed competition in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market, and Charleston Market for Ready-Mix Concrete by: (i) limiting or displacing customer choice; (ii) limiting or displacing competition on the basis of price; and (iii) limiting or displacing competition on the basis of the inclusion and amount of additional fees.

Direct purchasers of Ready-Mix Concrete from Defendants' plants in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market were substantially impacted by the conspiracy among Defendants to fix or raise prices and allocate markets, and their enforcement of those agreements through bidrigging. These purchasers paid substantially more for Ready-Mix Concrete than they would have paid in the absence of the conspiracy, and therefore suffered antitrust injury to their business or property.

(ECF No. 139 at ¶¶ 188-189). Finally, the SAC includes reference to national data, which Plaintiffs assert demonstrates that the four markets at issue here "uniformly exhibited average prices above those reflected in national and South Regional PPI (Producer Price Index) data for

Ready Mix Concrete" and exhibited price fluctuations that did not represent national trends or follow the cost of Portland cement. (*Id.* at ¶¶ 192, 201).

The Court finds that the SAC provides "something 'more' than parallel conduct" and therefore satisfies the plausibility pleading standard for a § 1 conspiracy claim (and underlying theories) as to Defendants. The Fourth Circuit has given clear warning that courts not impose a probability standard at the motion-to-dismiss stage or subject a complaint's allegations to a "preponderance of the evidence" standard. *SD3*, 801 F.3d at 425. Accordingly, the Court does not entertain at this juncture "whether a lawful alternative explanation appear[s] more likely" from the facts of the SAC. *Id.* (quoting *Houck v. Substitute Tr. Servs. Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)). For these reasons, the Court denies the pending motions to dismiss to the extent they assert the SAC fails the plausibility pleading standard. The Court now addresses the additional specific arguments raised in the six pending motions to dismiss.

## B.     The Joint Motion to Dismiss

Defendants represented by the Joint Motion ("Joint Defendants") argue that the allegations of conspiracy do not support the temporal and geographical breadth of the claim: the SAC "alleges a broad conspiracy spanning more than 8 years and 4 geographic markets, while the actual facts alleged do not support that breadth." (ECF No. 148-1 at 4). Rather, the Joint Defendants contend, "Plaintiffs' limited factual allegations pertain only to activities in the Savannah, Statesboro, and Hilton Head markets between September 2011 and December 2014." *Id.* They assert that the § 1 claim should be dismissed "to the extent it reaches beyond the September 2011—December 2014 period, and to the extent it includes the Charleston, SC market." *Id.* The Joint Defendants concede for the purpose of the motion that Plaintiffs have stated a § 1 conspiracy claim as to the period between September 2011 and December 2014. *See* (ECF No. 148).

1. <u>Temporal Scope</u>

Plaintiffs respond that "Defendants' attempt to artificially 'bookend' the Plaintiffs' claims between September 2011 and 2014, before discovery has even begun, is at odds with the Complaint and settled antitrust law," and "would also reward the Defendants' own concealment of wrongdoing." (ECF No. 161 at 16). Plaintiffs assert that the SAC satisfies the pleading standard for the "period of 2010 through at least mid-2017," and state:

> Plaintiffs have described the "mechanics" of the conspiracy in extensive detail, including the role of each Defendant, the individual participants, the methods of reaching agreement, the subject matter of the agreements, and the methods of monitoring and enforcement. (SAC ¶¶ 152-79). Plaintiffs have further alleged that the key employees who entered into and performed the conspiracy had the same pricing authority and acted in the same roles on behalf of the Defendants throughout most or all of the entire period. (SAC ¶¶ 123-51). These allegations are substantially reinforced by economic data from the entire Class Period that is consistent with the presence of a conspiracy. (SAC ¶ 191 and Figure 6, ¶ 201 and Figures 7 and 8).

(*Id.* at 17-18).

Both sides cite out of circuit law to support their respective positions. *See, e.g., Nypl v. JPMorgan Chase & Co.,* No. 15-9300, 2018 WL 1276869, at *4 (S.D.N.Y. Mar. 12, 2018) (dismissing conspiracy claim to the extent plaintiffs alleged it extended beyond December 31, 2013, explaining that allegations that conspiracy was "ongoing" were conclusory and also contradicted by documents attached to the complaint); *In re Refrigerant Compressors Antitrust Litig.,* 795 F. Supp. 2d 647, 661 (E.D. Mich. 2011) (denying Rule 12(b)(6) request to "carve out" conspiracy claim where the complaint contained "direct or inferential allegations respecting all material elements to sustain a recovery under the Sherman Act"). Indeed, the Court was unable to locate law from within the Fourth Circuit to instruct as to the propriety of narrowing a § 1 conspiracy claim at the Rule 12(b)(6) stage, having decided that the allegations support the claim as a matter of law. Having reviewed the out of circuit authority that the Parties cite, along with

their respective arguments, the Court declines to narrow the claim at this stage. The Court so decides in large part because it finds that, although a close call, Plaintiffs adequately allege a conspiracy that existed prior to September 2011.

Plaintiffs assert:

[f]rom at least January 1, 2010 through the present, Defendants have engaged in discussions leading to: (i) agreements concerning the list prices, and specific prices stated in bids, quotes or otherwise, for Ready-Mix Concrete and related fees to be charged to customers in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market; (ii) agreements concerning the annual across-the-board price increases for Ready-Mix Concrete to impose on customers in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market; and (iii) agreements concerning the allocation, among Defendants, of territories and customers in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market. These agreements were successful, causing customers in the Savannah Market, the Statesboro Market, the Hilton Head/Bluffton Market and the Charleston Market to pay substantially more for ReadyMix Concrete than they would have in the absence of the conspiracy, and causing antitrust injury to their business or property.

(*Id.* at ¶ 152). This paragraph (and paragraphs like it) would not be sufficient, without factual support, to state a claim. However, Plaintiffs also allege:

From at least 2010 through the present, Defendants have periodically updated their list prices to increase their prices for Ready-Mix Concrete, and have sent their customers price increase announcements informing them of the price increases. For each price increase during this period, before increasing their list prices, representatives of Defendants communicated through an intermediary, or communicated in person and/or by phone, regarding the amount of such increases and agreed concerning either the increased price per yard for a benchmark mix (3000 psi) or the amount of an across-the board increase.

(ECF No. 139 at ¶ 153).

From at least 2010 through the present, Defendants prepared price sheets and/or internal price lists that reflected the price increases to which they had agreed. The price sheets and internal price lists reflecting their agreement were provided to customers and employees of their respective companies to be used for determining the price of the Ready-Mix Concrete they sold or offered for sale in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market.

15

The price sheets and internal price lists reflecting their agreements were used by Defendants to set actual and offered prices for Ready-Mix Concrete for customers in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market, who paid the base, list or price sheet price. The price sheets and internal price lists reflecting their agreement were also used by Defendants as a starting point to set actual and offered prices in the form of annual contract or quote prices, specific price quotes, bid prices, structured discount prices and other negotiated or discounted prices in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market.

Defendants communicated with one another from at least 2010 through the present to determine whether their agreements on price increases were being successfully implemented in the prices offered to and/or paid by customers. Defendants were and are also able to monitor the prices being offered by the other companies for Ready-Mix Concrete from information provided to them by customers, prospective customers and other participants in the industry.

(*Id.* at ¶¶ 161-163).    Plaintiffs also allege:

[f]rom before 2011 until September 2011, Lafarge and Evans had an agreement that Lafarge would not sell Ready-Mix Concrete in Statesboro, Georgia, if the job required a Lafarge truck to pass an Evans concrete plant. Lafarge told its salespeople to not sell Ready-Mix Concrete for jobs located in the Statesboro area.

After Argos USA purchased the Lafarge plants in the Savannah/Charleston Region in September 2011, Argos USA/Argos Ready Mix entered into a new agreement with Evans for the Statesboro Market. Greg Melton (Argos USA/Argos Ready Mix) and Bo Strickland (Evans) agreed that neither would go to a price below $88.00 per yard (using the 3000 psi benchmark) on commercial jobs, and that the two companies would alternate winning bids for major projects, with the intended losing bidder submitting a purposefully higher bid.

(*Id.* at ¶¶ 164-165).

From at least 2010 until June 2016, Greg Melton (on behalf of Lafarge and then Argos USA/Argos Ready Mix) and David Melton (Elite) communicated regularly by phone, as often as several times per week, about pricing and specific jobs in the Savannah Market and Hilton Head/Bluffton Market, and to agree on the allocation of specific jobs between Lafarge or Argos USA/Argos Ready Mix and Elite. Greg Melton and David Melton also shared mix designs necessary for submitting bids on certain jobs to facilitate their bid-rigging and market allocation scheme.

(*Id.* at ¶ 171).

From at least 2010 through the present, Greg Melton (LaFarge and Argos USA/Argos Ready Mix), Jim Pedrick (LaFarge and Argos USA), David Melton

(Elite), Troy Baird (Elite), Bo Strickland (Evans), Tim Coughlin (Coastal/Thomas), Tim Mahoney (Coastal/Thomas) and additional individuals representing Defendants have engaged in ongoing communications, both directly and through intermediaries, regarding the sale and pricing of Ready-Mix Concrete in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market, and specific jobs and specific customers in these Markets, for the purpose of furthering and enforcing the conspiracy, including without limitation:

• Confirmation of pricing on particular jobs, on list prices and on price increases;
• Making or responding to complaints about undercutting agreed pricing;
• Making or responding to complaints about selling in prohibited locations; and
• Threatening harm or retaliation for failing to comply with agreed pricing or market allocation.

(*Id.* at ¶ 182).

Without deciding whether it is appropriate to narrow a claim for conspiracy after having determined that the pleading states the claim as a matter of law, the Court finds that the allegations quoted above suffice to support the claim for the contested period of between January 1, 2010 through September 2011. The Court additionally declines to truncate the claim to extending not beyond December 2014 and agrees with Plaintiffs that the matter is better resolved after the Parties have engaged in discovery.

2. Geographic Scope

With respect to the geographic scope of the claim, Plaintiffs define the Charleston Market as "areas served by: Argos USA/Argos Ready Mix plants in North Charleston and Summerville, and Thomas (formerly Coastal) plants in North Charleston and Summerville," which Plaintiffs identify in an illustration included in the SAC. (ECF No. 139 at ¶ 86). The Joint Defendants argue that Plaintiffs assert "no specific details whatsoever . . . concerning conduct in the Charleston Market," and because "Plaintiffs have identified no specific meetings, communications, or particular jobs in the Charleston Market, their claim of a § 1 conspiracy in that market is entirely unsupported." (ECF No. 148-1 at 20). Plaintiffs respond that they have identified "many key

individuals" who were "responsible for forming, implementing and enforcing the Defendants' price-fixing agreements" and who "had authority over the Charleston area. (ECF No. 161 at 22 (citing ECF No. 139 at ¶¶ 127-32, 141-46)). Plaintiffs further respond that "Defendants' conspiratorial conduct was directed to the sale of Ready-Mix Concrete by Lafarge, Argos USA/Argos Ready Mix, Coastal and Thomas in the Charleston Market." (*Id.* (citing ECF No. 139 at ¶¶ 152, 161-62, 173, 179, 181-82)).

The SAC identifies James Pedrick as a representative for Lafarge and then Argos USA, and Andy Stankwytch as a representative of Argos USA, each of whom had "responsibility for cement sales and distribution" in the "Statesboro, Savannah, Hilton Head/Bluffton, and Charleston Markets." (ECF No. 139 at ¶¶ 127-133). The SAC identifies Tim Coughlin who, as the chief executive officer of Defendant Coastal from January 1, 2010 through April 2015 and senior vice president of Defendant Thomas Inc., "had authority over all pricing decisions for Ready-Mix Concrete, additives and related items or services sold by [Coastal and Thomas] in the . . . Savannah, Hilton Head/Bluffton and Charleston Markets, and including annual price increases and the prices stated in price lists, bids and other offers to customers." (*Id.* at ¶¶ 141-143).

Again, without determining whether it would be proper to render a narrower reading of the conspiracy claim than what is set forth in the SAC having now determined the claim has been pleaded as a matter of law, the Court finds that these allegations suffice to envelop the Charleston Market as defined by Plaintiffs into the claim. The SAC directly implicates Pedrick, Stankwytch, and Coughlin in the conspiracy. *See, e.g.,* (ECF No. 139 at ¶ 154). And while the allegations discussing the Charleston Market do not specifically mention Defendants Elite Concrete or Evans Concrete, these Defendants are implicated by the allegations that their representatives conspired with Pedrick, Stankwytch, and Coughlin. *See id.* The Court finds that it would not be appropriate

at this time to remove from the conspiracy claim reference to the Charleston Market. Accordingly, the Court denies the Joint Motion.

## C.      Lafarge's Motion to Dismiss

Defendant Lafarge seeks dismissal on the following bases: the claim fails to meet the pleading standard; fails to meet either Article III or antitrust standing requirements; and is barred by the applicable statute of limitations. (ECF No. 147). For the reasons stated above, the Court disagrees that Plaintiffs fail to meet the pleading standard. For the reasons stated below, the Court further disagrees that Plaintiffs lack standing. The Court addresses Lafarge's statute of limitations argument in a separate section along with a similar argument raised by Defendant Elite Concrete.

1. <u>Article III Standing</u>

Plaintiffs, as the Parties asserting federal jurisdiction, have the burden of establishing standing. *Mirant Potomac River, LLC v. U.S. E.P.A.*, 577 F.3d 223, 226 (4th Cir. 2009). Here, because Defendant Lafarge seeks dismissal at the pleading stage, the assessment of standing is confined to the allegations in the SAC. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017), *cert. denied sub nom.*, *Beck v. Shulkin*, 137 S. Ct. 2307 (2017). To demonstrate Article III standing, Plaintiffs bear the burden of establishing that they suffered (1) a concrete "injury-in-fact" that is (2) "fairly traceable" to Defendants' alleged conduct and is (3) redressable by the relief sought in the SAC. *Beck*, 848 F.3d at 269. In a putative class action, courts "analyze standing based on the allegations of personal injury made by the named plaintiffs." *Id.*

In its motion to dismiss, Lafarge asserts a facial challenge to subject matter jurisdiction and contends *inter alia* that Plaintiffs lack standing because the SAC "does not show that any of the named plaintiffs ever made a ready-mix concrete purchase from Lafarge or over which Lafarge had any influence to cause harm." (ECF No. 147-1 at 35-36). Lafarge refers to the SAC for

support:

> As plaintiffs concede, Lafarge discontinued its concrete operations in Georgia and South Carolina "in mid-2011." (Compl. ¶ 13; *see also id.* ¶ 19). The only "agreement" "Lafarge" allegedly made was "to not sell Ready-Mix Concrete for jobs located in the Statesboro area" in Georgia "until September 2011." (*Id.* ¶ 164) Plaintiff Bremer Construction formed over two years later, in 2014; Plaintiff Forrest Concrete was not registered to do business in Georgia until six years later, in 2017; and Plaintiff Pro Slab never was registered to do business in Georgia. *See supra* p.8 & n.4 (describing judicially noticeable Georgia Secretary of State public records). Not surprisingly, none of the named plaintiffs allege that they purchased directly from Lafarge or from any defendant in Georgia in 2010-2011.

*Id.* Lafarge asserts that "[a] company that was not in business at the relevant time (Bremer Construction) and two companies that were not registered to do business in the relevant geographic markets at the relevant time (Pro Slab and Forrest Concrete) cannot meet the threshold for Article III standing." (*Id.* at 36).

Plaintiff responds that Lafarge's contention regarding who was in business in which market at what time is not relevant to the standing analysis because "Plaintiffs allege that they were harmed by *the conspiracy* that included LaFarge." (ECF No. 156 at 33) (emphasis in original). In other words, Plaintiffs assert, they have established standing because the SAC alleges both that (1) the conspiracy impacted purchases of ready-mix concrete in the relevant market at the relevant time, and (2) Lafarge participated in the conspiracy. *Id.*

The Court agrees that Plaintiffs adequately allege Article III standing. As stated above, the allegations asserted in the SAC meet the pleading requirement for § 1 conspiracy, the Court declines to narrow the temporal scope of the claim, and the SAC squarely alleges Lafarge's participation in the alleged conspiracy between January 1, 2010 and September 2011. *See, e.g.,* (ECF No. 139 at ¶¶ 123, 124, 127-128, 154). The Court agrees with the reasoning set forth in *Oxbow Carbon & Minerals LLC v. Union Pacific Railroad Co.*, that "[a]t this stage, plaintiffs 'need not show more than general factual allegations laying out a good faith basis for how one or

more of the defendants injured plaintiffs . . . . Nor must each plaintiff allege facts against all defendants, nor each defendant's relationship with a plaintiff be explicitly identified." 81 F. Supp. 3d 1, 7 (D.D.C. 2015) (disagreeing that plaintiffs' failure to state to whom they paid the surcharge at issue was a fatal pleading defect, explaining that defendants "are jointly and severally liable under Section 1 for any injury suffered by plaintiffs") (quoting *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 125 (E.D.N.Y. 2000); citing *In re Uranium Antitrust Litig.,* 617 F.2d 1248, 1257 (7th Cir. 1980)).  *See also Beck*, 848 F.3d at 270 ("At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim").  Accordingly, the Court denies Lafarge's motion to dismiss as to this contention.

### 2. Antitrust Standing

Lafarge next argues that Plaintiffs fail to demonstrate antitrust standing.  In determining whether Plaintiffs have antitrust standing, the Court considers the following factors:

> (1) the causal connection between an antitrust violation and harm to the plaintiffs, and whether that harm was intended; (2) whether the harm "was of a type that Congress sought to redress in providing a private remedy for violations of the antitrust laws"; (3) the directness of the alleged injury; (4) "the existence of more direct victims" of the alleged antitrust injury; and (5) "problems of identifying damages and apportioning them" among those directly and indirectly harmed.

*Kloth v. Microsoft Corp.*, 444 F.3d 312, 324 (4th Cir. 2006) (quoting *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 540 (1983)).  The first two factors comprise antirust injury, *Novell, Inc. v. Microsoft Corp.,* 505 F.3d 302, 311 (4th Cir. 2007), which is described as injury to competition in the marketplace, *DataCell ehf. V. Visa, Inc.*, No. 1:14-cv-1658 GBL/TCB, 2015 WL 4624714, at *7 (E.D. Va. July 30, 2015) (citing *Atl. Richfield Co. v.. USA Petroleum Co.,* 495 U.S. 328, 334 (1990)).  *See Turner*, 301 F. Supp. 3d at 648 ("a plaintiff must show that the net effect of a challenged restraint is harmful to

competition") (quoting *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 508 (4th Cir. 2002)). The relevant marketplace is comprised of : (1) the relevant product market and (2) the relevant geographic market. *Id.* (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,* 637 F.3d 435, 441–42 (4th Cir. 2011)). The last three factors of the antitrust standing analysis focus on Plaintiffs' proximity to the harm alleged. *Novell,* 505 F.3d at 311.

Lafarge argues that "all five factors weigh heavily in favor of dismissal." (ECF No. 147-1 at 37). With respect to the first three factors, Lafarge relies primarily on the assertion that it exited the ready-mix concrete market before any of Plaintiffs entered it. As to the fourth factor, Lafarge argues that the more direct victims of the alleged antitrust activity are "the concrete purchasers that directly bought concrete from Lafarge from before 2011 until September 2011 in Statesboro, Georgia." (*Id.* at 39) (quotation marks and alterations omitted). Finally, Lafarge argues the claim presents problems of apportioning damages considering the entities just described that purchased concrete from Lafarge from before 2011 until September 2011.

Plaintiffs respond that they have standing because they allege that they directly purchased ready-mix concrete from one or more Defendants during the Class Period. (ECF No. 156 at 37). Plaintiffs rely on *Kloth,* 444 F.3d at 319-20 and *Illinois Brick,* 431 U.S. at 729 for support. Moreover, Plaintiffs assert, their allegations in the SAC satisfy each of the five elements. The Court agrees with Plaintiffs that they have sufficiently alleged antitrust standing. Accordingly, the Court turns to the argument regarding the statute of limitations.

**D.    Statute of Limitations**

Defendants Lafarge and Elite Concrete contend that Plaintiff's § 1 conspiracy claim is time-barred. Specifically, Lafarge asserts that the SAC acknowledges that it exited the market by mid-2011. Elite Concrete argues that the only factual allegations that implicate it date to between

22

early 2012 and October 2013.  (ECF No. 146-1).

Plaintiffs commenced this action on November 22, 2017.  "The statute of limitations for federal antitrust claims bars any action 'unless commenced within four years after the cause of action accrued,' plus any tolling."  *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 173 (4th Cir. 2007) (quoting 15 U.S.C. § 15b); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (price fixing conspiracies do "not permit the plaintiff[s] to recover for the injury caused by old overt acts outside the limitations period").  The four-year period starts to run when a cause of action accrues, "and a cause of action generally accrues when a defendant commits an act that causes economic harm to a plaintiff."  *GO Computer*, 508 F.3d at 177 (citation omitted). Additionally, "each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act."  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971).  The equitable doctrine of fraudulent concealment applies to antitrust claims.  When triggered, the doctrine moves the clock, "starting it from when the wrong was discovered rather than when it was committed."  *Go Computer*, 508 F.3d at 178 ("[W]hen the fraud has been concealed, or is of such a character as to conceal itself, the statute does not begin to run until the fraud is discovered . . . .") (citation omitted).

1. Lafarge

Lafarge asserts that all damages are barred by the statute of limitations because it ceased concrete operations in Georgia and South Carolina in mid-2011.  Plaintiffs do not contest that Lafarge's alleged conspiratorial conduct occurred outside of the last four years.  Rather, Plaintiffs allege that Lafarge fraudulently concealed the conspiracy and therefore the cause of action is tolled.

The doctrine of fraudulent concealment applies only "when there has been no negligence or laches on the part of a plaintiff in coming to knowledge of the fraud." *Go Computer*, 508 F.3d at 178 (citation omitted). Therefore, under Fourth Circuit law, to invoke the doctrine of fraudulent concealment, Plaintiffs must demonstrate that (1) the Party pleading the statute of limitations fraudulently concealed facts that are the basis of Plaintiffs' claims, and (2) Plaintiffs failed to discover those facts within the statutory period, despite (3) the exercise of due diligence. *Id.* The particularity requirement of Rule 9 of the Federal Rules of Civil Procedure applies to allegations of fraudulent concealment. *See Pocahontas Sup. Coal Co., Inc. v. Bethlehem Steel Corp.*, 828 F.2d 211, 219 (4th Cir. 1987). Intent, however, may be alleged generally. *Grand Strand and Water & Sewer Auth. v. Oltrin Solutions, LLC*, No. 4:14-cv-2800-RMG, 2015 WL 13469927, at *5 (D.S.C. Mar. 3, 2015).

Lafarge argues that Plaintiffs "do not satisfy Rule 9(b) with their conclusory tolling allegations that never identify a single action taken by Lafarge, much less describe the 'who, what, where, and when' of such action." (ECF No. 147-1 at 30). Lafarge also argues that Plaintiffs fail to "plead facts that would satisfy the due diligence element of fraudulent concealment," and further "fail to explain, in non-conclusory fashion, why they could not have discovered the combination and conspiracy alleged at any earlier date." (*Id.* at 32) (quotation marks omitted).

Plaintiffs assert that the Fourth Circuit has adopted the intermediate standard for demonstrating fraudulent concealment, under which "a plaintiff's proof may include acts of concealment involved in the antitrust violation itself." (ECF No. 156 at 26). Plaintiffs further assert that Lafarge is properly charged with the fraudulent concealment of its co-conspirators, the other Defendants, and that fraudulent concealment is "determined by the conduct of Defendants as a whole." (*Id.* at 27).

The Court begins with its finding that Plaintiffs have pleaded a § 1 conspiracy claim, which the Court declines to narrow at this time.[2]  Accordingly, the next consideration is whether Plaintiffs have adequately alleged fraudulent concealment as to the conspiracy.  Plaintiffs allege that the illegal price-fixing, bid-rigging, and market allocation activities are "inherently self-concealing," and that Defendants concealed and pursued these activities "in a manner that precluded detection," as follows:

> Defendants also misrepresented market conditions to explain price changes and other anticompetitive conditions. For example, in their price-increase letters to Ready-Mix Concrete customers, Defendants falsely attributed price increases and fuel surcharges to changes in input costs.
>
> Defendants discussed and formed their anticompetitive agreements during secret meetings and conversations. No one other than the co-conspirators was invited to or present at these meetings or conversations. Defendants conducted these meetings and conversations in secrecy to prevent the discovery of their conspiracy by members of the Class and Subclasses.
>
> Some employees of Defendants reported to their superiors, including regional-level managers, that the antitrust violations alleged herein were occurring in the Savannah Market, Statesboro Market, Hilton Head/Bluffton Market and Charleston Market. In response, those employees were firmly told not to ever communicate about such conduct, were told that no one would believe them or that there was no evidence of such conduct, and were punished with negative job reviews or other retaliatory treatment.

(ECF No. 139 at ¶¶ 206-209).  The SAC identifies representatives of Argos USA/Argos Ready Mix, Coastal, Elite, and Evans as orchestrating the price increases, (*id.* at ¶¶ 154-155, 157-161); identifies Greg Melton of Lafarge and then Argos USA/Argos Ready Mix as monitoring the market on behalf of the conspiracy, (*id.* at ¶ 181); and identifies representatives of Lafarge, Argos USA/Argos Ready Mix, Elite Concrete, Evans Concrete, Coastal, and Thomas Entities as engaging

---

[2] As discussed above, discovery may support narrowing the temporal and/or geographical scope of the claim.  However, at this stage, the Court considers application of the statute of limitations as to the conspiracy claim as it is pleaded in the SAC.

in ongoing communications for the purpose of furthering and enforcing the conspiracy, (*id.* at ¶¶ 182, 183, 186). The Court acknowledges that the question is a close call under the affirmative acts standard set forth in *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122-25 (4th Cir. 1995), but finds that these allegations amount to more than a mere "failure to admit to wrongdoing." *Cf. Boland v. Consolidated Multiple Listing Service, Inc.*, 868 F. Supp. 2d 506, 518 (D.S.C. 2011). Accordingly, the Court finds Plaintiffs have alleged affirmative acts.

The requirement that a plaintiff exercises due diligence is measured by an inquiry notice standard, which "charges a person to investigate when the information at hand would have prompted a reasonable person to do so . . . ." *Go Computer*, 508 F.3d at 178 (citing *Brumbaugh v. Princeton Partners,* 985 F.2d 157, 162 (4th Cir. 1993)). "Where a plaintiff knows of a pattern of particular actions that a defendant has taken against him, though the pattern's precise scope might be unclear and its exact legal ramifications uncertain, the plaintiff is on inquiry notice of his claim." *Id.* at 179. Unlike in *Go Computer*, where the record reflected plaintiff's suspicions that defendants were engaged in antitrust activities, the allegations in the SAC do not indicate that Plaintiffs were in receipt of information that would have prompted a reasonable person to inquire. Rather, Plaintiffs assert that they were unaware of the alleged conspiracy until July 2017, when they learned of a federal lawsuit naming certain Defendants, which Defendants' competitors had initiated, *Southeast Ready Mix, LLC and Mayson Concrete, Inc. v. Argos North America Corp. et al.*, No. 1:17-cv-02792- ELR (N.D. Ga. July 24, 2017). (ECF No. 139 at ¶ 214).

Under the doctrine Plaintiffs wish to invoke, "'when the fraud has been concealed or is of such a character as to conceal itself,' and the plaintiff is not negligent or guilty of laches, the limitations period does not begin to run until the plaintiff discovers the fraud." *Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc.*, 71 F.3d 119, 122 (4th Cir. 1995). The allegations

in the SAC are sufficient here at the pleading stage to support fraudulent concealment under the affirmative acts standard and therefore are sufficient to invoke the equitable doctrine of tolling. *See id.* at 122-25. Defendants may renew their argument that the claim is time-barred at a later date, if appropriate.

Finally, Lafarge argues that putting aside the matter of tolling with respect to Plaintiffs' request for damages, any claim for equitable relief is barred by the doctrine of laches. (ECF No. 147-1 at 33). Lafarge asserts that "it is nonsensical for plaintiffs to ask this Court to order that Lafarge 'be restrained' from any 'conspiracy alleged herein' when the only unlawful agreement attributed to Lafarge allegedly ended in 2011." *Id.* Plaintiffs respond that it is improper for Lafarge to seek dismissal of the type of remedy Plaintiffs request where the SAC adequately states the cause of action with which the requested remedy is associated. (ECF No. 156 at 31). As stated above, the Court will allow the § 1 conspiracy claim to proceed fully intact. Accordingly, the basis for imposing the doctrine of laches is not persuasive. Moreover, because the doctrine is an affirmative defense, Fed. R. Civ. P. 8(c)(1), it is more appropriately raised on a motion for summary judgment, *Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993). Lafarge may renew its argument at a later date, if appropriate.

2. Elite Concrete

Elite Concrete argues that the actionable activity set forth in the SAC is limited to allegations that Defendants sent letters, in October 2013, setting price increases that would go into effect in 2014. Elite Concrete contends that Plaintiffs "do not describe any overt act in furtherance of the conspiracy after November 22, 2013." (ECF No. 146-1 at 6). Elite Concrete further argues that Plaintiffs "do not even identify sales by Defendants in 2014 or thereafter," and contend that the omission is significant in light of the fact that Plaintiffs have amended their pleading twice.

*Id.* Finally, Elite Concrete argues that Plaintiffs fail to adequately allege fraudulent concealment and fail to demonstrate due diligence.

The SAC states a § 1 conspiracy claim that includes Elite Concrete as a co-conspirator. Additionally, the SAC adequately alleges fraudulent concealment under the affirmative acts standard, and those allegations implicate representatives of Elite Concrete. For instance, the SAC names David Melton, representative of Elite Concrete, as participating in the price-increase letter campaign, and further alleges that Defendants used the price-increase letters to "falsely attribute[] price increases and fuel surcharges to changes in input costs." (ECF No. 139 at ¶¶ 154, 155, 207). Again, it is a close call as to whether Plaintiffs have adequately alleged fraudulent concealment but at this stage the balance tips in favor of finding that the claim was tolled. Finally, the Court disagrees with Elite Concrete that in referencing market data for the relevant time period the SAC demonstrates that Plaintiffs failed to exercise due diligence.[3] Elite Concrete may explore in discovery what market trends Plaintiffs were aware of and when.

### E.    Coastal's Motion to Dismiss

Defendant Coastal contends that the Court should limit the § 1 conspiracy claim as to Coastal to not extending beyond April 2015, because that is the month during which Coastal sold its assets to Defendant Thomas Entities, according to the SAC. (ECF No. 150 at 5). Coastal also contends that the portion of the claim dating to before April 2015 is barred by the statute of limitations because the only factual allegations implicating Defendant Coastal date to before November 22, 2013. (ECF No. 150 at 7).

---

[3] In their response to Elite Concrete's motion to dismiss, Plaintiffs assert the SAC demonstrates a "continuing violation." (ECF No. 160 at 15). In finding that Plaintiffs have alleged fraudulent concealment, the Court determines it need not pass on whether the SAC sets forth continuing violations.

Because the Court finds that Plaintiffs plead a § 1 conspiracy claim as a matter of law and declines to limit the temporal scope of the claim at this time, Coastal's first argument is unavailing. Coastal's second argument is similarly unavailing in light of the Court's finding that Plaintiffs have adequately alleged fraudulent concealment. Coastal asserts that Plaintiffs fail to satisfy the particularity requirements of Rule 9(b) "where their fraudulent concealment allegations make no reference to Coastal at all." (ECF No. 150 at 8). While the allegations specific to fraudulent concealment generally omit specific names of individuals and entities, *see* (ECF No. 139 at ¶¶ 204-218), they rely on allegations that identify Defendants' representatives. For instance, as noted above, Plaintiffs allege that Defendants "misrepresented market conditions to explain price changes and other anticompetitive conditions," and used "their price-increase letters to Ready-Mix Concrete customers [to] falsely attribute[] price increases and fuel surcharges to changes in input costs." (ECF No. 139 at ¶ 207). Plaintiffs allege that Coastal representatives participated in those price increases and created price increase letters. *See, e.g., (id.* at ¶¶ 154, 158-160). The Court construes all facts in favor of the nonmoving party. Accordingly, the Court denies Coastal's motion to dismiss.

## F.    Evans Concrete's Motion to Dismiss

Defendant Evans Concrete asserts that the Court should not exercise personal jurisdiction over it and that venue in this District is likewise improper. (ECF No. 149-1 at 1-2). With respect to personal jurisdiction, Evans Concrete argues that it lacks sufficient contacts in the state of South Carolina for the Court to exercise personal jurisdiction consistent with the requirements of due process. Evans Concrete also argues that the conspiracy theory of jurisdiction does not apply based on the facts alleged in the SAC. Additionally, Evans Concrete argues that personal jurisdiction does not lie under application of Section 12 of the Clayton Act, which is relevant to both the

question of personal jurisdiction and venue. Finally, Evans Concrete argues the SAC fails to allege facts to establish South Carolina as an available venue under 28 U.S.C. § 1391. (ECF No. 149-1).

Plaintiffs respond that the SAC "pleads a *prima facie* case establishing this Court's personal jurisdiction over Evans pursuant to the Fourth Circuit's conspiracy theory of jurisdiction"; and, furthermore, "Evans' alleged acts in furtherance of the conspiracy by themselves constitute sufficient minimum contacts with the state to establish personal jurisdiction." (ECF No. 158 at 8). Plaintiffs also assert that Section 12 of the Clayton Act confers personal jurisdiction over Evans Concrete and that venue in this District is proper.

1. Personal Jurisdiction: Due Process and Minimum Contacts with the Forum State

A federal district court can exercise personal jurisdiction over a nonresident defendant if "(1) such jurisdiction is authorized by the long-arm statute of the state in which the district court sits; and (2) application of the relevant long-arm statute is consistent with the Due Process Clause of the Fourteenth Amendment." *Universal Leather, LLC v. Koro AR, S.A.*, 773 F.3d 553, 558 (4th Cir. 2014). Due process requires that a defendant have sufficient "minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Personal jurisdiction may be exercised specifically or generally. Specific jurisdiction is based on a defendant's conduct in the state connected to the lawsuit. *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711-12 (4th Cir. 2002) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). Specific jurisdiction depends upon "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be

constitutionally 'reasonable.'" *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 397 (4th Cir. 2003). By contrast, general jurisdiction is established where the defendant's contacts with the forum state have been "continuous and systematic" so as to support jurisdiction over claims that are unrelated to those continuous and systematic contacts. *Helicopteros Nacionales*, 466 U.S. at 414.[4] Simply stated, the defendant must have "minimum contacts" with the forum. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-76 (1985).

Evans Concrete and Plaintiffs agree that the first prong of the personal jurisdiction inquiry is satisfied.[5] Evans Concrete argues that Plaintiffs cannot satisfy the second prong, that is, Plaintiffs cannot demonstrate the necessary minimum contacts between Evans Concrete and South Carolina. For support, Evans Concrete relies on the affidavit of Timothy ("Bo") Strickland, who serves as the chief executive officer of non-Defendant Evans Concrete Holdings, Inc. and as manager of Defendant Evans Concrete. *See* (ECF No. 77-2). Plaintiffs do not contest the affidavit or attestations asserted therein, but rather argue that personal jurisdiction is established pursuant to the alleged § 1 conspiracy.

The Fourth Circuit recognizes the "theory of obtaining personal jurisdiction by the showing of a conspiracy so that a conspirator not present in the forum State will, nevertheless, be adjudged to have had a personal presence in the forum State by means of adequate minimum contacts of the other conspirators therein." *Lolavar v. de Santibanes*, 430 F.3d 221, 229 (4th Cir. 2005). This theory for the exercise of personal jurisdiction requires the plaintiff to "make a threshold showing that a conspiracy existed and that the defendants participated therein." *Id.* To succeed under this

---

[4] Plaintiffs appear to concede that the Court does not have general jurisdiction over Evans Concrete.

[5] South Carolina's long-arm statute is in accord with the limits of the Due Process Clause of the United States Constitution. S.C. Code Ann. § 36-2-803; *Atlantic Soft Drink Co. of Columbia, Inc. v. South Carolina Nat'l Bank*, 336 S.E.2d 876, 878 (S.C. 1985).

theory, Plaintiffs must "make a plausible claim" (1) that a conspiracy existed; (2) Evans Concrete participated in the conspiracy; and (3) a co-conspirator's activities in furtherance of the conspiracy had sufficient contacts with South Carolina to subject that conspirator to jurisdiction in South Carolina. *Unspam Technologies, Inc. v. Chernuk*, 716 F.3d 322, 329 (4th Cir. 2013). Plaintiffs must offer more than "bare allegations" to satisfy these requirements, and must "plead with particularity the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy." *Id.* (citing *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997)).

As discussed above, the SAC meets the plausibility standard of stating a § 1 conspiracy claim. In fact, in the Joint Motion, Defendant Evans Concrete concedes that the SAC states a § 1 conspiracy claim for the period between September 2011 and December 2014. In declining to narrow the temporal or geographic scope of the claim, the Court explained in relevant part that while the allegations discussing the Charleston Market do not specifically mention Defendants Elite Concrete or Evans Concrete, these Defendants are implicated by the allegations that their representatives conspired with Pedrick, Stankwytch, and Coughlin. *See, e.g.,* (ECF No. 139 at ¶ 154). It is undisputed, at least at this stage, that these individuals represented Defendants Lafarge, Argos USA, and Coastal, and that those Defendants have minimum contacts with South Carolina. *See, e.g.,* (*id.* at ¶¶ 83-87) (discussing Defendants' Argos USA/Argos Ready Mix and Thomas Entities' presence in the Charleston Market and Hilton Head/Bluffton Market). Furthermore, the SAC alleges that the illicit agreements to fix prices and charge fees applied to customers of ready-mix concrete in the Hilton Head/Bluffton Market and the Charleston Market, as well as the Savannah and Statesboro Markets, with the result that customers in all of these markets paid "substantially more for Ready-Mix Concrete than they would have in the absence of the conspiracy

. . . ." (*Id.* at ¶¶ 152-163). Accordingly, the Court finds that Plaintiffs have demonstrated a conspiracy theory of personal jurisdiction.

The Court must also consider whether the exercise of personal jurisdiction over Evans Concrete is reasonable such that it would not offend traditional notions of fair play and substantial justice. *See Lesnick v. Hollingsworth & Vose Co.*, 35 F.3d 939, 945-46 (4th Cir. 1994) (listing considerations such as (a) burden on defendant; (b) interests of the forum state; (c) plaintiff's interest in obtaining relief; (d) efficient resolution of controversies as between states; and (e) shared interests of the several states in furthering fundamental substantial social policies). According to the SAC, Evans Concrete participated in a conspiracy in which the geographic parameters created by the location of Defendants' plants and the limitations on the distance the cement trucks could drive to make deliveries were known to the participants. *Cf. Verizon Online Services, Inc. v. Ralsky*, 203 F. Supp. 2d 601, 622-23 (E.D. Va. 2002) ("Defendants should have reasonably expected to be haled into court where their [tort] inflicted the greatest harm, and cannot avoid jurisdiction by simply pleading ignorance of the jurisdictional facts"). The Court finds in construing the factual allegations in Plaintiffs' favor, as it must, Evans Concrete knew (or should have known) that one or more of its co-conspirators was acting in South Carolina and would have had a reasonable expectation that it could be brought into the state. Accordingly, Evans Concrete is not before the Court as a result of random contacts or of unilateral activity with another party or third person, such that exercise of personal jurisdiction over Evans Concrete would be unreasonable.

In finding that it may exercise personal jurisdiction over Evans Concrete consistent with the requirements of due process, the Court declines to address whether Plaintiffs can establish personal jurisdiction as to this Defendant under Section 12 of the Clayton Act. Instead, the Court

turns to Evans Concrete's contention that venue in this District is not proper.

2.  Venue

The SAC makes general reference to 28 U.S.C. § 1391, which provides three avenues for determining the proper venue for a civil action. Relevant here, § 1391(b)(2) states that an action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."

Evans Concrete argues that venue in this District is not proper as to it because the SAC "fails to allege that any part of the events or omissions giving rise to the claims against Evans occurred in South Carolina." (ECF No. 149-1 at 16). However, for the reasons explained throughout this opinion, the Court declines to view the SAC in isolated subparts. *See SD3*, 801 F.3d at 424-25 (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 310 (2007) (explaining that "courts must consider the complaint in its entirety" to determine whether "all of the facts alleged, taken collectively," give rise to relevant inferences, rather than asking "whether any individual allegation, scrutinized in isolation, meets that standard")). *See also Phillips v. Crown Cent. Petro. Corp.*, 602 F.2d 616, 625 (4th Cir. 1979) ("'[t]he character and effect of a [Sherman Act] conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'") (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)). Plaintiffs have alleged a conspiracy that involved multiple participants across the coastal region extending from Savannah to Charleston and inland to Statesboro. Accordingly, in applying § 1391(b)(2), the Court does not focus on the alleged activities of Evans Concrete alone, as Evans Concrete is but one of the alleged co-conspirators, but on the alleged activities that give rise to the claim. While the SAC specifies meetings that

occurred in Georgia, the activities at the heart of the claim, i.e., price-fixing, market allocation, and bid rigging, occurred in Georgia *and* South Carolina. *See, e.g.,* (ECF No. 139 at ¶¶ 161-162, 169-173). Therefore, the Court finds that venue in this District is proper under 28 U.S.C. § 1391(b)(2).

## G.      Thomas Entities' Motion to Dismiss

Defendants the Thomas Entities purchased certain assets belonging to Defendant Coastal in April 2015. (ECF No. 139 at ¶¶ 26, 29). The Thomas Entities argue in their motion to dismiss that the SAC fails to allege successor liability based on the asset purchase. These Defendants further argue that Thomas Entities executed an asset purchase agreement with Coastal whereby they disclaimed liability for any violation of law Coastal may have committed prior to the asset purchase. (ECF No. 151-1). They offer an affidavit, to which the asset purchase agreement is attached. (ECF No. 151-2). Thomas Entities also argue that in any event the SAC fails to allege any communication or act tying the Thomas Entities to the § 1 conspiracy. (ECF No. 151-1).

The Court addresses first the affidavit and purchase agreement, which Thomas Entities submits is appropriate for review at this stage because the agreement is integral to the SAC. For support, the Thomas Entities assert that "Plaintiffs have relied on Thomas Concrete of South Carolina's Asset Purchase Agreement . . . by alleging, 'In 2015 Coastal sold its assets to Thomas Concrete of South Carolina, Inc. . . . ,'" (ECF No. 151-1 at 7 n.2), and because the SAC "is peppered with statements conflating Coastal and the Thomas Entities, apparently because of the asset purchase," *id.* (citing ECF No. 139 at ¶¶ 77–79, 83–88). In adjudicating a motion to dismiss, a court may consider materials not attached to the complaint when those materials are integral to and explicitly relied on in the complaint and the plaintiff does not challenge their authenticity. *Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). The Fourth Circuit has explained

35

the rationale for this exception to the rule against considering extrinsic evidence at the Rule 12(b)(6) stage as follows:

> the primary problem raised by looking to documents outside the complaint—lack of notice to the plaintiff—is dissipated "[w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint." What the rule seeks to prevent is the situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*American Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *In re Burlington Coat Factory Securities Litigation,* 114 F.3d 1410, 1426 (3d Cir. 1997)). The Court disagrees that the asset purchase agreement is integral to and relied upon by the SAC such that the Court may consider the agreement without converting the motion to dismiss into a motion for summary judgment. This action concerns the alleged violation of antitrust laws, *not* the breach or deficient drafting of the asset purchase agreement between Coastal and the Thomas Entities, or some other cause of action for which the purchase asset agreement would provide vital context. *See Goines v. Valley Comty. Servs. Bd.,* 822 F.3d 159, 166 (4th Cir. 2016) (suggesting that a relevant inquiry into whether a document is integral may include whether the complaint's "claims . . . turn on," or are "otherwise based on" statements contained in the document) (citing *Sira v. Morton,* 380 F.3d 57, 67 (2d Cir. 2004) ("reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint"); *Smith v. Hogan*, 794 F.3d 249, 255 (2d Cir. 2015) (document with "no independent legal significance to [plaintiff's] claim" was not integral to complaint)). *Cf. Blankenship v. Manchin*, 471 F.3d 523, 524 n.1 (4th Cir. 2006) (explaining that review of a newspaper article not attached to the complaint was appropriate in action for violation of First Amendment right to free speech because the article quoted and gave context to the language that

comprised the heart of the free speech claim). The Thomas Entities can argue the substance of the asset purchase agreement on a motion for summary judgment.

The Thomas Entities further argue that the SAC fails to adequately allege successor liability and fails to connect the Thomas Entities with any wrongdoing. (ECF No. 151-1 at 11-16).[6] However, the Court is tasked with viewing the factual allegations in a light most favorable to Plaintiffs, and Plaintiffs allege that Coastal merged into and/or was subsumed by the Thomas Entities. *See, e.g.,* (ECF No. 139 at ¶¶ 26, 29, 30). Plaintiffs also allege that none of the alleged antitrust activity changed once Thomas Entities controlled Coastal; and rather that the alleged business of price fixing, bid rigging, and market allocation continued as usual, specifically through the direction of Tim Coughlin and with the help of Tim Mahoney. (*Id.* at ¶¶ 141, 143, 146, 182). The Court finds that the SAC states a § 1 conspiracy claim as to all Defendants, including Thomas Entities.

## CONCLUSION

After careful consideration of the Parties' briefs, the associated record, and the applicable law, the Court hereby denies the motions to dismiss (ECF Nos. 146, 147, 148, 149, 150, 151).

**IT IS SO ORDERED.**

/s/Bruce H. Hendricks
Hon. Bruce Howe Hendricks
United States District Judge

September 19, 2019
Charleston, South Carolina

---

[6] The Thomas Entities contend that Delaware law controls the asset purchase agreement and therefore governs the question of successor liability but assert that in any event the outcome is the same under South Carolina law. (*Id.* at 11 n.5). The Court need not resolve the issue at this time.